**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **RÜMEYSA ÖZTÜRK,** | |
| *Petitioner*, | Civil Action No. 1:25-cv-10695-DJC |
| v. | |
| **DONALD J. TRUMP,** et al., | Motion for leave to file excess pages granted on April 2, 2025. |
| *Respondents*. | |

<u>**PETITIONER'S REPLY IN SUPPORT OF HER AMENDED PETITION**</u>

**INTRODUCTION**

Even before Ms. Öztürk's evening arrest in Massachusetts, ICE had "determined" that she would be removed from the state and held in Louisiana. D.E. 19-1 ¶ 6. Yet for approximately 22 hours after Ms. Öztürk's arrest—including more than 17 hours after Ms. Öztürk's counsel had alerted government counsel of this habeas petition and more than 16 hours after this Court ordered that Ms. Öztürk not be moved out of Massachusetts in order to "preserve the status quo," D.E. 3 ¶ 3—Ms. Öztürk's counsel was kept in the dark about her client's whereabouts as ICE quickly and quietly moved her to three separate locations in three different states on her way to Louisiana. ICE's deliberate and secretive hopscotch approach is an unlawful attempt to game the system. This Court should assume jurisdiction over this matter and grant Ms. Öztürk's petition, or at the least, transfer the petition to the District of Vermont.

**FACTUAL BACKGROUND**

**I.        Ms. Öztürk is a cherished member of the Tufts community.**

Ms. Öztürk is a Turkish PhD student in Eliot-Pearson Child Study and Human Development at the Tufts Graduate School of Arts and Sciences. She received her master's degree in developmental psychology from Teachers College at Columbia University, where she

was a Fulbright scholar. In her department's own words, Ms. Öztürk is "compassionate, service-minded, and principled individual" and a student "upon whom [the] department has come to depend." **Exhibit 1**, Rossman Decl. (Rossman), Exhs. 1-A, 1-U. Her commitment to the Tufts community includes serving as a teaching assistant, facilitating campus events hosted by her department and the Muslim Students Association, and fostering interfaith dialogue. *Id.*, Exhs. 1-U, 1-K, 1-B. "Her absence has left a profound void" in the Tufts community. *Id.*, Exh. 1-A.

On March 26, 2024, Ms. Öztürk co-authored an op-ed published in *The Tufts Daily*, which criticized the Tufts' administration's response to the Tufts Community Union Senate's passage of several resolutions concerning human rights violations in Gaza.[1] The op-ed argued the resolutions "were the product of meaningful debate and represent a sincere effort to hold Israel accountable for clear violations of international law."[2] The op-ed urged Tufts to "trust in the Senate's rigorous and democratic process" and "meaningfully engage with and actualize the resolutions passed by the Senate."[3] In February 2025, Canary Mission published a profile on Ms. Öztürk, claiming that she "engaged in anti-Israel activism in March 2024 . . . ." D.E. 12 at 17. Its sole support for this contention was a link to the March 2024 *Tufts Daily* op-ed. *Id.*

## II.    ICE arrested and secretly transferred Ms. Öztürk to Louisiana.

On March 25, 2025, at approximately 5:15 p.m., plainclothes officers arrested Ms. Öztürk outside of her Somerville apartment. Video footage of the arrest shows that Ms. Öztürk screamed in fear as a hooded officer grabbed her wrists while another officer, who later covered

---

[1] Rumeysa Ozturk et al., *Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions*, THE TUFTS DAILY (Mar. 26, 2024), https://www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj.
[2] *Id.*
[3] *Id.*

his face, took her phone.[4] A total of six officers ultimately surrounded Ms. Öztürk, restrained her hands behind her back, and placed her in an unmarked vehicle.

ICE ERO's Boston Field Office in Burlington, Massachusetts, which is responsible for all of New England, typically books people who are arrested on civil immigration charges in Massachusetts in a process that takes several hours. **Exhibit 3**, Yountz Decl. (Yountz) ¶¶ 10, 12; **Exhibit 4**, Fisher-Pinkert Decl. (Fisher) ¶ 5; **Exhibit 6,** Moran Decl. (Moran) ¶ 5. The HSI office in Boston can also process people arrested in eastern Massachusetts by HSI or by CBP. Yountz ¶ 10; Fisher ¶ 5. When ICE pursues detention, the person is typically held in Burlington for at least 12 hours—and generally 24-48 hours—before any transfer occurs. Yountz ¶ 12.

Here, however, Ms. Öztürk was not taken to either Burlington or the HSI office in Boston. Instead, ICE transported Ms. Öztürk to an undisclosed location in Methuen, Massachusetts for an undisclosed reason. D.E. 19-1 ¶ 11. ICE held Ms. Öztürk in Methuen for just 14 minutes before transporting her across the border to another undisclosed location tin Lebanon, New Hampshire, for another undisclosed reason. D.E. 19-1 ¶¶ 11-12. Once Ms. Öztürk was removed from Massachusetts, she was held in New Hampshire for close to 2 and a half hours before ICE again placed her in a van and began driving to Vermont at approximately 9:03 p.m. D.E. 19-1 ¶¶ 11-12. The number and location of these transfers, as well as their highly condensed time frame, is highly unusual. Yountz ¶¶ 11,14; Fisher ¶ 7; **Exhibit 8,** Diaz, ¶ 8.

Ms. Öztürk was still in the van at 10:02 p.m. when her counsel filed a habeas petition on her behalf, and immediately alerted government counsel. D.E. 19-1 ¶212-13; **Exhibit 2**, Mahsa Khanbabai Decl. (Khanbabai) ¶¶ 2-3. The emergency clerk similarly alerted government

---

[4] WCVB Channel 5 Boston, *Surveillance shows Tufts graduate student detained*, YOUTUBE (Mar. 26, 2025), https://www.youtube.com/watch?v=PuFIs7OkzYY.

counsel. Khanbabai ¶ 3. ICE admits that ICE officials "obtained Petitioner's counsel's contact information through the filing of the instant habeas petition[.]" D.E. 19-1 ¶ 20. Yet no one told Ms. Öztürk's counsel when Ms. Öztürk arrived at the ICE Field Office in St. Albans, Vermont, at 10:28 p.m. D.E. 19-1 ¶¶ 12-13; Khanbabai ¶ 22. In fact, no one told Ms. Öztürk's counsel that Ms. Öztürk was in Vermont for the more than seven hours that she was held in that state, before she was flown to Louisianna at 5:31 a.m. D.E. 19-1 ¶¶ 13, 16-17; Khanbabai ¶ 22.

This movement and lack of notice occurred despite the Court's 10:55 p.m. order on Tuesday night that required the government not to move Ms. Öztürk out of Massachusetts without providing at least 48 hours' notice, to "preserve the status quo". D.E. 2, 3. At 10:59 p.m, Ms. Öztürk's counsel emailed government counsel this order, who also received notice from the emergency clerk. Khanbabai ¶¶ 4-5. In response, ICE neither returned Ms. Öztürk to Massachusetts nor notified the Court, Ms. Öztürk's counsel, or government counsel, that Ms. Öztürk was in Vermont. Instead, 5 and a half hours after this order, ICE placed Ms. Öztürk on a multiple flights to get her to Louisiana without notifying the Court, Ms. Öztürk's counsel, or government counsel. Khanbabai ¶ 10-14, 22.

For almost ten additional hours after Ms. Öztürk's flight left Vermont, ICE continued to keep her location a secret, despite numerous efforts from multiple people to learn her whereabouts. Ms. Öztürk's counsel repeatedly contacted ICE ERO and ICE HSI but received no response. Khanbabai ¶ 6. She repeatedly checked ICE's Online Detainee Locator System, but Ms. Öztürk's "current detention facility" field remained blank. Khanbabai ¶ 7. She repeatedly asked the government attorneys assigned to the case about Ms. Öztürk's whereabouts, to no avail. Khanbabai ¶ 9-14. The Turkish consulate personally went to the ICE office in Burlington, Massachusetts, but was told that ICE could not provide any information about Ms. Öztürk's

location other than the fact that she was not at that facility. Khanbabai ¶ 8. It was not until 3:27 p.m. on Wednesday afternoon, approximately 22 hours after Ms. Öztürk's arrest, that Ms. Öztürk's counsel received an email from government counsel that ICE had "informed" them that Ms. Öztürk had been moved to Louisianna. Khanbabai ¶ 14.

