## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

RÜMEYSA ÖZTÜRK, Petitioner,

v.

DONALD J. TRUMP, in his official
capacity as President of the United States;
PATRICIA HYDE, in her official capacity
as the New England Field Office Director
for U.S. Immigration and Customs
Enforcement; MICHAEL KROL, in his
official capacity as HSI New England
Special Agent in Charge, U.S. Immigration
and Customs Enforcement; TODD LYONS,
in his official capacity as Acting Director,
U.S. Immigration and Customs
Enforcement; KRISTI NOEM, in her
official capacity as Secretary of the United
States Department of Homeland Security;
and MARCO RUBIO, in his official
capacity as Secretary of State, Respondents

Case No. 2:25-cv-00374-WKS

**BRIEF OF INTERNATIONAL LAW PROFESSORS, EXPERTS, PRACTITIONERS,
AND SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF PETITIONER**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**                                                                    ii

**INTEREST OF AMICI CURIAE**                                                                1

**INTRODUCTION**                                                                            1

**ARGUMENT**                                                                                4

**I. International law requires the United States to respect the human rights to freedom of opinion and expression.**                                                                4

**II. International law requires the U.S. government to show that any restrictions on rights satisfy principles of legality, legitimacy, necessity and proportionality, and nondiscrimination.**                                                          8

A. International law prohibits restrictions that are vague, overbroad and overly discretionary.                                                                          9

B. International law prohibits restrictions that do not have a legitimate purpose and are not necessary and proportionate.                                                 11

C. International law prohibits discriminatory restrictions.                              14

D. International law prohibits retaliation against individuals exercising their rights.   16

**III. The exercise of fundamental rights by all noncitizens in the United States is at risk of being chilled.**                                                             18

**CONCLUSION**                                                                              20

**APPENDIX**       *List of Amici Curiae*                                                   22

i

# TABLE OF AUTHORITIES

**Relevant Case Files**

Pet'r's Am. Pet., ECF. No. 12                                                    4, 8, 9, 17

Order, ECF No. 42                                                                passim

**U.S. Cases**

*Chung v. Trump,* No. 1:25-cv-02412 (S.D.N.Y. 2025)                              2, 17

*Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764 (1993)                           3

*Khalil v. Joyce*, No. 25-cv-01935-JMF, 2025 WL 849803 (S.D.N.Y. 2025)          17

*Khalil v. Trump*, No. 25-cv-10695-DJC (S.D.N.Y. 2025)                          2

*Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804)                           3

*Murray v. The Schooner Charming Betsy,* 6 U.S. (2 Cranch) (1804)               6

*Roper v. Simmons*, 543 U.S. 551 (2005)                                         6

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)                                  2, 5

*Talbot v. Seeman*, 5 U.S. (1 Cranch) (1801)                                    6

*Thompson v. Oklahoma,* 487 U.S. 815 (1988)                                     5

**U.S. Statutes**

Immigration and Nationality Act                                                 4, 11

**Constitutional Provisions**

U.S. Const. amend. I                                                            1, 2

**U.S. Executive Orders**

Exec. Order 14161, *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed Reg 8451 (Jan. 20, 2025)          13

Exec. Order 14188, *Additional Measures to Combat Anti-Semitism,* 90 Fed. Reg. 8847 (Jan. 29, 2025) ..... 13

**Other U.S. Government Documents**

Declarations and Reservations by United States of America made upon ratification, accession or succession of the ICCPR, 138 Cong. Rec. at *S4783 ..... 4

S. Comm. on Foreign Rel., Rep. on the International Covenant on Civil and Political Rights, S. Exec. Rep. No. 23, 1 (102d Sess. 1992) ..... 4, 7

**International Cases**

*Alekhina v. Russia,* App. No. 38004/12, Eur. Ct. H.R. (July 17, 2018) ..... 13

*Amelkovich v. Belarus,* Hum. Rts. Comm., U.N. Doc. CCPR/C/125/D/2720/2016) (May 29, 2019) ..... 16

*Ivcher Bronstein v. Peru*, Judgment (Merits, Reparations, and Costs), Inter-Am. Ct. H.R. (ser. C) No. 79 (Feb. 6, 2001) ..... 7

*Khadzhiyev v. Turkmenistan*, U.N. Hum. Rts. Comm., U.N. Doc. CCPR/C/122/D/2252/2013 (May 24, 2018) ..... 16

*Nikolaichik v. Belarus*, U.N. Hum. Rts. Comm., U.N. Doc. CCPR/C/139/D/3056-3134/2018 (Oct. 12, 2023) ..... 11

*Rabbae v. The Netherlands*, U.N. Hum. Rts. Comm., U.N. Doc. CCPR/C/117/D/2124/2011 (Nov. 18, 2016) ..... 7, 12

*Shin v. Republic of Korea*, U.N. Hum. Rts Comm., Comm. No. 926/2000, (Mar. 16, 2004) ..... 14

**International Treaties**

American Convention on Human Rights, *adopted on* Nov. 22, 1969, 1144 U.N.T.S. 123 ..... 5, 13

International Convention on the Elimination of All Forms of Racial Discrimination, Dec. 21, 1995, 660 U.N.T.S. 195      5, 14, 15

International Covenant on Civil and Political Rights, Dec. 16, 1966, T.I.A.S. 92-908, 999 U.N.T.S. 3      passim

Organization of American States, American Convention on Human Rights art. 7(5), Nov. 22, 1969, 1144 U.N.T.S.123      5

Organization of American States, Multilateral Treaties, Signatories and Ratifications, https://www.oas.org/dil/treaties_B-32_American_Convention_on_Human_Rights_sign.htm      5

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331      5

## UN Documents

American Declaration of the Rights and Duties of Man, *adopted by* the 9th International Conference of American States, 1948, U.N. Doc. E/CN.4/122      5

Comm. on Economic, Social and Cultural Rights, *General Comment No. 13 on the right to education (article 13)* U.N. Doc. E/C.12/1999/10 (Dec. 8, 1999)      8

Comm. on the Elimination of Racial Discrimination, *General Recommendation 30*: Discrimination against non-citizens, U.N. Doc CERD/C/64/Msc.11/rev.3 (Feb. 23-Mar. 12, 2004)      14

David Kaye (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Report of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression*, U.N. Doc. A/75/261 (July 28, 2020)      8, 9, 10, 11

David Kaye (Special Rapporteur on the Promotion and Protection of the Right to Freedom of

    Opinion and Expression), *Report of the Special Rapporteur on the promotion and protection of*

    *the right to freedom of opinion and expression,* U.N. Doc. A/HRC/38/35 (Apr. 6, 2018)    12

Farida Shaheed (Special Rapporteur on the Right to Education), *Academic Freedom*, U.N. Doc.