ICE states that it decided that Ms. Öztürk would be transferred to Louisiana even before she was arrested because it had "determined there was no available bedspace for [her] at a facility where she could appear for a hearing" in New England. D.E. 19-1 ¶ 6. Yet ICE provides no explanation of, or support for, how it reached this "determin[ation]." Plymouth County Correctional Facility in Massachusetts, Wyatt Detention Facility in Rhode Island, Stafford County Correctional Facility in New Hampshire, Cumberland County Jail in Maine, Chittenden Regional Correctional Facility in Vermont, and ICE's Buffalo Facility in Batavia, New York can all hold women detained by ICE. Yountz ¶¶ 8-9; Fisher ¶ 6.  There is no indication that ICE communicated with any of these facilities to determine whether they had bedspace available for Ms. Öztürk. To the contrary, it seems ICE either did not communicate with these facilities or ignored what it heard. For example, it appears that the Cumberland County Jail had at least 16 open beds on March 25 and March 26, 2025 **Exhibit 5**, Anna R. Welch Decl. ¶ 7-12.

### III.    Ms. Öztürk's arrest and detention, as well as the termination of her visa and student status, are part of a policy intended to silence and chill the speech of students and scholars who advocate for the rights of Palestinians.

Ms. Öztürk's arrest and detention, and the termination of her visa and her student status, are part of an effort by the Trump administration to silence and chill speech supportive of the rights of Palestinians and critical of Israel's war in Gaza, especially on university campuses. Opponents of such speech, including President Trump, have mischaracterized such speech as inherently supportive of Hamas and antisemitic. Thus, on the campaign trail, President Trump promised to "terminate the visas of all of those Hamas sympathizers, and . . . get them the hell

out of our country," and stated that foreign students would "behave" because "any student that protests, I throw them out of the country." D.E. 12 ¶¶ 38-43.

In January 2025, President Trump signed two Executive Orders to begin to fulfill his campaign promise of chilling speech in support of Palestinians. First, Executive Order 14161states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." With regard to noncitizens already in the United States, it declares the need to "ensure" that they "do not . . . advocate for, aid, or support designated foreign terrorists and other threats to our national security."

Second, Executive Order 14188, entitled "Additional Measures to Combat Anti-Semitism," declares the "policy of the United States to combat anti-Semitism vigorously." In a fact sheet,[5] the White House promised "[i]mmediate action" to "investigate and punish anti-Jewish racism in leftist, anti-American colleges and universities." The sheet framed the order as a "promise" to "Deport Hamas Sympathizers and Revoke Student Visas." It quoted the President to say to noncitizens "who joined in the pro-jihadist protests" that the government "will find you, and . . . deport you." The President promised to "quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."[6]

On March 6, 2025, Secretary Rubio posted to X: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists." D.E. 12 ¶ 48.

In early March 2025, the Trump administration began targeting students who had spoken in support of Palestinians for visa revocation, removal, and arrest and detention. On March 7,

---

[5] Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism, THE WHITE HOUSE (Jan. 30, 2025).

DHS agents attempted to arrest a Columbia doctoral student who had posted on social media and signed open letters related to Israel's war in Gaza. D.E. 12 ¶ 53. DHS released a statement characterizing her as being "involved in activities supporting Hamas. *Id.* In the ensuing days and weeks, ICE has continued to target students and scholars engaged in activism, including by arresting Mahmoud Khalil and Dr. Badar Khan Suri, and promptly sending both to Louisiana detention facilities, D.E. 12 ¶¶ 54-57, and by unsuccessfully attempting to detain Yunseo Chung before a court temporarily prohibited it.[7]

### IV.    Ms. Öztürk's amended habeas petition and complaint asserts claims under the First Amendment, the Due Process Clause, and the Administrative Procedure Act.

Ms. Öztürk filed an amended habeas petition and complaint on March 28, 2025. The petition asserts claims under the First Amendment, the Due Process Clause, and the Administrative Procedure Act, and seeks bail pending adjudication.

First, the petition raises a claim that the government's policy targeting noncitizens who advocate for the rights of Palestinians, and its arrest and detention of Ms. Öztürk under that policy, violates the First Amendment. Noncitizens are entitled to First Amendment protection. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Moreover, "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Because the government targeted Ms. Öztürk for arrest and detention due to her viewpoints, it violated the

---

[7] Jaclyn Diaz, *What we know about the case of detained Georgetown professor Badar Khan Suri*, NPR (Mar. 21, 2025), https://www.npr.org/2025/03/21/nx-s1-5336173/immigration-georgetown-university-professor. Dr. Suri was later sent to Texas.

First Amendment. *Bello-Reyes v. Gaynor*, 985 F.3d 696, 698 (9th Cir. 2021); *Ragbir v. Homan*, 923 F.3d 53, 70 (2d Cir. 2019), *cert. granted, remanded, and vacated sub nom. on other grounds*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020); *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 921 (W.D. Tex. 2018).

Second, the petition challenged the legality of Ms. Öztürk's detention under the Due Process Clause. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The Due Process Clause prohibits detention "unless . . . ordered in a criminal proceeding with adequate procedural protections, or, in certain special and narrow nonpunitive circumstances where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* (emphasis removed) (citations and internal quotation marks omitted). Because an individual's liberty interest is so significant,[8] due process limits the permissible reasons for detention, which must be "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690; *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). The Due Process Clause also requires that a noncitizen's actual detention bear some "reasonable relation" to these permissible nonpunitive purposes, which in the immigration context are to ensure a noncitizen's appearance in connection with the removal process and protect the community. *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972); *Zadvydas*, 533 U.S. at 690-91; *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring) (detention may not be to "incarcerate for other reasons"). Ms. Öztürk's arrest and detention under the government's policy targeting noncitizens who advocate for the rights of Palestinians to punish

---

[8] *Fernandez v. Trias Monge*, 586 F.2d 848, 855 (1st Cir. 1978) ("[D]eprivation of physical liberty is an intolerable affront to our most fundamental notions of Justice[.]").

and chill speech is not reasonably related to any permissible government purpose, and violates the Due Process Clause.

Third, the petition raised a claim under the APA. This claim challenges the government's policy of targeting noncitizens based on their expression of viewpoints favorable to the rights of Palestinians, and the revocation of Ms. Öztürk's student status—which cited the Foreign Policy Ground at 8 U.S.C. § 1227(a)(4)(C)(i)—as arbitrary and capricious and contrary to law.

Fourth, the petition seeks bail pending adjudication. The Supreme Court and the First Circuit, and the government's brief, have recognized this Court's inherent judicial authority to release a petitioner *pendente lite*. *See, e.g.*, *Ex Parte McCardle*, 74 U.S. 506, 508 (1868); *Aronson v. May*, 85 S. Ct. 3, 4-5 (1964); *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972); D.E. 19 at 25-26. Releasing Ms. Öztürk during the pendency of this petition is appropriate in light of substantial claims raised and the extraordinary circumstances of this case.

## ARGUMENT

**I.    This case should proceed in the District of Massachusetts, but if the Court disagrees, transfer to the District of Vermont would be appropriate.**

Even taking as true the government's factual assertions, the petition in this case was filed while Ms. Öztürk was not at a detention facility but in a vehicle fully within the control of the Massachusetts-based ICE respondents named here—which include the heads of ICE operations in New England—and as the government was taking unusual steps to move Ms. Öztürk out of Massachusetts quickly. D.E. 19-1 at ¶ 12-13; Khanbabai Decl; Yountz Decl. After the filing of the Petition, ICE ignored a Court order seeking to preserve the "status quo" and requiring notice if Ms. Öztürk were transferred out of Massachusetts. Respondents also failed to inform the Court, while preventing counsel from learning Ms. Öztürk's whereabouts and Ms. Öztürk from

contacting counsel until she was in Louisiana. Under these circumstances, venue is proper in

Massachusetts. If the Court disagrees, it should at most transfer the case to Vermont.