    A/HRC/56/58 (June 27, 2024)    8

Farida Shaheed (Special Rapporteur on the Right to Education), *Statement by the Special*

    *Rapporteur on the right to education, Ms. Farida Shaheed on her visit to the United States of*

    *America* (May 10, 2024)    7, 19

Frank La Rue (Special Rapporteur on the promotion and protection of the right to freedom of

    opinion and expression), U.N. Doc. A/66/290 (Aug. 10, 2011)    13

G.A. Res. 217A, Universal Declaration of Human Rights (Dec. 10, 1948)    5, 6, 14, 15

Gina Romero (Special Rapporteur on the Promotion and Protection of the Right to Freedom of

    Opinion and Expression), *Protecting the Rights of Freedom of Assembly and Association from*

    *Stigmatization*, U.N. Doc. A/79/263 (July 31, 2024)    14, 15, 17, 20

Hum. Rts. Comm., *General Comment No. 15: The Position of Aliens Under the Covenant*,

    Twenty-Seven Session (1986), U.N. Doc HRI/GEN/1/Rev. 1    15

Hum. Rts. Comm., *General Comment No. 31*, U.N. Doc. CCPR/C/21/Rev.1/Add.13 (May 26,

    2004)    15

Hum. Rts. Comm., *General Comment No. 34: Article 19: Freedoms of Opinion and Expression*,

    U.N. Doc. CCPR/C/GC/34 (Sep. 12, 2011)    passim

Hum. Rts. Comm., *General Comment No. 35: Article 9: Liberty and security of person*, U.N.

    Doc. CCPR/C/GC/35 (December 16, 2014)    16

Hum. Rts. Comm., *General Comment No. 37: Article 21: On the right to peaceful assembly*, U.N. Doc. CCPR/C/GC/37 (Sept. 17, 2020)  15

Irene Khan (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Report on global threats to freedom of expression arising from the conflict in Gaza*, U.N. Doc. A/79/319 (Aug. 23, 2024)  passim

Letter to the United States from the U.N. Special Rapporteurs on Human Rights Defenders; Cultural Rights; Education; Food; Freedom of Expression; Freedom of Assembly and Association; Adequate Housing; Violence Against Women and Girls; and the Working Group on Discrimination Against Women and Girls, U.N. Doc. AL USA 12/2024 (May 10, 2024)  8

Mary Lawlor (Special Rapporteur on the Situation of Human Rights Defenders), *"We are not just the future": challenges faced by child and youth human rights defenders,* U.N. Doc. A/HRC/55/50 (Jan. 17, 2024)  19

Press Release, Irene Khan, Special Rapporteur on the right to freedom of opinion and expression et al., U.S. must immediately release Palestinian rights-activist Mahmoud Khalil and stop threats of deportation against foreign residents, say U.N. experts, U.N. Press Release (Mar. 20, 2025)  2

Press Release, U.N. OHCHR, Deporting international students involved in pro-Palestinian protests will escalate trauma and polarisation on US campuses: U.N. experts, U.N. Press Release (Mar. 17, 2025)  14, 19

Press Release, U.N. OHCHR, Speaking out on Gaza / Israel must be allowed: UN experts, U.N. Press Release (Nov. 23, 2023)  19

Press Release, U.N. OHCHR, U.S. must immediately release Palestinian rights-activist

    Mahmoud Khalil and stop threats of deportation against foreign residents, say U.N. experts

    (Mar. 20, 2025)                                            19

Press Release, U.N. OHCHR, USA: Free speech on campus needs to be protected, not attacked,

    say experts, U.N. Press Release (July 15, 2024)                18

U.N. Economic and Social Council, *The Siracusa Principles on the Limitation and Derogation*

    *Provisions in the International Covenant on Civil and Political Rights*, U.N. Doc.

    E/CN.4/1985/4 (Sep. 28, 1984)                         9

U.N. ESCOR, 160th mtg., U.N. Doc. E/CN.4/SR.160 (1950)      7

U.N. GAOR, 3d Sess., 183d plen. mtg, U.N. Doc. A/PV.183 (Dec. 10, 1948)   5

U.N. High Comm'r for Hum. Rts., *Rep. on the expert workshops on the prohibition of incitement*

    *to national, racial or religious hatred*, U.N. Doc. A/HRC/22/17/Add.4 (Jan. 11, 2013)   13

U.N. Treaty Body Database, Ratification Status of United States of America,

    https://perma.cc/L88B-GHJT                        5

U.S. Mission to the U.N., Explanation of Position on the Commission on the Status of Women

    (CSW) Political Declaration (Mar. 10, 2025)             6

**Books**

Amal Clooney & David Neuberger, <u>Freedom of Speech in International Law</u> 47 (2024)   11, 13

**Articles**

Louis Henkin, *Constitutional Rights and Human Rights*, 13 Harv. C.R.-C.L. L. Rev.

    593 (1978)                         3

**Other Authorities**

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, 11:05 AM),

    https://perma.cc/BML5-GR84                                                                                                    18

Inter-Am. Comm'n H.R., *Criminalization of the Work of Human Rights Defenders,*

    OEA/Ser.L/V/II., doc. 49/15 (Dec. 31, 2015)                                                           16

Inter-Am. Comm'n H.R., *Second Report on the Situation of Human Rights Defenders in the*

    *Americas*, OEA/Ser.L/V/II., Doc. 66 (Dec. 31, 2011)                                        10

Jazzmin Jiwa, *'I could be next': international students at Columbia University feel 'targeted'*

    *after Mahmoud Khalil's arrest*, The Guardian (Mar. 19, 2025, 11:00 AM),

    https://perma.cc/MBF6-XPJ5                                                                                        18

Jocelyn Gecker, *After Columbia arrests, international college students fall silent*, ABC News

    (Mar. 15, 2025, 1:09 AM), https://perma.cc/ZC2G-86JB                                       18

Restatement (Third) of Foreign Rel. § 114 (Am. L. Inst. 1987)                             3, 6

## INTEREST OF AMICI CURIAE[1]

*Amici curiae* are international law and human rights professors, experts, practitioners, and scholars.[2] *Amici* respectfully submit this brief to provide the Court with analysis of the international law issues at stake in this case. *Amici* have a strong interest in the outcome of this case and its impacts on human rights. In particular, *Amici* are profoundly concerned that Respondents' actions in this case threaten universal human rights protected by international law, including the rights to opinion and expression on a nondiscriminatory basis. Some *Amici* themselves fear retaliation for exercising these rights, including in relation to signing onto this brief. *Amici* are aware of other similarly qualified individuals who wanted to join in this brief but were chilled from doing so out of fear of retaliation, including arrest or deportation.

## INTRODUCTION

*Amici* are deeply concerned that the arrest, detention, and threatened deportation of Ms. Rümeysa Öztürk violates her fundamental human rights and puts the rights of many others at risk. In particular, this case implicates the human rights to opinion and expression, and their protection on a nondiscriminatory basis. These rights are essential to free debate, personal development, education, and societal progress, and are necessary pillars of democracy. They are protected by international law—including through the International Covenant on Civil and Political Rights ("ICCPR"), which the United States has ratified—as well as by the U.S. Constitution. International Covenant on Civil and Political Rights, art. 19, Dec. 16, 1966, T.I.A.S. 92-908, 999 U.N.T.S. 3 [hereinafter ICCPR]; U.S. Const. amend. I.