**Venue over Ms. Öztürk's petition is proper in Massachusetts.**

Habeas is the most "adaptable" remedy in American law. *Boumediene v. Bush*, 553 U.S.

723, 779 (2008). And as the critical exceptions to the default habeas jurisdictional rules in

*Rumsfeld v. Padilla,* 542 U.S. 426 (2004), suggest, it simply cannot be that the government may

detain a person, keep their counsel, family, and friends from knowing where they are being held,

look on as that counsel timely files a habeas petition challenging their unlawful detention in the

only place the detainee was known to be, move the detainee 1000 miles away, and end up in the

venue the government intended to manufacture all along.

There is no dispute that the "default rule" in habeas cases is "that the proper respondent is

the warden of the facility where the prisoner is being held" at the time the petition was filed. *Id.*

at 435–36, 442. In *Padilla*, the Supreme Court interpreted that language to mean the person

"with the power to produce the body of such party before the court or judge." *Id.* at 435.[9] But the

Court in *Padilla* also made clear that, in rare but important cases, the default rule would not

apply. 542 U.S. at 452 (Kennedy, J., concurring); *see also Khalil v. Joyce (Khalil D.N.J.)*, 2025

WL 972959, at *20 (D.N.J. Apr. 1, 2025); *accord Khalil v. Joyce (Khalil S.D.N.Y.)*, No. 25 Civ.

1935, 2025 WL 849803, at *13 (S.D.N.Y. Mar. 19, 2025).[10]

All four of the *Padilla* exceptions apply here. First, the unknown custodian exception

---

[9] The government spends much of its brief arguing that courts in this Circuit apply the immediate
custodian and district of confinement rules. ECF 19 at 7–13. But Petitioner does not take issue
with how those rules apply in ordinary cases.

[10] Historically, the writ of habeas has been about principles, not rules, and was never intended to
depend on technicalities that could easily be abused by the executive to restrict relief. *See*
Stephen I. Vladeck, *The New Habeas Revisionism*, 124 Harv. L. Rev. 941, 948 (2011); *see also*
*Holiday v. Johnston*, 313 U.S. 342, 350 (1941).

applies. "[I]t is impossible to apply the immediate custodian and district of confinement rules" "when . . . a prisoner is held in an undisclosed location by an unknown custodian." *Padilla*, 542 U.S. at 450 n.18 (cleaned up) (discussing *Demjanjuk v. Meese*, 784 F.2d 1114 (D.C. Cir. 1986)); *see Khalil D.N.J.*, 2025 WL 972959, at \*28-30 (calling the "unknown custodian exception" "the law of the land" and citing cases showing that "the lower federal courts have consistently embraced the unknown custodian exception to the immediate custodian rule"); *see United States v. Moussaoui*, 382 F.3d 453, 465 (4th Cir. 2004). At the time Ms. Öztürk filed her petition, her lawyers had no way to know where she was—other than that she was detained by hooded, plainclothes ICE officers in Somerville. D.E. 12 ¶ 19. Her lawyers acted swiftly to file a petition challenging her detention in the only place that they could reasonably file it. And likewise, this Court promptly acted to preserve its jurisdiction over that petition. D.E. 3. This exception is consistent with *Padilla*, 542 U.S. at 450 n.18; *Khalil D.N.J.*, 2025 WL 972959, at \*28–29, as well as the habeas pleading statute, which contemplates this very situation—filing a petition when a detainee's custodian is unknown, *see* 28 U.S.C. § 2242.[11] It is also consistent with Judge Farbiarz's decision in *Khalil*. *See* 2025 WL 972959, at \*30 (believing petitioner was in New York, and "because no phone calls were allowed" to "undo the impression," unknown custodian exception applied); *Demjanjuk*, 784 F.2d at 1115 (applying exception where detainee was held in a "confidential" location).

---

[11] *See United States v. Moussaoui*, 382 F.3d 453, 465 (4th Cir. 2004) (where "immediate custodian" is "unknown," "the writ is properly served on the prisoner's ultimate custodian"); *United States v. Paracha*, 2006 WL 12768, at \*6 (S.D.N.Y. Jan. 3, 2006), *aff'd*, 313 F. App'x 347 (2d Cir. 2008) (similar); *Ali v. Ashcroft*, 2002 WL 35650202, at \*3 (W.D. Wash. Dec. 10, 2002); *see also* 28 U.S.C. § 2242 (at the pleading stage, requiring the naming of a petitioner's warden "if known"); Hertz & Liebman, 1 Federal Habeas Corpus Practice & Procedure § 10.1 (7th ed. 2015) ("The 'immediate custodian' rule . . . is inapplicable . . . where the prisoner's current whereabouts are unknown.").

By itself, the unknown custodian exception defeats the government's arguments that this Court lacks jurisdiction. The exception explains why the government's arguments that the Court dismiss Ms. Öztürk's petition because it "named improper respondents," D.E. 19 at 11-12, and it was filed in the wrong district, D.E. 19 at 12-13, are wrong. Her lawyers could not have known that she was not in Massachusetts when they filed the petition, and they reasonably believed she was there at that time.[12] Ms. Öztürk could not correct that impression, either, because she was not permitted to contact her lawyers, despite repeated requests. Öztürk Decl. ¶ 6. And they could not have known that they had to name "her immediate custodian in Vermont when the petition was filed" because ICE's efforts to withhold her location and prevent her from contacting counsel ensured that counsel remained unaware that she was in Vermont at all.

Moreover, even applying the immediate custodian rule, the petition was properly filed against Respondent Hyde, who is located in Massachusetts. Hyde and the New England Field Office took custody over Ms. Öztürk at the time of her arrest in the early evening of March 25 and never relinquished it until she stepped off a plane in Alexandria, Louisiana, almost 21 hours later. Wesling Decl. ¶¶ 4–18. At the time the habeas petition on her behalf was filed, she was not in a facility with a superintendent, but in a vehicle being moved around between different locations in New England. Under longstanding immediate custodian first principles, at all times before Ms. Öztürk's arrival in Louisiana, the New England Field Office Director—Respondent Hyde—was the one who could, at the command of this Court or another, "produce the body . . .

---

[12] The government's theory would suggest that lawyers seeking to increase the odds they file petitions in the "right" districts amidst government efforts to quickly transfer people to far-away jurisdictions might try to file in multiple places, just to be safe. But as Judge Farbiarz pointed out, that approach "might . . . be[] in some tension with the lawyer's professional obligations." DNJ Op. 43 n.26. Here, Ms. Öztürk's lawyers did all they could have possibly done to learn the location of their client. D.E. 12 ¶¶ 25-39.

before the court." *Padilla*, 542 U.S. at 435 (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885)); *see also Rasul v. Bush*, 542 U.S. 466, 478–79 (2004). Here, all existing evidence points to Hyde as the actual immediate custodian and true warden in this case, including during periods after the habeas petition was filed. That distinguishes this case from others involving the common scenario of habeas petitioners held in long-term detention by a contract warden.