---

[1] No counsel for any party has authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than *amici* or their counsel contributed money intended to fund preparing or submitting this brief.

[2] A list of *amici* is set forth in Appendix I. The positions taken in this brief are those of *amici* alone and should not be attributed to any institution with which *amici* are or have been affiliated.

Given the fundamental nature of these rights, *see id,*, international law does not permit limitations on freedom of opinion and permits only limited restrictions on freedom of expression. Any such restrictions must respect principles of legality, legitimacy, proportionality and necessity, and nondiscrimination. Leading independent human rights experts—appointed by governments at the United Nations ("U.N.") and mandated to monitor human rights globally—have expressed alarm that "U.S. authorities are openly weaponising deportation as a tool to censor critical voices, seriously damaging the precious rights of free speech and assembly that the U.S. has long cherished and promoted at home and abroad." Press Release, Irene Khan, Special Rapporteur on the right to freedom of opinion and expression et al., U.S. must immediately release Palestinian rights-activist Mahmoud Khalil and stop threats of deportation against foreign residents, say U.N. experts, U.N. Press Release (Mar. 20, 2025). This case, and other similar cases now proceeding in U.S. courts, *see, e.g.*, Khalil v. Trump, No. 25-cv-10695-DJC (S.D.N.Y. 2025); Chung v. Trump, No. 1:25-cv-02412 (S.D.N.Y. 2025), are likely to reverberate globally: restrictions on fundamental rights here could set a dangerous precedent for diminishing the enjoyment of human rights around the world, and could also seriously impact the rights and safety of any U.S. citizen abroad who expresses views disfavored by a foreign government.

International law's protections of the freedoms of expression and opinion echoes the robust domestic protections provided under the First Amendment of the U.S. Constitution. *See* U.S. Const. amend. I. In ratifying the ICCPR in 1992, the U.S. government committed to implementing civil and political rights protections consistent with the Covenant. As a matter of international law, the ICCPR is binding on the United States. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004) ("the Covenant does bind the United States as a matter of international

law."). While articles 1 through 27 of the ICCPR are not self-executing under U.S. law, *see* Declarations and Reservations by United States of America made upon ratification, accession or succession of the ICCPR, 138 Cong. Rec. at *S4783, by ratifying the Covenant, the United States committed to "take the necessary steps . . . to adopt such laws or other measures as may be necessary to give effect to the rights recognized [therein]." ICCPR art. 2(2). The ICCPR-guaranteed rights "are similar to those guaranteed by the U.S. Constitution and the Bill of Rights," S. Comm. on Foreign Rel., Rep. on the International Covenant on Civil and Political Rights, S. Exec. Rep. No. 23, 1 (102d Sess. 1992) [hereinafter: Senate Report on ICCPR Ratification]; *see also* Louis Henkin, *Constitutional Rights and Human Rights*, 13 HARV. C.R.-C.L. L. REV. 593, 609, 620 (1978)).

Respondents have restricted Ms. Öztürk's rights by arresting her, detaining her, and threatening to deport her. They claim her presence in the United States has "potentially serious adverse foreign policy consequences for the United States" under the Immigration and Nationality Act ("INA"). Order, ECF No. 42, at 7 (citing letter to Petitioner indicating visa was revoked pursuant to 8 U.S.C. §1227(a)(4)(C)(i); INA §237(a)(4)(C)(i)). Invoking this vague and discretionary law to restrict speech and opinion raises serious concerns under international law. It has long been recognized that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 81 (1804); *see also Hartford Fire Ins. Co. v. Cal*., 509 U.S. 764, 814-15 (1993); Restatement (Third) of Foreign Rel. § 114 (AM. L. INST. 1987) ("Where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States.").

The law on which the government relies is vague and overbroad. It grants a single government official unfettered discretion to decide to deport an individual, likely violating the international law principle that any restrictions on the right to freedom of expression must satisfy the principle of legality. Further, "foreign policy" is not a permitted ground under international law to restrict basic rights. In addition, fundamental rights cannot be restricted in a discriminatory manner, including against noncitizens. The government has not shown a legitimate purpose for restricting Ms. Öztürk's rights—and even if it did have such a purpose, it has not shown that its extreme actions of arrest, detention, and attempted deportation are necessary and proportionate to a legitimate aim. The lack of a legitimate basis for restricting Ms. Öztürk rights raises concerns that the government is using administrative processes to retaliate against her for her speech. Any such retaliation would be prohibited by international law.

The government's treatment of Ms. Öztürk, and its threats to arrest and deport others who are similarly situated, has chilled the exercise of basic rights across the United States. *See* Pet'r's Am. Pet., ECF No. 12, at 13-15. Noncitizens fear that if individuals like Ms. Öztürk can be arrested and detained for political speech disfavored by the government, then they too could be punished merely for voicing their opinions and engaging in debate on social or political issues. Allowing the government to detain and deport noncitizens based on their expression and opinions, pursuant to a vague and overbroad law, would chill the exercise of fundamental rights across the United States. *Amici* thus respectfully urge this court to rule in favor of Petitioners' Amended Petition for Habeas Corpus.

## ARGUMENT

I.  **International law requires the United States to respect the human rights to freedom of opinion and expression.**

International human rights law protects the rights to opinion and to freedom of expression. *See, e.g.*, ICCPR art. 19; G.A. Res. 217A, Universal Declaration of Human Rights arts. 19 (Dec. 10, 1948), [hereinafter UDHR]; American Declaration of the Rights and Duties of Man art. IV, *adopted by* the 9th International Conference of American States, 1948, U.N. Doc. E/CN.4/122; *see also* International Convention on the Elimination of All Forms of Racial Discrimination art. 5(d)(viii), Dec. 21, 1995, 660 U.N.T.S. 195, [*hereinafter* ICERD] (state parties undertake to eliminate discrimination with regard to these rights). The United States ratified the ICCPR in 1992, and that instrument is binding on the United States. U.N. Treaty Body Database, Ratification Status of United States of America, https://perma.cc/L88B-GHJT; *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004) (ICCPR "does bind the United States as a matter of international law…"). The Universal Declaration on Human Rights ("UDHR"), which the United States helped to draft and voted for in 1948, *see* U.N. GAOR, 3d Sess., 183d plen. mtg. at 933–34, U.N. Doc. A/PV.183 (Dec. 10, 1948) (recorded vote: 48-0-8), and the American Convention on Human Rights ("ACHR"), which the United States signed in 1977, Organization of American States, American Convention on Human Rights art. 7(5), Nov. 22, 1969, 1144 U.N.T.S.123; Organization of American States, *Multilateral Treaties*, Signatories and Ratifications, https://perma.cc/5RTN-9ZVP, also enshrine these rights. While the United States has signed but not ratified the ACHR, under international law it cannot defeat the object and purpose of the Convention. *See* Vienna Convention on the Law of Treaties art. 18, May 23, 1969, 1155 U.N.T.S. 331. While the ICCPR is not self-executing in the United States, the U.S. Supreme Court has cited to the ICCPR in interpreting constitutional protections. *See Thompson v. Oklahoma,* 487 U.S. 815, 831 n.34 (1988); *Roper v. Simmons*, 543 U.S. 551, 575-578 (2005). In *Murray v. The Schooner Charming Betsy*, the Supreme Court established: "[A]n act of

Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 81 (1804); *accord Talbot v. Seeman*, 5 U.S. (1 Cranch) (1801); *see also* Restatement (Third) of Foreign Rel. § 114 (AM. L. INST. 1987) ("Where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States").