Second and third, "the Government was not forthcoming with respect to the identity of the custodian and the place of detention," and "there is an indication that he Government's purpose in removing" Ms. Öztürk was "to make it difficult for [her] lawyer to know where the habeas petition should be filed" and *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring).[13] Here, the government moved Ms. Öztürk from Somerville, Massachusetts, to Methuen, Massachusetts (for 14 minutes), to Lebanon, New Hampshire (for less than 180), and on to St. Albans, Vermont, in the course of under five hours. Wesling Decl. ¶¶ 10–13. It gave no justification for all of these moves, and the government conspicuously omits any mention (let alone details) about where or why Ms. Öztürk was taken in those places. What's more, on the evening of her arrest, Ms. Öztürk's lawyers made numerous attempts to locate her, and she made numerous attempts to reach counsel. Khanbabai ¶ 6-7; **Exhibit 7**, Öztürk Decl. ¶ 6. As ICE admits, it obtained counsel's contact information through the filing of her habeas petition on the night of her arrest but gave that contact information to officials *in Louisiana* once she arrived at her final detention location, ensuring that Ms. Öztürk would be unable to contact counsel until she was

---

[13] The *Padilla* majority—again, of which both Justice Kennedy and Justice O'Connor formed a crucial part—twice emphasized that Justice Kennedy's proposed exception had not been met in the case before the Court. *See* 542 U.S. at 435–36 (majority op.) ("No exceptions to this rule, either recognized or proposed, apply here." (cleaned up)); *id.* at 441–42 ("There is no indication that there was any attempt to manipulate behind Padilla's transfer—he was taken to the same facility where other al Qaeda members were already being held, and the Government did not attempt to hide from Padilla's lawyer where it had taken him.").

outside of New England. DE 19-1 ¶ 20. This is precisely the kind of scenario that Justice Kennedy was worried about in *Padilla*—and why he explained that, in such cases, "habeas jurisdiction would be in the district court from whose territory the petitioner had been removed." 542 U.S. at 454.

And fourth, under *Ex Parte Endo*, 323 U.S. 283 (1944), the government may not deprive a court of habeas jurisdiction by moving them out of a district. *See Khalil D.N.J.*, 2025 WL 972959, at *20–24 (discussing widespread consensus understanding of "the *Endo* Rule"). "The objective of habeas relief," the Supreme Court held, "may be in no way impaired or defeated by the removal of the prisoner from the territorial jurisdiction of the District Court." *Endo,* 323 U.S. at 307 (cleaned up). That is what the government is attempting to do here and what it sought to do in moving Ms. Öztürk after an order intended to "preserve the status quo." DE 3 ¶ 3.

The government argues that "there are no extraordinary circumstances that make appropriate the naming of supervisory officials as respondents to this action or that ground jurisdiction with this Court." D.E. 19 at 13. And it maintains that all of the government's transfers of Ms. Öztürk were done of out "operational necessity." *Id.* While the Court should not credit the assertion regarding ICE's purposes made by a declarant with no apparent personal knowledge of them, D.E. 19-1 ¶ 1-6, the "unknown custodian rule" does not even implicate the government's reasons for transferring Ms. Öztürk, and it can and should be applied regardless of why the government maintains she needed to be moved three times in less than three and a half hours between three different states. Ms. Öztürk's lawyers did not know who was detaining her or where, but they reasonably filed here, the last place she was known to have been, after making multiple failed efforts to get information from the government concerning her whereabouts.

Second, it does not require any finding of "bad faith," D.E. 19 at 14, to apply the two exceptions addressed in Justice Kennedy's *Padilla* concurrence. As to one, "the Government was not forthcoming with respect to the identity of the custodian and the place of detention," 542 U.S. at 454—period. And as to the other, all Justice Kennedy suggested was required was "an indication" that the government's purpose was somehow related to making it difficult for a lawyer to file a petition in the right place. Even without a finding of bad faith, there is at least an indication that the government's movements of Ms. Öztürk were connected to her lawyers' ability to file a habeas petition. Those movements were highly unusual, fleeting, and apparently involved transfer to facilities that do not serve as regular ICE detention centers. Yountz Decl. The "indications" Justice Kennedy was looking for in *Padilla* are more than present.

Third, the government points to other cases to show these exceptions should not apply here, but all its discussion does is make clear that none of those cases are like this one. In *Vasquez v. Reno*, 233 F.3d 688 (1st Cir. 2000), the petitioner was in Louisiana for at least six months before he filed a habeas petition in Massachusetts against the Attorney General (on the same theory that was rejected a year later in *Padilla*). *See* Pet. for Cert. at *3–4, *Vasquez v. Att'y Gen.*, 2001 WL 34125049 (U.S. Mar. 8, 2001); *Padilla*, 542 U.S. at 435 ("[L]ongstanding practice confirms that in habeas challenges to present physical confinement[,] . . . the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official.").[14] Moreover, the First Circuit in *Vasquez* made clear that it could "envision that there may be extraordinary circumstances in which" the immediate custodian rule might not apply, and that an "example of an extraordinary

---

[14] Because *Padilla* post-dates *Vasquez*, neither the petitioner nor the First Circuit had any occasion to discuss the exceptions.

circumstance might be a case in which the INS spirited an alien from one site to another in an attempt to manipulate jurisdiction"—a case like this one. *Id.* at 696 (citing *Padilla* exceptions).

Next, the government makes much of language in *Ruvira-Garcia v. Guadian*, 2020 WL 1983875 (N.D. Ill. Apr. 17, 2020), but in that case, a woman detained in Texas for almost a month filed a habeas petition in Illinois—where she had never been detained, but where she had "reside[d] and where she litigated her immigration status." *Id.* at *2. She did not raise the *Padilla* exceptions at all. In *Fuentes v. Choate*, 2024 WL 2978285 (D. Colo. June 13, 2024), the court rejected (as the government acknowledges) any argument that "inconvenience" could justify departure from the immediate custodian rule. *Id.* at *10. And the court rejected invocation of the *Padilla* exceptions because rather than any indications of interference with a lawyer's proper filing, the petitioner had been moved after a suicide attempt to the same hospital where she had received treatment for a previous suicide attempt and where the government could "ensure[ that she] receive[d] the proper level of medical care." *Id.*

The government also invokes Judge Furman's opinion in *Khalil S.D.N.Y.*, 2025 WL 849803, but that is no help to it, either. Judge Furman examined the transfer of Mahmoud Khalil from New York City, where he was arrested, to New Jersey the following morning. *Id.* at *8. There, Judge Furman explained why he found that the evidence "f[e]ll short" of that justifying the invocation of a *Padilla* exception, because his "own experience" showed that transfers of immigration detainees from New York to New Jersey were "far from anomalous." *Id.* at *8.

\* \* \*

The extraordinary circumstances surrounding Ms. Öztürk's multiple transfers more than justify invoking one or all of the exceptions to the immediate custodian and district of confinement rules in *Padilla* and finding that this Court has habeas jurisdiction over her petition.

**If the Court determines that this is not the proper venue for Ms. Öztürk's     petition, it should transfer the petition to the District of Vermont.**

If the Court does not agree that the extraordinary circumstances presented in this case justify the kind of departure from the immediate custodian and district of confinement rules contemplated by both the majority and the concurring Justices in *Padilla*, it should transfer this case to Vermont, where Ms. Öztürk was detained at the time her lawyers filed her petition.

The government argues that the Court should instead dismiss the petition, "because any receiving court, like this Court, would lack jurisdiction to consider Petitioner's claim of unlawful arrest and detention and to provider her requested relief." D.E. 19 at 26–27. But in a case almost on all fours with this one, decided just yesterday, Judge Farbiarz thoroughly rejected that exact argument. In *Khalil*, the court determined that the District of New Jersey had jurisdiction over a habeas petition filed mistakenly in New York while the petitioner was in New Jersey. The court's analysis makes clear why, if this Court were to transfer this petition, Vermont would be the proper transferee district. *See Khalil D.N.J.*, 2025 WL 972959, at *14–20.

One of the federal transfer statutes, 28 U.S.C. § 1631, not only empowers, but requires, the Court to transfer a case "to cure want of jurisdiction" where transfer is "in the interest of justice." Under that statute:

> Whenever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action . . . could have been brought at the time it was filed or noticed, and the action . . . shall proceed as if it had been filed in . . . the court to which it is transferred on the date upon which it was actually filed in . . . the court from which it is transferred.