The rights to freedom of opinion and expression are critical to the exercise of democracy and to the realization of all other rights. *See* UDHR Preamble. They are "cornerstones of a democratic society." Senate Report on ICCPR Ratification at 3. As the U.S. Mission to the UN recently articulated, "[g]overnment censorship of speech is intolerable to a free society." U.S. Mission to the U.N., Explanation of Position on the Commission on the Status of Women (CSW) Political Declaration (Mar. 10, 2025). Indeed, the rights to opinion and expression "constitute the foundation stone for every free and democratic society." Hum. Rts. Comm., *General Comment No. 34: Article 19: Freedoms of Opinion and Expression*, para. 2, U.N. Doc. CCPR/C/GC/34, (Sep. 12, 2011).

**The right to opinion** protects the holding of "opinions without interference." ICCPR art. 19(1). The U.N. Human Rights Committee, tasked with interpreting the ICCPR and state compliance with the treaty, has observed that the ICCPR permits "no exception or restriction" on this right, while other rights under the ICCPR cannot be violated because of a person's "actual, perceived, or supposed opinions." *General Comment No. 34*, paras. 5, 9. Importantly, "[a]ll forms of opinion are protected," whether they be of a "political, scientific, historic, moral or religious nature." *Id*. para. 9. A state party would violate the ICCPR if it "criminalize[d] the holding of an opinion," or engaged in acts of "harassment, intimidation, or stigmatization of a

person, including arrest, detention, trial or imprisonment for reasons of the opinions they may hold." *Id.*

The **right to expression** includes the right "to seek, receive and impart information and ideas of all kinds." ICCPR art. 19(2); *see also General Comment No. 34*, para. 11. During the drafting of the ICCPR, the United States stated that it was "devoted" to freedom of speech, and that freedom of information "must not be compromised," noting that it "was one of the first freedoms to be stamped out when undemocratic regimes seized power." U.N. ESCOR, 160th mtg., para. 33, U.N. Doc. E/CN.4/SR.160 (1950). The right includes expression related to "political discourse," "public affairs," "discussion of human rights," and "teaching." *General Comment No. 34*, para. 11. Protected speech includes speech which may be "deeply offensive" to some, *General Comment No. 34*, para. 11; *Rabbae v. The Netherlands,* U.N. Hum. Rts. Comm., para. 10.4, U.N. Doc. CCPR/C/117/D/2124/2011 (Nov. 18, 2016), as well as speech which may be disfavored or "unwelcome or shock the State." *Ivcher Bronstein v. Peru*, Judgment (Merits, Reparations, and Costs), Inter-Am. Ct. H.R. (ser. C) No. 79, para. 152 (Feb. 6, 2001). International law provides that "[e]xpressing support for, or opposition to, a specific government, is fully guaranteed by the rights to freedom of expression, association, and peaceful assembly. . . ." Farida Shaheed (Special Rapporteur on the Right to Education), *Statement by the Special Rapporteur on the right to education, Ms. Farida Shaheed on her visit to the United States of America* (May 10, 2024). Freedom of expression also protects speech in support of Palestine. *See* Irene Khan (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Report on global threats to freedom of expression arising from the conflict in Gaza*, para. 88, U.N. Doc. A/79/319 (Aug. 23, 2024) [*hereinafter* Khan Report].

7

In addition, the right to expression underpins academic freedom, which the state is required to respect and protect. *See* Farida Shaheed (Special Rapporteur on the Right to Education), *Academic Freedom*, para. 21, U.N. Doc. A/HRC/56/58 (June 27, 2024); David Kaye (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Report of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression*, para. 8, U.N. Doc. A/75/261 (July 28, 2020) [*hereinafter* Kaye Report]; Comm. on Economic, Social and Cultural Rights, *General Comment No. 13 on the right to education (article 13)*, para. 39, U.N. Doc. E/C.12/1999/10 (Dec. 8, 1999). At universities, "the right to express views on a campus inside or outside of class is at the heart of academic freedom." Letter to the United States from the U.N. Special Rapporteurs on Human Rights Defenders; Cultural Rights; Education; Food; Freedom of Expression; Freedom of Assembly and Association; Adequate Housing; Violence Against Women and Girls; and the Working Group on Discrimination Against Women and Girls, at 4, U.N. Doc. AL USA 12/2024 (May 10, 2024).

## II.    International law requires the U.S. government to show that any restrictions on rights satisfy principles of legality, legitimacy, necessity and proportionality, and nondiscrimination.

Ms. Öztürk is a PhD student at Tufts University. Pet'r's Am. Pet., ECF No. 12, at 1. On March 25, 2025, she was surrounded by masked plain-clothed federal officers on the street outside her home in Somerville, MA. *Id.*; Order, ECF No. 42, at 7. She was handcuffed, placed into an unmarked car, and subsequently transferred to different detention facilities across four states. Pet'r's Am. Pet., ECF No. 12, at 1; Order, ECF No. 42, at 4. Ms. Öztürk was informed that her student visa had been revoked only after her arrest, and was held incommunicado for over 20 hours before her counsel could locate and reach her. Pet'r's Am. Pet., ECF No. 12, at 1,

7; Order, ECF No. 42, at 3-6. She now remains in detention 1,300 miles away in Louisiana. Order, ECF No. 42, at 6. Her arrest and detention "appear to be based solely on her co-authorship of an op-ed in her school newspaper, *The Tufts Daily*," which criticized the University's response to resolutions adopted by the undergraduate student Senate that sought to "hold Israel accountable for clear violations of international law." Pet'r's Am. Pet, ECF No. 12, at 2. She was arrested shortly after the website Canary Mission published her photograph and profile, claiming that she "engaged in anti-Israel activism" and citing her op-ed. *Id.* at 17.

Under international law, *holding* an opinion—no matter how contentious—cannot be restricted in any way. *General Comment No. 34*, para. 9 (noting "[t]his is a right to which the Covenant permits no exception or restriction."). International law allows only limited restrictions on expression, and for any restriction, a government must satisfy an established three part test of 1) legality, 2) legitimacy, and 3) necessity and proportionality. Further, restrictions cannot be discriminatory. *Amici* are deeply concerned that this test has not been satisfied here, and that Ms. Öztürk's arrest, detention, and threatened deportation violate her fundamental human rights.