*Id.* (emphasis added); *see also* 28 U.S.C. § 1404(a) (permitting transfer "in the interests of justice"); 28 U.S.C. § 1406(a) (same). Section 1631 applies to habeas petitions. *Khalil D.N.J.*, 2025 WL L972959, at *16–17; *see Quinn-Goncalves v. ICE Field Office*, No. 24-cv-10653, 2024

17

WL 2024 WL 1159213 (D. Mass. Mar. 15, 2024) (transferring habeas petition to District of New Hampshire pursuant to 28 U.S.C. § 1631). As Judge Farbiarz explained, Section 1631 "work[s] as a kind of time machine," allowing one court to transfer a case to another district "as if it had been filed" in the transferee court to begin with. *Khalil D.N.J.*, 2025 WL L972959, at \*15.[15]

It would plainly be "in the interests of justice" to transfer this case to Vermont instead of dismissal. In *Khalil S.D.N.Y.*, Judge Furman transferred a petition from New York to New Jersey after concluding that justice would be served by transfer instead of dismissal, because the latter would have meant "litigating far from [the petitioner's] lawyers, from his eight-months-pregnant wife, and from the location where most (if not all) of the events relevant to his petition took place," and because his "lawyers filed the Petition in [the S.D.N.Y.] based on a good-faith and reasonable belief that he was then detained [t]here." 2025 WL 849803, at \*12. The same is true here. Moreover, this record contains evidence that when Ms. Öztürk was in Vermont, ICE made efforts to ensure her counsel would not know where she was. Here too, Ms. Öztürk's lawyers and community are located in New England, and the events relevant to her petition took place here. Because transfer to Vermont would serve the interests of justice, transfer there is mandatory (assuming this Court believes it lacks habeas jurisdiction). *See* 28 U.S.C. § 1631 ("shall").

Finally, the government asks for dismissal but suggests that if the Court does not dismiss the petition, it can and should transfer the petition to Louisiana. D.E. 19 at 26–28. But transfer to Louisiana is not possible. Under all three transfer statutes, cases can only be transferred to places where they "could have been brought" (28 U.S.C. §§ 1631, 1406(a)) or "might have been brought (28 U.S.C. § 1404(a)). That key phrase means "the situation which existed when suit

---

[15] Judge Farbiarz made clear that in situations like this, subject matter jurisdiction is "irrelevant" 2025 WL 972959, at \*16, \*6 n.12. And Section 1631 can cure an absence of personal jurisdiction, should the Court doubt that the District of Vermont has jurisdiction. *Id.* at \*16–18.

was instituted." *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960). The government might argue that the phrase "'where it might have been brought' should be held to relate not only to the time of the bringing of the action, but also to the time of the transfer." *Id.* at 342. But long ago, the Supreme Court forcefully rejected that interpretation: that language cannot "be interpreted to mean . . . 'where it may now be rebrought, with defendants' consent.'" *Id.* at 342–43. By the plain terms of the transfer statutes, transfer to the Western District of Louisiana is improper because, at the time of filing, Ms. Öztürk could not have brought the petition there—under the government's own argument here—because she was not physically in Louisiana nor detained by a warden in Louisiana. She was, instead, in Vermont.

## II.      This Court has jurisdiction to review Ms. Öztürk's claims.

## 8 U.S.C. § 1252(b)(9) does not bar review.

Section 1252(b)(9) poses no obstacle to this Court's review. That provision channels review of "all questions of law and fact, . . . arising from any action taken or proceeding brought to remove an alien from the United States . . . " into Petitions for Review ("PFR"). Under *Jennings* and subsequent Supreme Court and First Circuit precedent, the critical issue is whether the PFR process provides adequate relief. 583 U.S. at 293 (plurality). *Jennings* endorsed a narrow reading of "arising from" and explained that (b)(9) does not channel review into the PFR process where doing so would make claims "effectively unreviewable" and the allegedly unlawful conduct "would have already taken place." *Id*. Section 1252(b)(9)'s "targeted language" is "narrow." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020).

The rule after *Jennings* is simple: "When a detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for review of a final order of removal, § 1252(b)(9) does not bar consideration by a district court." *E.O.H.C. v. Sec'y, DHS*, 950 F.3d 177, 180 (3d Cir. 2020). This principle applies with full force in this case. Petitioner challenges her

retaliatory arrest and detention, which is currently chilling her speech and subjecting her to the

harms of punitive detention in violation of her due process rights. D.E. 12 ¶¶ 67–76. Requiring

Petitioner to raise these claims in her immigration proceedings and go through the lengthy

process of getting a final order of removal, appealing it to the BIA and then filing a PFR would

render her claims "effectively unreviewable" because the unlawful conduct—chilling of her

speech and punitive detention—"would have already taken place." *Jennings*, 583 U.S. at 293.

Respondents' reliance on *Aguilar* is misplaced, as that case *supports* a finding of

jurisdiction here. D.E. 19 at 22. Indeed, *Aguilar* emphasized the limits of § 1252(b)(9),

explaining that "certain claims, by reason of the nature of the right asserted, cannot be raised

efficaciously" on a PFR, and that reading § 1252(b)(9) to cover such claims would effectively

bar "any meaningful judicial review." *Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 11

(1st Cir. 2007). In line with that observation, and particularly relevant here, *Aguilar* clearly stated

that "district courts retain jurisdiction over challenges to the legality of detention in the

immigration context." *Id*. Nor does *Gicharu* support Respondent's position. D.E. 19 at 22. There,

the First Circuit reiterated that Section 1252(b)(9) must be construed narrowly, but found that the

petitioner's "claims of insufficient service and ineffective assistance of counsel" were barred

because they "plainly 'arise from' the removal process." *Gicharu v. Carr*, 983 F.3d 13, 17 (1st

Cir. 2020). Finally, Respondents cite to an out-of-circuit district court case, *Taal v. Trump*, 2025

WL 926207, (N.D.N.Y. Mar. 27, 2025), but that decision is under-reasoned and, in any case,

does not involve claims challenging the legality of detention, which, under *Jennings*, *Aguilar*,

and other First Circuit precedent, are reviewable in habeas.

**8 U.S.C. 1252(g) does not bar review.**

Section 1252(g) does not apply because Petitioner is not challenging any discretionary

decision to "'*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" 8 U.S.C.

§ 1252(g). Respondents broadly suggest that Ms. Öztürk challenges the Attorney General's discretionary decision to commence proceedings under § 1252(g). But Respondents' argument is incompatible with Supreme Court and Circuit Court precedent interpreting the scope of § 1252(g) and therefore must be rejected.

As the Supreme Court has explained, "what § 1252(g) says is" quite "narrow[]." *Reno v. Am.-Arab Anti-Discrim. Comm. (AADC)*, 525 U.S. 471, 482 (1999). The provision bars courts from reviewing only certain exercises of discretion by the Attorney General and "applies *only* to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* Section 1252(g) does *not* preclude review of "many other decisions or actions that may be part of the deportation process;" *see also Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (rejecting the government's argument that § 1252(g) "sweep[s] in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General" and noting "we read the language" in § 1252(g) "to refer to just those three specific actions themselves").

For starters, the First Circuit has affirmed that "§ 1252(g) does not bar judicial review of [a Petitioners] challenge to the lawfulness of his detention." *Kong v. United States*, 62 F.4th 608, 609 (1st Cir. 2023); *see also, Zadvydas*, 533 U.S. at 690, 691. Other courts have readily found habeas jurisdiction over challenges to retaliatory detention. *See, e.g.*, *Bello-Reyes v. Gaynor*, 985 F.3d 696, 698 (9th Cir. 2021) (addressing merits of First Amendment challenge to ICE detention); *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 921 (W.D. Tex. 2018) (addressing merits of First Amendment challenge to ICE detention).