## A. International law prohibits restrictions that are vague, overbroad, and overly discretionary.

The principle of **legality** requires that restrictions on expression are "provided by law," and "drafted with sufficient precision to enable an individual to regulate his or his conduct accordingly." *General Comment No. 34*, paras. 24-25; Kaye Report, para. 24. Governments are prohibited from "imposing vague or arbitrary limitations," and must ensure "adequate safeguards and effective remedies against abuse." U.N. Economic and Social Council, *The Siracusa Principles on the Limitation and Derogation Provisions in the International Covenant on Civil and Political Rights*, para. 31, U.N. Doc. E/CN.4/1985/4 (Sep. 28, 1984). "A restriction may not be unduly vague or overbroad such that it could confer unfettered discretion on officials." Kaye

Report, para. 24; *see also General Comment No. 34*, para. 25. Human rights advocates have particular reasons to be concerned about vagueness, as it increases the risk that a law could be used in retaliation for their work. *See* Inter-Am. Comm'n H.R., *Second Report on the Situation of Human Rights Defenders in the Americas*, para. 92-93, OEA/Ser.L/V/II., Doc. 66 (Dec. 31, 2011); Khan Report, para. 70 (vague laws "leave a lot of room for misuse, which often leads to the silencing of legitimate human rights advocacy.").

Based on the available evidence, Ms. Öztürk's detention and threatened deportation appear to run afoul of the legality principle. Respondents rely on a vague and overbroad law that provides "unfettered discretion" to one official to restrict otherwise legally protected speech. Respondents have not charged Ms. Öztürk with any crime. Instead, they claim the legal authority to revoke Ms. Öztürk's status on "foreign policy" grounds. Order, ECF No. 42, at 8. Section 237(a)(4)(C)(iii) of the INA, upon which Respondents rely, incorporates by reference 8 U.S.C. §1182 (a)(3)(C)(iii)(2025) and INA §212 (a)(3)(C)(iii), which in turn provide that while normally a noncitizen may *not* be removed because of their lawful "beliefs, statements, or associations," they *can* be removed if the Secretary of State "personally determines" that their presence "would compromise a compelling United States foreign policy interest." The law does not clarify the basis for such determinations and confers "unfettered discretion" in decision-making on the Secretary of State, making it difficult for an individual to "regulate his or her conduct accordingly." *General Comment No. 34*, paras. 24-25; Kaye Report, para. 24. "Foreign policy" is an exceedingly broad and vague category that can cover a wide-range of issues, from economic and trade policy, to the environment, women's rights, humanitarian aid, and public health, among others. Government foreign policies frequently shift, and are not

necessarily made public. The Respondents have yet to explain what foreign policy interest is at stake in this case.

**B. International law prohibits restrictions that do not have a legitimate purpose and are not necessary and proportionate.**

To lawfully impose restrictions on expression, a government must show those restrictions are grounded in a **legitimate purpose** and that they are **necessary** and **proportionate** to that purpose. For a restriction to be **legitimate**, it must have a valid purpose aimed at protecting "the rights or reputations of others," "national security," "public order," or "public health or morals." ICCPR art. 19(3).[3] This list of legitimate aims is "exhaustive, and cannot be used pretextually to curtail speech." Amal Clooney & David Neuberger, <u>Freedom of Speech in International Law</u> 47 (2024). Governments have the burden of showing "that the restriction actually protects, or is likely to protect, the legitimate State interest at issue." Kaye Report, para. 24. Governments must also demonstrate in an "individualized fashion" the direct and immediate connection between the threat and expression. *General Comment No. 34*, para. 35. Restrictions must not "impair the essence of the right, or be aimed at . . . causing a chilling effect." *Nikolaichik v. Belarus*, U.N. Hum. Rts. Comm., para. 7.4, U.N. Doc. CCPR/C/139/D/3056-3134/2018 (Oct. 12, 2023). International law places a particularly high value on political discourse. Clooney & Neuberger, *supra*, at 50 ("Across the board, [international human rights bodies] recognize that when speech

---

[3] Upon its ratification of the ICCPR, the United States issued a declaration that sought "to *increase* the scope of protection of the right to free expression." Amal Clooney & David Neuberger, <u>Freedom of Speech in International Law</u> 29 (2024). The United States declared: "[I]t is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant." 138 Cong. Rec. S4781-01 (daily ed. Apr. 2, 1992) (U.S. reservations, declarations, and understandings to the International Covenant on Civil and Political Rights).The United States then specifically referenced Article 19 of the ICCPR (freedom of expression) and its permissible restrictions. *Id.*

addresses a matter of public interest, this should be a factor favouring a higher degree of protection."). Accordingly, restrictions on such discourse "require very strong reasons . . . for broad restrictions imposed in individual cases would undoubtedly affect respect for the freedom of expression in general in the State concerned." *Alekhina v. Russia,* App. No. 38004/12, Eur. Ct. H.R. para. 212 (July 17, 2018); *see also General Comment No. 34,* para. 35.

In this case, Respondents have not shown that Ms. Öztürk's detention and threatened deportation serve a legitimate purpose. As noted above, the only interest articulated by the government to retrospectively justify its revocation of her visa was a vague "foreign policy" interest, Order, ECF No. 42, at 7, which is not one of the enumerated grounds for limiting freedom of expression. ICCPR art. 19; *General Comment No. 34*, para. 22.

Even if the government did show a legitimate purpose for restricting Ms. Öztürk's rights, its restrictions must be **necessary** and **proportionate** to achieve that purpose. Proportionality and necessity are "strict tests." *Rabbae v. The Netherlands,* para. 10.4, U.N. Doc. CCPR/C/117/D/2124/2011. They require states to "demonstrate that the restriction imposes the least burden on the exercise of the right and actually protects, or is likely to protect, the legitimate state interest at issue. States may not merely assert necessity, but must demonstrate it." David Kaye (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression) *Report of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression,* U.N. Doc. A/HRC/38/35, para. 7 (Apr. 6, 2018).

Here, the government has not argued or shown that its actions in response to Ms. Öztürk's expression—detention and threatened deportation in response to an op-ed in a student newspaper—are necessary and proportionate. Instead, the revocation of Ms. Öztürk's visa

"aligns with new policy directives from President Donald Trump who, after assuming office, signed two Executive Orders aimed at fulfilling a campaign promise to revoke the visas of students he characterized as 'Hamas sympathizers.'" Order, ECF No. 42, at 7 (referencing Exec. Order 14188, *Additional Measures to Combat Anti-Semitism,* 90 Fed. Reg. 8847 (Jan. 29, 2025); Exec. Order 14161, *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed Reg 8451 (Jan. 20, 2025)). However, any restrictions on speech, including those designed to combat hate speech, must be consistent with other applicable international law, proportionate, non-discriminatory, and must "not be based on ambiguous or overbroadly defined offences." Clooney & Neuberger, *supra,* at 173, 175. *See also General Comment No. 34*, paras. 50-52 (the acts that are addressed in article 20 are all subject to restriction pursuant to article 19, paragraph 3); U.N. High Comm'r for Hum. Rts., *Rep. on the expert workshops on the prohibition of incitement to national, racial or religious hatred*, para. 18, U.N. Doc. A/HRC/22/17/Add.4 (Jan. 11, 2013) [*hereinafter* Rabat Plan of Action]; La Rue Report, para. 28-30.