Moreover, Ms. Öztürk is not challenging any ultimate exercise of discretion by the Attorney General to commence proceedings. Rather, she asserts legal claims challenging her

detention under the First and Fifth Amendments, the separate and independent basis for the Secretary of State's determination to revoke her visa in retaliation for exercising protected First Amendment speech, and the agency's violation of the APA. As a textual matter, the Secretary of State's determination to invoke the Foreign Policy Ground in retaliation for Ms. Öztürk's protected speech is wholly separate from any decision by the Attorney General to commence proceedings. And even if the Court were to construe Ms. Öztürk's claim as a challenge to the revocation of her visa in retaliation for exercising protected speech, § 1252(g) would not bar review as such a determination is completely distinct from any discretionary action to "commence proceedings." Indeed, Courts have consistently concluded that § 1252(g) does not bar review of the legal authority of an agency action, *even if* related to one of three discretionary decisions. *See Kong*, 62 F.4th at 609 (holding "Section 1252(g)'s bar on judicial review of claims 'arising from' the government's decision to 'execute removal orders' does not preclude jurisdiction over the challenges to the legality of the detention); *Garcia v. Att'y Gen.*, 553 F.3d 724, 729 (3d Cir. 2009) (challenge to "very authority" behind decision to commence proceedings does "not implicate[]" § 1252(g)); *Madu v. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) (explaining that while § 1252(g) bars courts from reviewing "certain exercises of discretion by the attorney general, it does not proscribe substantive review of the underlying legal bases for those discretionary decisions and actions"). Furthermore, § 1252(g) does not preclude review of challenges to certain systematic government policies. *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020) (§ 1252(g) did not preclude judicial review of a challenge to the government's DACA rescission policy, even though the decision to rescind the program could be "cast . . . as an initial 'action' in the agency's 'commence[ment] [of] proceedings'"). None of the actions here, whether it be the detention, the policy, or the

revocation decision, "arises from" any of the three discrete actions enumerated in 1252(g), and none of them are discretionary.

Respondent's reliance on cases involving the government's discretionary decision of *whether* and *when* to commence proceedings is therefore irrelevant here. *See* DE 19 at 18. While decisions on "whether and when" to commence a proceeding may fall within the scope of prosecutorial discretion, the very legal basis to revoke Ms. Öztürk's visa for engaging in First Amendment speech, her immediate transfer thousands of miles away to manipulate jurisdiction, and her unlawful detention are not discretionary decisions precluded from review under the provision. Respondents in fact have no discretion to undertake such actions.

Nor does *AADC* preclude review. There, the plaintiffs all had independent grounds of removal, including visa-overstay violations or failure to maintain status, and the Court found that "an alien unlawfully in this country has no right to assert selective enforcement as a defense against deportation." *AADC*, 525 U.S. at 488. Here, by contrast, there is no independent basis for Petitioner's removal and revocation of visa: the sole basis *is* the engagement in protected First Amendment activity. Indeed, *AADC* warned against the use of §1252(g) where, as here, the "basis of discrimination is so outrageous." *AADC* at 491. As the Second Circuit held in *Ragbir v. Homan*, "[t]o allow this retaliatory conduct to proceed would broadly chill protected speech, among not only activists subject to . . . deportation but also those citizens and other residents who would fear retaliation against others." 923 F.3d 53, 71 (2d Cir. 2019), *judgment vacated sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020) (vacating on other grounds). The other cases Respondents cite fail for similar misapplications or they deal with claims against the three specific discretionary actions in 1252(g) as opposed to challenges against nondiscretionary actions or underlying policy. *See, e.g.*, *Zundel v. Gonzales*, 230 F. App'x 468, 475 (6th Cir.

2007) (the decision to remove petitioner was based not on First Amendment claims but INS's determination "he had stayed in the country beyond the period for which he was authorized"). In sum, nothing in § 1252(g) precludes this Court's review.

**8 U.S.C. § 1226(e) does not bar review.**

8 U.S.C. § 1226(e) does not preclude review here. That provision states that DHS's "discretionary judgment regarding the application of [Section 1226] shall not be subject to review." But Petitioner does not challenge a "discretionary judgment"; instead, she asserts that the government has no legal authority to detain her in retaliation for her protected speech and that her detention violates due process because it serves no legitimate purpose. D.E. 12 ¶¶ 73–76. Section 1226(e) has no application to such claims challenging the legality of detention. *See Demore*, 538 U.S. at 516–17 (finding that "Section 1226(e) contains no explicit provision barring habeas review, and . . . its clear text does not bar [a petitioner's] constitutional challenge" to the legal authority for their detention); *Sylvain v. Att'y Gen.*, 714 F.3d 150, 155 (3d Cir. 2013) (citing *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011)) ("[Section 1226(e)] does not limit habeas jurisdiction over constitutional claims or questions of law."); *Al–Siddiqi v. Achim*, 531 F.3d 490, 494 (7th Cir. 2008) ("[T]his section ... does not deprive us of our authority to review statutory and constitutional challenges.")). "Because the extent of the Government's detention authority is not a matter of 'discretionary judgment,'" Petitioner's challenge to the legal basis for detention "falls outside the scope of § 1226(e)." *Jennings*, 583 U.S. at 296.

Defendants' cases are not to the contrary, but rather, support Petitioner's position. *See, e.g.*, *Hernandez-Lara v. Lyons*, 10 F.4th 19, 33 (1st Cir. 2021) (Section 1226(e) did not deprive the court or jurisdiction where petitioner challenged the extent of the government's detention authority); *Nielsen v. Preap*, 586 U.S. 392, 401 (2019) (affirming that Section 1226(e) does not bar challenges to "the extent of the statutory authority that the Government claims").

24

**8 U.S.C. § 1201(i) does not bar review.**

       *1. Ms. Öztürk does not challenge the revocation of her visa.*

       Contrary to Respondents' assertion, Ms. Öztürk has not challenged the lawfulness of the revocation of her student visa. D.E. 19 at 16. Rather, Ms. Öztürk challenges actions collateral to and beyond the visa revocation itself: Respondents' unconstitutional policy of targeting noncitizens for their protected political speech; the retaliatory termination of Ms. Öztürk's SEVIS status[16]; Ms. Öztürk's retaliatory arrest notwithstanding Respondents' general practice not to do so when visas are revoked; and, most importantly, Ms. Öztürk's ongoing unlawful detention.[17] Respondents do not contend that § 1201(i) bars review of the legality of Ms. Ozturk's arrest and detention. And challenges to the remaining actions are collateral to the basis for the visa revocation and are similarly not barred by 1201(i). *Maramjaya v. U.S. Citizenship & Immigr. Servs.*, 2008 WL 9398947, at *4 (D.D.C. Mar. 26, 2008).

       To the extent that Ms. Öztürk's challenge to Respondents' policy of unlawfully arresting and detaining individuals as a form of First Amendment retaliation implicates any statutory challenge, such a challenge is squarely based on Respondents' use of the Foreign Policy Ground and not the visa revocation itself.[18] The government has relied on the Foreign Policy Ground to intimidate and retaliate against noncitizens who have expressed—or are merely *perceived* to

---

[16] *See Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 176 (3d Cir. 2019) (noting that the "mechanism of revocation is [] inapplicable to this appeal," which involved DHS's termination of a student's SEVIS status).

[17] Defendants concede that Ms. Öztürk is not subject to mandatory detention, and do not dispute that ICE could have released her after arrest. D.E. 19 at 19-20.

[18] Before ICE could issue an NTA to Ms. Ozturk asserting that her visa had been revoked, Ms. Öztürk's SEVIS designation was terminated. D.E. 12 ¶ 33 & Ex. A. The SEVIS termination notice (addressed but not provided to Ms. Öztürk) cited both 8 U.S.C. § 1201(i) and 8 U.S.C. § 1227(a)(4)(C)(i)—that is, the Foreign Policy Ground. ICE subsequently issued an NTA to Ms. Öztürk but only chose to charge her as removable under 8 U.S.C. § 1227(a)(1)(B) because her visa had been revoked under 8 U.S.C. § 1201(i).

have expressed—speech the government disfavors. Respondents' current reliance on 8 U.S.C. § 1201(i) should not deflect the Court's attention away from the governement's well-publicized unconstitutional and unlawful conduct.