International law does require states to "protect individuals from violence and discrimination," including antisemitic violence and discrimination, wherever they occur. Clooney & Neuberger, *supra,* at 153. *See also* Frank La Rue (Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression), U.N. Doc. A/66/290, paras. 26-31 (Aug. 10, 2011) [*hereinafter* La Rue Report]; ACHR art. 13(5). But human rights experts have noted that it is a mistake to "confuse and conflate criticism of the policies of Israel, which is a legitimate exercise of freedom of expression, with antisemitism." Khan Report, para. 75. They have also documented a pattern of stigmatization of those who advocate for Palestinian human rights. *See* Gina Romero (Special Rapporteur on the Promotion and Protection of the Right to

13

Freedom of Assembly and Association), *Protecting the Rights of Freedom of Assembly and Association from Stigmatization*, U.N. Doc. A/79/263, para. 57 (July 31, 2024) [*hereinafter* Romero Report] ("High-level government officials, public figures and the media have used demonizing and vilifying rhetoric against global pro-Palestinian solidarity protests. This stigmatization has been framed as a fight against anti-Semitism and hate speech.").

Even in circumstances where a government acts to protect individuals from violence or discrimination, a government invoking a legitimate ground to restrict freedom of expression must "demonstrate in specific and individualized fashion the precise nature of the threat, and the necessity and proportionality of the specific action taken, in particular by establishing a direct and immediate connection between the expression and the threat." *General Comment No. 34*, para. 35; *see also Shin v. Republic of Korea*, U.N. Hum. Rts Comm., para. 7.3, Comm. No. 926/2000 (Mar. 16, 2004). Here, the government makes no showing that Ms. Öztürk's expression rises to the level of violence or discrimination. Nor has the government demonstrated with any specificity or precision the nature of the supposed threat posed by her expression, the direct and immediate connection between her expression and such a threat, or the necessity and proportionality of its response.

In short, limitations on speech "must remain an exception," and there is a "high threshold" for imposing such limits. Rabat Plan of Action, para. 18. Respondents fail to clear that bar.

### C. International law prohibits discriminatory restrictions.

The rights to freedom of expression and opinion must be guaranteed without discrimination. *See* ICCPR art. 2(1); *General Comment No. 34*, para. 26; ICERD art. 5(d)(viii);

14

UDHR art. 2; Comm. on the Elimination of Racial Discrimination, *General Recommendation 30*: Discrimination against non-citizens, para. 3, U.N. Doc CERD/C/64/Msc.11/rev.3 (Feb. 23-Mar. 12, 2004). In restricting these rights, governments may not discriminate between citizens and noncitizens, or on the basis of nationality or national or ethnic origin. *See* ICCPR art. 2(1); UDHR art. 2; ICERD art. 5(d); Hum. Rts. Comm., *General Comment No. 15: The Position of Aliens Under the Covenant*, Twenty-Seven Session (1986), para. 7, U.N. Doc HRI/GEN/1/Rev. 1 (noncitizens "have the right to freedom of thought, conscience . . . [and] to hold opinions and express them [as well as] receive the benefit of the right of peace assembly and of freedom association. . . . There shall be no discrimination between aliens and citizens in the application of these rights."); Hum. Rts. Comm., *General Comment No. 31*, para. 10, U.N. Doc. CCPR/C/21/Rev.1/Add.13 (May 26, 2004) ("a State party must respect and ensure the rights laid down in the Covenant to anyone within the power or effective control of that State Party"); *General Comment No. 37*, para. 5. Moreover, no distinction can be made "on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs." UDHR art. 2. Yet the use of Section 237(a)(4)(C)(iii)—an immigration-related provision—impermissibly restricts speech for noncitizens that is protected for citizens.

Viewpoint discrimination is also prohibited, and any restrictions on the rights must be content-neutral. *General Comment No. 37,* para. 22; *see also Amelkovich v. Belarus,* Hum. Rts. Comm., U.N. Doc. CCPR/C/125/D/2720/2016) (May 29, 2019) (rejecting controversial ideas as valid basis for restricting freedom of expression). Restrictions specifically targeting expression in support of Palestinian human rights are thus impermissible. *See* Romero Report, para. 58 (vilification, criminalization, sanctions, arrests, detentions and the use of excessive force against students involved in Palestine solidarity protests are discriminatory); *see generally* Khan Report.

In March 2025, the top international law experts with U.N. mandates to monitor and assess human rights stated that the "arbitrary detention of U.S. lawful permanent residents, and removal of international students who have participated in university protests in solidarity with Palestine" is "disproportionate, unnecessary, and discriminatory." Press Release, U.N. OHCHR, Deporting international students involved in pro-Palestinian protests will escalate trauma and polarisation on US campuses: UN experts, U.N. Press Release (Mar. 17, 2025).

**D. International law prohibits retaliation against individuals exercising their rights.**

Under international law, states are prohibited from using criminal, judicial, and administrative processes to retaliate against individuals exercising their protected rights. States may not use "an arrest or detention as punishment for the legitimate exercise of the rights as guaranteed by the [ICCPR] . . . including freedom of opinion and expression." Hum. Rts. Comm., *General Comment No. 35: Article 9: Liberty and security of person*, para. 23, U.N. Doc. CCPR/C/GC/35 (December 16, 2014); *Khadzhiyev v. Turkmenistan*, U.N. Hum. Rts. Comm. para. 7.7, U.N. Doc. CCPR/C/122/D/2252/2013 (May 24, 2018). A State's punitive power is misused when it is targeted to hinder legitimate activities in defense of human rights. Inter-Am. Comm'n H.R., *Criminalization of the Work of Human Rights Defenders*, 3, 7-8, 41-43, OEA/Ser.L/V/II., doc. 49/15 (Dec. 31, 2015). This principle applies equally with respect to advocacy for Palestinian human rights. As the U.N. Special Rapporteur for freedom of opinion and expression has observed, international law "creates an imperative for all States to change their laws, policies and practices restricting or prohibiting such advocacy." Khan Report, para. 84.