### 2. Even if some of Ms. Öztürk's claims are construed as a challenge to the revocation of her visa, the jurisdictional bar in § 1201(i) has no force here.

Section 1201(i) bars judicial review *only* over "discretion[ary]" decisions by the Secretary of State to revoke visas. But "that discretion is not boundless." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd,* 484 U.S. 1 (1987). Discretion may not be used to "transgress constitutional limitations," and "[i]t is the duty of the courts" to establish where the "constitutional boundaries lie." 785 F.2d at 1061. The Secretary of State cannot cloak unconstitutional or unlawful conduct under the guise of "discretion" and thereby evade judicial review. *Cf. Limone v. United States*, 579 F.3d 79, 102 (1st Cir. 2009) (unconstitutional conduct cannot be immunized as discretionary); *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 36-37 (D.R.I. 2014), *aff'd in part, dismissed in part*, 793 F.3d 208 (1st Cir. 2015) (allegations that ICE officers acted unconstitutionally in arresting and detaining plaintiff without probable cause or due process fell outside discretionary function exception to Federal Tort Claims Act).

This Circuit has preserved judicial review where the claim, as here, "does not arise from [a] discretionary decision" but instead "arises from the government's alleged violations of law . . . and in failing to abide by its own regulations." *Kong v. United States*, 62 F.4th 608, 618 (1st Cir. 2023) (rejecting 8 U.S.C. 1252(g)'s application to claim challenging lawfulness of arrest and detention) (internal citations omitted). Respondents have no discretion to violate the First Amendment by arresting, jailing, and attempting to deport Ms. Öztürk based on her political speech critical of U.S. and foreign government policies; to violate the Due Process Clause by

subjecting Ms. Öztürk to unjustified and wholly punitive civil detention by relying on an unconstitutionally vague statute; and to violate the APA. D.E. 12 ¶¶ 38-66.

Ms. Öztürk also enjoys due process rights by virtue of having been admitted for entry on a valid F-1 student visa and having lived and studied in the U.S. for almost a year at the time of her arrest. *Zadvydas*, 533 U.S. at 693 ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *see also Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 167 (3d Cir. 2018) (holding that petitioners who have significant ties to the U.S. and are accorded important statutory and procedural protections are entitled to invoke the Suspension Clause and petition for a writ of habeas corpus); *Ibrahim v. DHS*, 669 F.3d 983, 994-95 (9th Cir. 2012) (noncitizens in the United States "may bring constitutional challenges . . . including the ability to challenge the revocation of a visa"). The revocation of her visa and subsequent misconduct also violate her due process rights.

None of the cases Respondents cites with respect to the scope of § 1201(i) involved challenges by noncitizens living in the U.S. who had been unlawfully detained.[19] The significant due process concerns here, where Ms. Öztürk was arbitrarily arrested and transported a thousand miles away to be subjected to arbitrary detention as a form of retaliation for her protected speech, cannot be discarded because the government premises this illegal conduct on a discretionary decision to revoke her visa.

---

[19] Indeed, *Bolante v. Achim* noted that district courts "retain jurisdiction to review detention unrelated to a removal proceeding, and therefore not subject to circuit court review under INA § 242," such as "when the government has punitively detained an alien independent of removal." 457 F. Supp. 2d 898, 902 (E.D. Wis. 2006).

Ms. Öztürk's claims are also protected under the Suspension Clause. Respondents' arguments suggesting that the effect of § 1201(i) is to divest this Court's jurisdiction to consider the legality of Ms. Öztürk's detention are without merit and similar arguments have been expressly rejected by the First Circuit. *See Kong v. United States*, 62 F.4th 608, 616 (1st Cir. 2023) (finding that "the effective result of the government's desired interpretation" of § 1252(g) was "to bar all detention-related claims" which "would raise serious constitutional concerns under the Suspension Clause" because "[a]bsent the right to judicial review through a habeas petition, the government could detain noncitizens indefinitely without needing to provide a justification to anyone").

The government makes similar arguments here, suggesting that this Court is precluded from considering the lawfulness of detention that results from a discretionary visa revocation because Ms. Öztürk "can seek judicial review before an Immigration Court, the BIA, and eventually to a court of appeals if she is ordered removed." D.E. 19 at 15. But the "adequacy of this 'meaningful opportunity' to demonstrate that one's detention is unlawful depends on 'the rigor of any earlier proceedings': for example, 'when a person is detained by executive order, rather than, say, after being tried and convicted in a court, the need for collateral review is more pressing.'" *Taylor v. McDermott*, 516 F. Supp. 3d 94, 110 (D. Mass. 2021) (quoting *Boumediene*, 553 U.S. at 782-83). Here, the executive's unlawful retaliatory decision to place Ms. Öztürk in detention was devoid of any rigor and due process; rather Respondents rely on the very discretionary nature of the decision to revoke Ms. Öztürk's visa as a basis to deny her the opportunity to invoke the writ. Such an inversion of a fundamental constitutional provision should not be afforded any weight.

Ms. Öztürk similarly does not have adequate alternatives to this Court's review of her unlawful detention under the writ. *See Osorio-Martinez*, 893 F.3d at 167 (holding the "INA's jurisdiction-stripping provisions effect an unconstitutional suspension of the writ" when the challenged removal regime did not provide an adequate substitute process); *Sean B. v. McAleenan*, 412 F. Supp. 3d 472 (D.N.J. 2019) when available alternatives to district court habeas review are not adequate, "the district court has been found to retain limited habeas jurisdiction, as a constitutional necessity"). Here, Ms. Öztürk is subject to unlawful detention and while Respondents concede she may seek bond through the immigration court, they fail to acknowledge that the arbiter there would be Respondents' employee, not an independent Article III judge, and the distinct eligibility criteria for release in the alternative proceeding. *Compare Lyons*, 10 F.4th at 41 (holding that to detain a non-citizen under discretionary detention, the government bears the burden to prove the non-citizen is a danger to the community by a clear and convincing standard or flight risk by a preponderance of the evidence standard) *with Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006) (holding non-citizen bears the burden to prove eligibility for bond). And while Ms. Öztürk could eventually resolve her eligibility to remain in the United States through this alternative process, the underlying unlawful arrest and detention requires the remedy of the great writ. *See Lopez v. Doe*, 681 F. Supp. 3d 472, 488 (E.D. Va. 2023) (holding that "the appeals process following the immigration court's resolution of [a] motion to reopen is neither 'adequate' nor 'effective'" because while it "would eventually resolve his claim, [...] his detention claim becomes moot on finality"); *Boumediene,* 553 U.S. at 785 ("Even when the procedures authorizing detention are structurally sound, the Suspension Clause remains applicable and the writ relevant.").

**Ms. Öztürk challenges a final agency action.**

The government's APA arguments lack merit. First, as explained above, none of the INA

jurisdictional provisions on which the government relies divests this Court of review over Ms.

Öztürk's non-discretionary constitutional and APA claims. Sections 1252(g) and 1226(e) do not

preclude review to challenges to the Executive's legal authority, and Ms. Öztürk is not required

to exhaust any administrative process where doing so would render her claims "effectively

unreviewable." *See supra*, parts II.A-D.

Moreover, Ms. Öztürk challenges final agency action. Ms. has raised claims concerning

the unlawful termination of her SEVIS status. *See* D.E. 12 ¶ 63-66. Petitioner has alleged that

ICE did not follow appropriate procedures concerning the termination of her SEVIS status. *Id.*

The regulations at 8 C.F.R. § 214.1(d) lay out the sole means by which ICE may [20] a student's

non-immigrant status. None of those steps were followed in Ms. Öztürk's case. D.E. 12-1.

An order terminating an individual's student status is reviewable as final agency action under the

APA. *Jie Fang*, 935 F.3d at 182. Nowhere in their opposition do Respondents address the

unlawful termination of Ms. Öztürk's SEVIS status, and she is free to challenge that termination

in district court. *Id.* (reinstatement and removal proceedings are not adequate substitutes for

seeking review of unlawful termination).