16

Taken together, the available facts indicate that Ms. Öztürk's detention and threatened deportation are likely due to her political speech related to Palestine. Order, ECF No. 42, at 7-8 ("Ozturk's case is one of several cases in which the Trump Administration has implemented these Executive Orders by revoking the immigration status of non-citizens who expressed support for Palestine."). Multiple government officials have indicated that Ms. Öztürk was targeted for her speech. Pet'r's Am. Pet., ECF No. 12, at 16-17. For example, when asked about the specific actions that led to Ms. Öztürk's visa revocation, Secretary Rubio stated "we gave you a visa to come and study and get a degree not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that we're going to take it away. [...] We don't want it. We don't want it in our country. Go back and do it in your country. But you're not going to do it in our country." *Id.*. at 16. The treatment of Ms. Öztürk appears to be part of an escalating government response to speech and protests in support of Palestinian human rights. *Id.* at 20-21; *see, e.g., Chung v. Trump*, No. 25-cv-02412 (S.D.N.Y. 2025); *Khalil v. Joyce*, No. 25-cv-01935-JMF, 2025 WL 849803 (S.D.N.Y. 2025); *Id.* at 13-15 (detailing other similar cases). U.N. experts have documented a pattern of stigmatization and criminalization against students advocating for Palestinian human rights. *See* Khan Report, para. 36 (noting over 45 state and federal measures had been proposed "aimed at restricting street protests in support of Palestine, punishing student protestors and stigmatizing their Palestinian advocacy as 'terrorism'"); Romero Report, para. 57 ("In various universities in the United States of America, such as Columbia University, authorities and law enforcement have responded disproportionately, with vilification, criminalization, sanctions, arrests, detentions, and the use of excessive force."). Detaining and seeking to deport Ms. Öztürk in retaliation for her exercise of her basic rights would be illegal under international law.

Further, if Ms. Öztürk's arrest and detention have no legal basis, they are also violations of the right to liberty and security of the person, ICCPR, art. 9, and further implicate other fundamental human rights, including the right not be subjected to unlawful interference with privacy or home, or unlawful attacks on reputation. ICCPR, arts. 17, 23.

III.    **The exercise of fundamental rights by all noncitizens in the United States is at risk of being chilled.**

The impacts of the government's restrictions on human rights reverberate far beyond Ms. Öztürk's case. Following the arrest of Columbia University student Mahmoud Khalil two weeks prior to Ms. Öztürk, President Trump warned that "[t]his is the first arrest of many to come." Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, 11:05 AM), https://perma.cc/BML5-GR84. Noncitizens across the United States are uncertain about which speech or activities may result in retaliation or punishment, and fear that they could similarly face arrest, detention, and deportation for exercising their fundamental human rights to expression and opinion. *See, e.g.*, Jazzmin Jiwa, *'I could be next': international students at Columbia University feel 'targeted' after Mahmoud Khalil's arrest*, The Guardian (Mar. 19, 2025, 11:00 AM), https://perma.cc/MBF6-XPJ5; Jocelyn Gecker, *After Columbia arrests, international college students fall silent*, ABC News (Mar. 15, 2025, 1:09 AM), https://perma.cc/ZC2G-86JB. Even prior to the government's arrest of Ms. Öztürk and others, U.N. experts warned that sanctions against students advocating for Palestine, including deportation or threats of deportation from the United States, have "a chilling effect on the diversity of views, affecting academic freedom on campus, in and outside classrooms." Press Release, U.N. OHCHR, USA: Free speech on campus needs to be protected, not attacked, say experts, U.N. Press Release (July 15, 2024); *see also* Press Release, U.N. OHCHR, Speaking out on Gaza / Israel must be allowed: UN experts, U.N. Press Release (Nov. 23, 2023).

18

On March 17, 2025, a group of the world's top human rights experts—appointed by governments at the U.N. to monitor human rights globally—raised alarm that the U.S. government's arbitrary detention and deportation of students based on their protected free speech "create a chilling effect on the rights to freedom of expression, assembly and of association." Press Release, U.N. OHCHR, Deporting international students involved in pro-Palestinian protests will escalate trauma and polarisation on US campuses: U.N. experts, U.N. Press Release (Mar. 17, 2025). In a further statement on March 20, 2025, more U.N. experts expressed alarm that targeting foreign nationals in the United States with threats to revoke student visas or residency rights is "highly dangerous as it seeks to exert a chilling effect on free expression among immigrants going far beyond the Palestinian issue." Press Release, U.N. OHCHR, U.S. must immediately release Palestinian rights-activist Mahmoud Khalil and stop threats of deportation against foreign residents, say U.N. experts (Mar. 20, 2025). These experts called on the United States to "immediately end retaliation against students supporting Palestinians' rights." *Id.*

Sanctions such as deportation create a climate of fear and intimidation which discourages others from freely expressing their views or engaging in human rights work more broadly. *See* Farida Shaheed (Special Rapporteur on the Right to Education), *Statement by the Special Rapporteur on the right to education, Ms. Farida Shaheed on her visit to the United States of America*, 2 (May 10, 2024); *see generally* Mary Lawlor (Special Rapporteur on the Situation of Human Rights Defenders), *"We are not just the future": challenges faced by child and youth human rights defenders,* U.N. Doc. A/HRC/55/50 (Jan. 17, 2024). Further, U.N. experts have noted that stigmatizing narratives that misrepresent legitimate exercises of rights as illegal activities, and that characterize individuals exercising their rights threats to national security, can

have a "severe and lasting" chilling effect on "civic space broadly." Romero Report, para. 14. Indeed, as noted in the *amici*'s statement of interest above, fears of retaliation impacted the filing of this very brief by chilling the participation of eminent potential *amici*, particularly those who are not U.S. citizens.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that the Court grant petitioners' motion for preliminary injunction.

DATED: April 10, 2025

/s/  Brett Stokes
Brett Stokes
Director, Center for Justice Reform Clinic
Assistant Professor of Law
Vermont Law and Graduate School
164 Chelsea Street,
South Royalton, VT 05068
Tel: (802) 540 - 0398, ext. 102
bstokes@vermontlaw.edu

*Counsel for Amici Curiae*

**Certificate of Service**

I certify that on April 10, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States District Court for the District of Vermont. To the best of my knowledge, all participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.


/s/ Brett Stokes

Brett Stokes
Director, Center for Justice Reform Clinic
Assistant Professor of Law
Vermont Law and Graduate School
P.O. Box 1404,
Burlington, VT 05402
Tel: (802) 540-0398, ext. 102
bstokes@vermontlaw.edu
(in his individual capacity)

*Counsel for Amici Curiae*

# APPENDIX
### *List of Amici Curiae*

The positions taken in this brief are those of *amici* alone and should not be attributed to any institution with which amici are or have been affiliated.