**III.    Ms. Öztürk is entitled to release pending this litigation.**

Ms. Öztürk is a scholar and cherished member of her academic community. As Ms.

Öztürk's friends and colleagues attest, she is a welcoming and compassionate member of her

---

[20] ICE may terminate non-immigrant student status (1) by revoking a waiver that the Attorney General had previously authorized under § 212(d)(3) or (4) of the Immigration and Nationality Act; (2) by the introduction of a private bill to confer permanent resident status, or (3) pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons. 8 C.F.R. § 214.(d).

department, the Muslim Students Association, and the Interfaith Center at Tufts. She is devoted to the service of others. Her compassion and belief in the goodness of humanity is reflected in her academic research, which focuses on how social media can be used to encourage children to engage in behavior that a person does to benefit others rather than themselves. *See generally* Rossman Decl. and accompanying exhibits.

The government concedes that this Court has the authority to release Ms. Öztürk pending adjudication of her habeas petition.[21] *See* D.E. 19 at 25.[22] In the First Circuit, the applicable legal standard for release *pendente lite* turns on whether the petitioner raises their claim pre- or post-conviction. *See Glynn v. Donnelly*, 470 F.2d 95, 97 (1st Cir. 1072).[23] Ms. Öztürk has not been charged, much less convicted of any crime. Therefore, the less demanding standard articulated in *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) applies. *See Savino*, 453 F. Supp. 3d. 441, 454-55 & n.11 (D. Mass. 2020). Under *Mapp*, a court may grant release if the habeas petition raises substantial claims and extraordinary circumstances make the grant of bail necessary to make the habeas remedy effective." *Id.* at 453. As set forth above, Ms. Öztürk's claims for relief are more than substantial and the shocking circumstances in which they arise necessitate release.

A broad range of circumstances may qualify as "extraordinary."[24] Ms. Öztürk was targeted for arrest and detention pursuant to an unprecedented policy of targeting international

---

[21] This authority includes release on recognizance, with or without conditions, or on appropriate bail. *See, e.g.*, *Healy v. Spencer*, 406 F. Supp. 2d 129 (D. Mass. 2005).

[22] *See also Yanish v. Barber*, 73 S. Ct. 1105, 1107-09 (1953) (Douglas, J., in chambers); *York ex rel. Davidescu v. Nicolls*, 159 F.2d 147, 148 (1st Cir. 1947); *Savino v. Souza*, 453 F. Supp. 3d 441, 453-54 (D. Mass. 2020).

[23] *See also Aronson v. May*, 85 S. Ct. 3, 4-5 (1964) (Douglas, J., in chambers); *Bader v. Coplan*, No. 02-508, 2003 WL 163171, at *4 (D.N.H. Jan. 23, 2003) (*Glynn* applies post-conviction).

[24] *See, e.g.*, *Leslie v. Holder*, 865 F. Supp. 2d 627, 639 (M.D. Pa. 2012) (including extent of the petitioner's immigration detention); *D'Alessandro v. Mukasey*, 2009 WL 799957, at *3 (W.D.N.Y. Mar. 25, 2009) (including lack of flight risk or danger to community).

students for their constitutionally protected speech, on the basis of an op ed that was published in a campus newspaper and violated no university policies. Rossman, Exh. 1-V. Ms. Öztürk's detention was not some inevitable byproduct of the immigration detention system. The government acknowledges that ICE is under no obligation to detain Ms. Öztürk at all. D.E. 19 at 20. Ms. Öztürk's detention bears no reasonable relation to any permissible, non-punitive purpose as she is neither a flight risk nor a danger to her community. *See Zadvydas*, 533 U.S. at 690.[25] Moreover, Ms. Öztürk has asthma and, prior to being detained, took a daily medication to prevent asthma attacks. *See* Öztürk Decl. ¶ 4. Now she has already had three asthma attacks in her detention of little over a week. *Id.* ¶¶ 7-9.[26] Each day Ms. Öztürk remains in detention puts her life at risk, prolongs the government's unjustified retaliation, and reinforces the broad chill already cast on other noncitizens who will fear they could be next.

Because Ms. Öztürk satisfies prevails under either standard for relief and is neither a flight risk nor a danger to her community, the Court should grant her release *pendente lite*.

## CONCLUSION

For the foregoing reasons, the Court should accept jurisdiction over the petition and order the petitioner's release or at the least, transfer the petition to the District of Vermont.

---

[25] The government suggests that because Ms. Öztürk is entitled to a bond hearing in immigration court, she may not seek bail from this Court. D.E. 19, at 20, 26 & n.8. The government points to no authority for the proposition that a habeas petitioner must exhaust administrative remedies before seeking release *pendente lite*. For good reason. The exigency of Ms. Öztürk's substantial constitutional and statutory claims requires immediate release, especially where, as here, petitioner faces irreparable harm, the immigration courts are not empowered to hear constitutional claims, and there is ordinarily no judicial review of the agency's bond determination. *See Flores-Powell v. Chadbourne*, 677 F. Supp. 2d 455, 463-64 (D. Mass. 2010) ("A loss of liberty may be an irreparable harm.").

[26] *See also* Decker & Enriquez, *Inside the Black Hole*, 33, 37-38, 41-46, 50, 53, 57, 59-60, 66, 70, 72, 74-80 (August 2024), https://www.laaclu.org/sites/default/files/ inside_the_black_hole_systemic_human_rights_abuses_against_immigrants_detained_disappear ed_in_louisiana.pdf.

Dated: April 2, 2025                           Respectfully submitted,

                                               By:  /s/ Adriana Lafaille
                                                   Jessie J. Rossman (BBO #670685)
                                                   Adriana Lafaille (BBO #680210)
                                                   Rachel E. Davidson (BBO #707084)
                                                   Julian Bava (BBO #712829)
                                                   AMERICAN CIVIL LIBERTIES UNION
                                                       FOUNDATION OF MASSACHUSETTS, INC.
                                                   One Center Plaza, Suite 850
                                                   Boston, MA 02108
                                                   (617) 482-3170
                                                   jrossman@aclum.org
                                                   alafaille@aclum.org
                                                   rdavidson@aclum.org
                                                   jbava@aclum.org

                                                   Mahsa Khanbabai (BBO #639803)
                                                   115 Main Street, Suite 1B
                                                   North Easton, MA 02356
                                                   (508) 297-2065
                                                   mahsa@mk-immigration.com

                                                   Brian Hauss*
                                                   Esha Bhandari*
                                                   Brett Max Kaufman*
                                                   Noor Zafar*
                                                   Sidra Mahfooz*
                                                   AMERICAN CIVIL LIBERTIES UNION
                                                       FOUNDATION
                                                   125 Broad Street, Floor 18
                                                   New York, NY 10004
                                                   (212) 549-2500
                                                   bhauss@aclu.org
                                                   ebhandari@aclu.org
                                                   bkaufman@aclu.org
                                                   nzafar@aclu.org
                                                   smahfooz@aclu.org

                                                   Matthew D. Brinckerhoff*
                                                   Katherine Rosenfeld*
                                                   Vasudha Talla*
                                                   Sonya Levitova*
                                                   EMERY CELLI BRINCKERHOFF ABADY
                                                       WARD & MAAZEL LLP

One Rockefeller Plaza, 8th Floor
New York, NY 10020
212-763-5000
mbrinckerhoff@ecbawm.com
krosenfeld@ecbawm.com
vtalla@ecbawm.com
slevitova@ecbawm.com

Ramzi Kassem*
Naz Ahmad*
Mudassar Toppa*
Shezza Abboushi Dallal*
CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
CUNY School of Law
2 Court Square
Long Island City, NY  11101
(718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
mudassar.toppa@law.cuny.edu
shezza.dallal@law.cuny.edu

*Counsel for Petitioner*

*\*Pro hac vice application forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2025, a true copy of the above document will be filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

April 2, 2025                    */s/ Adriana Lafaille*
                                 Adriana Lafaille