**E. Tendayi Achiume**
Professor of Law, Stanford Law School; Former UN Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia and Related Intolerance

**Philip Alston**
John Norton Pomeroy Professor of Law, NYU School of Law; Former UN Special Rapporteur on extreme poverty and human rights; former UN Special Rapporteur on extrajudicial executions

**Aslı Bâli**
Professor of Law, Yale University

**Thomas B. Becker, Jr.**
Legal and Policy Director, University Network for Human Rights

**Karima Bennoune**
Lewis M. Simes Professor of Law, University of Michigan Law School; Former UN Special Rapporteur in the field of cultural rights

**Blaine Bookey**
Visiting Assistant Professor, University of California College of the Law, San Francisco; Legal Director, Center for Gender and Refugee Studies

**Christine Bustany**
Senior Lecturer in International Law, The Fletcher School of Law & Diplomacy, Tufts University

**Toby Cadman**
Barrister and Joint Head of Chambers, Guernica 37 Chambers

**Ruben Carranza**
Senior Expert, International Center for Transitional Justice (ICTJ)

**Sandra Coliver**
Former Executive Director, Center for Justice & Accountability

**Brian Concannon, Esq.**
Executive Director
Institute for Justice & Democracy in Haiti

**Tom Dannenbaum**
Associate Professor of International Law, the Fletcher School of Law & Diplomacy; Co-Director of the Center for International Law and Governance, Tufts University

**Lisa Dicker**
Clinical Instructor, Harvard Law School

**Dr Souheir Edelbi**
Lecturer, School of Law, Western Sydney University

**Susan Farbstein**
Clinical Professor of Law, Harvard Law School

**Carla Ferstman**
Director, Essex Human Rights Centre and Professor, Essex Law School, United Kingdom

**Alexandra Filippova**
Senior Staff Attorney, Institute for Justice & Democracy in Haiti

**Martin Flaherty**
Charles and Marie Robertson Visiting Professor, School of Public and International Affairs, Princeton University; Adjunct Professor, Columbia Law School

**Laurel Fletcher**
Chancellor's Clinical Professor of Law, UC Berkeley

**Kristina Fried**
Staff Attorney, Institute for Justice and Democracy in Haiti

**Tyler R. Giannini**
Clinical Professor of Law, Harvard Law School

**Jennifer M. Green**
Clinical Professor of Law; Director, Human Rights Litigation and Advocacy Clinic, University of Minnesota Law School

**Rebecca Hamilton**
Professor of Law, American University, Washington College of Law

**Hurst Hannum**
Professor Emeritus of International Law, Fletcher School of Law & Diplomacy, Tufts University

**Adil Haque**
Professor of Law, and Judge Jon O. Newman Scholar, Rutgers Law School

**Lindsay M. Harris**
Professor of Law, University of San Francisco School of Law

**Todd Howland**
Visiting Professor, Vermont Law and Graduate School

**Deena R. Hurwitz, Esq.**

**Marissa Jackson Sow**
Associate Professor of Law, University of Richmond

**Tejal Jesrani**
Director, TrialWatch Project, Human Rights Institute; Clinic Instructor, Human Rights Clinic, Columbia Law School

**Dr Richard Joyce**
Senior Lecturer, Melbourne Law School, University of Melbourne

**David Kaye**
Clinical Professor of Law; Director, International Justice Clinic, UC Irvine School of Law; Former United Nations Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression

**Nabila Khan**
Adjunct Professor, Toronto Metropolitan University

**John H. Knox**
Henry C. Lauerman Professor of International Law, Wake Forest University School of Law; Former UN Special Rapporteur on human rights and the environment

**Christian Lance-De Vos**
Adjunct Clinical Professor, Human Rights & Gender Justice Clinic, City University of New York Law School; Adjunct Assistant Professor of Political Science, Institute for the Study of Human Rights, Columbia University

**Daniel Levine-Spound**
Lecturer on Law, Harvard Law School

**Beatrice Lindstrom**
Senior Clinical Instructor; Lecturer on Law, Harvard Law School

**Bert Lockwood**
Distinguished Service Professor and Director, Urban Morgan Institute for Human Rights, University of Cincinnati College of Law

**Clara Long**
Director of Policy and Organizing, Human Impact Partners

**Rachel López**
James E. Beasley Professor of Law, Temple University Beasley School of Law

**Kate Mackintosh**
Executive Director, UCLALaw Promise Institute Europe

**Wade McMullen**
Distinguished Fellow, Human Rights Institute, Georgetown University Law Center

**Juan Ernesto Méndez**
Professor of Human Rights Law in Residence, Washington College of Law, American University

**Grace Meng**
Executive Director, Epstein Program in Public Interest Law and Policy, UCLA School of Law

**Chi Adanna Mgbako**
Clinical Professor of Law, Fordham Law School; Director, Walter Leitner International Human Rights Clinic

**Alice M. Miller**

Co-Director, Global Health Justice Partnership of the Yale Law School and the School of Public Health; Yale School of Public Health, Professor in the Practice; Women's, Gender and Sexuality Studies Council; Yale Law School, Associate Professor (Adjunct)

**Saira Mohamed**
Agnes Roddy Robb Professor of Law, University of California, Berkeley, School of Law

**Samuel Moyn**
Kent Professor of Law and History, Yale Law School

**Ruhan Nagra**
Associate Professor of Law, University of Utah

**Vasuki Nesiah**
Professor of Practice, The Gallatin School, New York University

**Citlalli Ochoa**
Practitioner-in-Residence, American University Washington College of Law

**Chidi Anselm Odinkalu, Ph.D.**
Professor of Practice, International Human Rights Law
The Fletcher School of Law & Diplomacy, Tufts University

**Diane Orentlicher**
Professor of Law, American University Washington College of Law

**Dinah PoKempner**
Former General Counsel Human Rights Watch; Associate Professor, Columbia University; Special Assistant to the UN Special Rapporteur on Freedom of Expression

**Jaya Ramji-Nogales**
Professor of Law, Temple University

**Emily A. Ray**
Clinical Fellow, Harvard Law School

**Michael Reed-Hurtado**
Adjunct Professor, Georgetown University

**Mathias Risse**

Berthold Beitz Professor in Human Rights, Global Affairs and Philosophy, Harvard Kennedy School; Director of the Carr Center for Human Rights Policy

**Naomi Roht-Arriaza**
Distinguished Professor of Law Emerita, University of California College of Law San Francisco

**Gabor Rona**
Professor of Practice, Cardozo Law School

**Kenneth Roth**
Visiting Professor, Princeton's School of Public and International Affairs; former executive director, Human Rights Watch (1993-2022)

**Britton Schwartz**
Deputy Director, International Human Rights Clinic, Santa Clara University School of Law

**Rajika Shah**
Director, Justice for Atrocities Clinic, LMU Loyola Law School

**Carey Shenkman**
Human Rights Lawyer

**Anita Sinha**
Professor of Law; Director, International Human Rights Law Clinic; Faculty Director, Program on Gender, Theory, Law & Practice, American University Washington College of Law

**Matiangai Sirleaf**
Nathan Patz Professor of Law, University of Maryland Francis King Carey School of Law; Professor, Department of Epidemiology and Public Health, University of Maryland School of Medicine

**Joseph Slaughter**
Associate Professor of English and Comparative Literature; Director of the Institute for the Study of Human Rights, Columbia University

**Chantal Thomas**
Professor of Law, Cornell Law School

**Ryan Thoreson**
Assistant Professor, University of Cincinnati College of Law

**Salma Waheedi**
Lecturer on Law, Harvard Law School

**Deborah M. Weissman**
Reef C. Ivey II Distinguished Professor of Law; Director, Criminalized Survivor, Detention, and Justice Clinic, University of North Carolina at Chapel Hill School of Law

**James Yap**
Adjunct Professor, Osgoode Hall Law School, York University