1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

RUMEYSA OZTURK,                    )
                                   )
              Petitioner           )
        vs.                        ) CASE NO. 2:25-cv-374
                                   )
PATRICIA HYDE, MICHAEL KROL,       )
TODD LYONS, KRISTI NOEM,           )
DONALD J. TRUMP, MARCO A.          )
RUBIO,                             )
                                   )
              Respondents.         )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

        Motions Hearing held at 9:33 a.m. on Monday,

April 14, 2025, in Burlington, Vermont, before

Honorable William K. Sessions, III, District Judge.

Sarah M. Bentley, CCR-B-1745
 Registered Professional Reporter and Notary Public

2

A P P E A R A N C E S

For the Petitioner:

    ADRIANA LAFAILLE, ESQ.
    ACLU Foundation of Massachusetts, Inc.
    Suite 850
    One Center Plaza
    Boston, Massachusetts  02108
       (617) 482-3170
       alafaille@aclum.org


    JESSIE J. ROSSMAN, ESQ.
    ACLU Foundation of Massachusetts, Inc.
    Suite 850
    One Center Plaza
    Boston, Massachusetts  02108
       (617) 482-3170
       jrossman@aclum.org


    NOOR ZAFAR, ESQ.
    American Civil Liberties Union Foundation
    18th Floor
    125 Broad Street
    New York, New York  10004
       (469) 301-5991
       nzafar@aclu.org




For the Respondents:

    MICHAEL P. DRESCHER, ESQ.
    Assistant United States Attorney
    United States Attorney's Office
    3rd Floor
    United States Federal Building and Post Office
    11 Elmwood Avenue
    Burlington, Vermont  05402-0570
       (802) 951-6725
       michael.drescher@usdoj.gov

3

I N D E X

PAGE

Statements by the Court                          4

Statements by Mr. Drescher                   5, 104

Statements by Ms. Zafar                         45

Statements by Ms. Lafallia                  61, 103

Statements by Ms. Rossman                       75

*    *    *

4

P R O C E E D I N G S

THE COURT:  Good morning.

THE CLERK:  This is Civil Case No. 25-374, Rumeysa Ozturk vs. Patricia Hyde, et al.

Present for the petitioner are Attorneys Adriana Lafaille, Jessie Rossman, and Noor Zafar.

Present for the respondent is Assistant United States Attorney Michael Drescher.

The matter before the Court is a hearing on a motion to dismiss.

THE COURT:  Okay.  Good morning, everyone.

(Brief pause.)

THE COURT:  All right.  Good morning, everyone.  This is a full house.  At least it looks like a full house from this perspective.

I invite you to be here.  I just would remind everyone that this is a courtroom.  This is a respectful environment; that I've asked the marshals if anyone becomes disruptive during the course of the argument that they should be removed, but other than that we certainly invite

5

everyone to be here.

So we're addressing a number of motions that have been filed.

First, the government has filed a motion to dismiss, and I think we'll address that first.

The petitioner has also filed a request for release and, alternatively, that she be removed back to this jurisdiction for the course of the habeas proceedings, and we'll deal with that second.

So, first, is the government ready to proceed on its motion to dismiss?

MR. DRESCHER:  It is.

THE COURT:  Technically you didn't file a motion to dismiss, but I perceived that that's exactly what you were requesting.  In fact, that's what you requested in the course of your filing so I call it a motion to dismiss, and I'll hear you.

MR. DRESCHER:  Understood.

With your Honor's indulgence, as the Court is aware, there are two or three separate issues pertinent to whether the Court has jurisdiction; the first being habeas, the second

6

being the transfer under 1631, and the third being the effect of the INA.

THE COURT:  Yes.

MR. DRESCHER:  Do you wish -- and I appreciate that counsel for petitioner, different counsel will argue different issues for petitioner, and so my question is how would you like the government -- do you want me to argue all of the issues initially?

THE COURT:  I think that you should argue all of the issues initially.  Then if, in fact, different counsel want to address those issues from the petitioner, they can do that.

MR. DRESCHER:  Thank you.

At the outset I want to emphasize that we do not contest that Ms. Ozturk is entitled to judicial review of what has happened and what is happening to her.

Our position is that under the system set up by Congress for administering the immigration laws and pursuant to decisions, pursuant to the decisions of the Supreme Court in the 2nd Circuit, this is neither the time nor the forum for that review to occur.

THE COURT:  All right, so you are

essentially suggesting that she does have a right to file a habeas petition addressing constitutional issues, which are separate and apart from the removal proceedings that she is now facing; is that correct?

MR. DRESCHER: We're not contesting her right to file a habeas petition.

THE COURT: Okay.

MR. DRESCHER: She's in the executive -- she's in the custody of the executive. Habeas is a traditional means of challenging the legality of that.

We do challenge whether this Court has habeas -- is the appropriate venue for that habeas challenge to be heard.

THE COURT: All right.

MR. DRESCHER: And, again, at the outset I appreciate that the system that Congress has set up does not provide Ms. Ozturk for the relief that she wants at this time and that she understandably wants to believe now.

I also appreciate that her detention, as for anyone who is in the custody of the executive branch, has a profound impact on her.

The Congress has made clear that claims

8

such as the one that are before the Court, whether it's habeas or other -- or fashioned otherwise, because they arise from the fact that Ms. Ozturk is in immigration proceedings right now and is subject to removal proceedings, her claims must be presented to an appropriate court of appeals at the appropriate time.

And in the meantime Ms. Ozturk may request that she be released on bond before the immigration judge, and to my knowledge she has not yet done so.

On the question of habeas jurisdiction, I think the critical case is <u>Padilla</u>.  And that case makes clear that the appropriate venue for considering a petitioner's habeas petition is the venue in which the petitioner's immediate custodian, is the venue that has jurisdiction over the immediate custodian, and is the venue of her detention.

THE COURT:  Okay.  So just before we get into the discussion about venue, you've looked at the complaint that has been filed by the petitioner.  Tell me what you think the complaint is seeking as a remedy.

MR. DRESCHER:  On its face it seeks an

order returning her initially to the District of Massachusetts.  Now they are asking her to be returned to the District of Vermont.

It's asking that she be released on bail.

It's asking that the Court declare her arrest and detention are constitutionally -- are unconstitutional.

It asks the Court to set aside a policy of targeting noncitizens for removal based on protected speech.

It's asking the Court to restore her -- certain entries relating to her in the system set up by the Department of Homeland Security relating to student visas, the SEVIS record, which it's not completely clear.

It may also be a challenge to the actual revocation of her visa.

She's asking the Court to enjoin any enforcement action against her based on -- based on foreign policy.

And those are the principal requests for relief.

THE COURT:  Well, so what questions is she addressing in her complaint in regard to her removal proceedings?

In other words, what restriction is she asking the Court to make about how immigration is to proceed in the removal proceeding?

MR. DRESCHER:  With your Honor's indulgence, I want to answer your Honor's question indirectly.

THE COURT:  Okay.

MR. DRESCHER:  First, as a core habeas matter, the only relief that's available for a core habeas matter is the petitioner's release.

THE COURT:  All right.

MR. DRESCHER:  All of the other remedies, while certainly relevant to her situation, are really outside the normal scope of a habeas case.

THE COURT:  All right, so -- and have you read the complaint to be consistent with that principal?

That is, what the petitioner is seeking is a declaration that her arrest violated both the First and the Fifth Amendment as well as the APA, and what she is seeking essentially is release?

That is, because the arrest was in violation of the First, Fifth and APA, she's

11

entitled to a release, but that has no impact upon the revocation or the removal proceeding?

MR. DRESCHER:  That's not totally clear, your Honor.

I'll take a step back.  It does have an impact on the removal proceedings insofar as she is currently in custody because her visa has been revoked and she's received a notice to appear asserting that she is no longer -- she is out of status because of the revocation of her visa.  Under the discretion that is accorded to the executive branch by Congress in 1226(a), she is being held in custody.

She is in custody because she is in removal proceedings.  She was taken into custody because -- because of her absence of status.

It is conceptionally impossible to separate her request to be released from custody from the fact that she is in custody because the Attorney General has initiated removal proceedings.  She has detained her in her discretion as part of those and has detained her as part of those removal proceedings.

Under the 2nd Circuit's analysis in the Delgado case and in the 2nd Circuit's analysis

12

in the Ragbir case, these -- the fact of her detention is inextricably connected to the fact that she is in removal proceedings. And --

THE COURT: Okay, so let's just assume that the Court were to grant the petitioner's request, declare the arrest to be in violation of the First and Fifth Amendment, okay, constitutional violation, which means then the Court addresses whether she should be in custody.

Are you suggesting that if the Court were to determine that she was arrested in violation of the First Amendment and the Fifth Amendment, that the Court has no remedy or that the petitioners have no remedy?

That is, in fact, if the Court ordered her to be released, you would say that the Court had no jurisdiction to order her released because of its impact on the removal proceeding?

MR. DRESCHER: Not because of its impact on the removal proceeding, although it certainly would presumably have an impact in terms of venue and other aspects of the removal proceedings, which I'm not completely familiar with.

13

Our position is the Court doesn't have jurisdiction to do that because it's connected to the removal proceedings. And it's not just me as a lawyer saying that. It's what Congress said in 1226 and in 1252.

First, Congress says that in 1226 there shall be no judicial review of the discretion -- the discretionary detention of a noncitizen who is subject to removal proceedings.

Now, that noncitizen, like petitioner here, can seek relief before the immigration court if she's detained, as is the case here. So Congress has made pretty crystal clear in 1226 that's the case.

The 2nd Circuit has recognized that that's the case in a case, Velasco Lopez.

THE COURT: Velasco Lopez, which is the central case, indicating that the Court does have the power to address a habeas petition despite the fact that someone may be in removal proceedings?

MR. DRESCHER: As I understand Velasco Lopez, and this is consistent with, I believe, the Supreme Court decision in Jennings, a court can exercise habeas jurisdiction when the

14

assertion is the scope of authority or a challenge to the statutory scheme; that in those cases that was what was at issue.

There was a -- it was not a challenge to the discretionary decision or, I believe in Jennings, in some cases a nondiscretionary decision under 1226(c).

THE COURT:  Well, you've read the proceedings of the petitioner which basically suggests that they're not in any way addressing the removal proceedings.  They're, in fact, approaching this subject matter almost as two separate areas of concern.

The first area of concern would be in the arrest and immediate detention in violation of constitutional rights.  That's a separate habeas proceeding which goes before an Article III judge.  That's habeas.

The second is the removal proceedings.  And what they're suggesting is they're not seeking relief at all in terms of the removal proceedings.  In fact, they're not trying to get the immigration judge or ICE in its prosecution of the removal proceedings to do anything.  That's not -- that's not a part of this case.

15

All they're saying is she was illegally arrested in violation of the First and Fifth Amendment in particular and, as a result, the remedy would be her release from detention here, not impacting her -- the removal proceedings in any particular way.  And, in fact, you know, suggesting that the removal proceedings continue on despite the fact that her arrest was determined to be illegal.

So do you disagree with that sort of dual way of approaching this subject matter?

MR. DRESCHER:  I believe I understand your Honor's point, but what I take issue with, what we take issue with is the -- is the idea that the Court can separate the fact that Ms. Ozturk was arrested and is in immigration custody from the fact that she's been charged with a notice to -- she's been served a notice to appear and is in custody because of the revocation of her visa.

THE COURT:  Okay, so she's filed a habeas petition suggesting that she was illegally arrested.  The remedy that she is seeking has nothing to do with damages against the government, has nothing to do with stopping her

16

removal proceeding.  Her remedy is pretty straightforward.

If you have a constitutional violation in the arrest of a person, you are entitled to release.  And, you know, I appreciate the fact that you -- that it becomes a little bit fuzzy when you're talking about detention and its impact on the removal proceeding, but what is really fundamentally a question for me is what if she is right?

What if there was a constitutional violation in her arrest?

The only remedy she's seeking is release, and you are suggesting that the Court has no power to release her because she has a removal proceeding in which she has been ordered detained by immigration authorities so that, as a result, she has no remedy.

I mean, this is the fundamental question because obviously if the Court -- if the Court found that there was a constitutional violation, I would turn to you and say, well, of course she needs to be released.

And if the government then says, well, no, she can't be released because we have a

17

detention order in immigration, which is in violate and she's not going to be released, then we're in a constitutional crisis.

MR. DRESCHER:  So I don't want to be heard -- I don't want to be perceived in any way as suggesting that we're not going to abide by an order of the Court.  If I take that hint in your Honor's statement, I want to make that clear.

Our argument, Judge, is that -- and it's not -- it's not the executive.  It's not me who is saying this.  It's Congress who said this, and it's the 2nd Circuit and the Supreme Court who have said this; that because of the intricacies of operating and administering the immigration laws of our country, the executive is vested with a wide amount of discretion.

And because of the intricacies of that system, Congress has specified that district courts should not be involved in reviewing the operations of the immigration -- of the immigration courts, to include reviews of the Attorney General's discretion, discretionary decision to detain a noncitizen who is in immigration proceedings, to include -- well, to

18

include the question of whether somebody is detained or not.

THE COURT: So as a general matter I don't disagree with that at all. I mean, I certainly think that Congress in the INA has, in particular, a number of provisions said that immigration authorities are in charge and that the judicial branch should have no impact in reviewing removal proceedings, removal orders, et cetera. There's no question about that.

There only is a question about this fundamental issue about whether or not during the course of an arrest or bringing the petitioner before immigration authorities there was a violation of fundamental liberties, in which case I agree with you that this is a very complex area of the law and -- and essentially the Constitution rubs up against the INA perhaps in some areas. You know, but fundamentally the Court's responsibility is to make an assessment about the constitutional liberties.

And if there is a constitutional violation here, I mean certainly that takes precedence, it seems to me.

Is that -- do you disagree with that?

MR. DRESCHER:  I don't disagree at all that making sure there is a system in place for judicial review of the constitutionality of what's going on is understandably important to all of us.

In this context, Congress has specified in Section 1252(b)(9) that judicial review of all questions of law and fact, including interpretation and application of constitutional provisions arising from any action taken or proceeding brought to remove an alien from the United States, shall be available only in judicial review of the final order under this section.

THE COURT:  I don't disagree with that, but to move the ball forward you have to make an assessment as to whether that provision is related to removal proceedings or that provision suggests that an Article III judge has no power to make a determination of a constitutional violation earlier in the process.

And I don't hear you saying that an Article III judge would not have the power to make a determination in a habeas proceeding of whether there has been a fundamental violation

of the First and Fifth Amendment.

Am I correct about that?

MR. DRESCHER:  I'm not sure.  There are habeas cases in which courts exercise habeas jurisdiction over challenges to a statutory system, over challenges to whether the executive has authority to exercise at all, but Section 1226(e), I believe, specifies in similarly broad language that there shall be no judicial review of the -- of the decision to -- and, again, and this is not just the statute.

If you look to Jennings, the Supreme Court case on point, which was a very messy set of concurrences, and at some point there was an opinion for the majority.  At some point there was different justices saying different things.

In Part II of that decision three justices say that 1226(e) bars judicial review of discretionary -- the exercise of discretion to detain an alien who is in removal proceedings.  Three justices say that.

Two justices in a concurrence say that there should be no jurisdiction at all under 1252.

So a majority of the Supreme Court has

21

concluded that there is no judicial review at the District Court level of an arrest in this context.

THE COURT: Okay, so tell me, if that's true, if what you're saying is under 1223 or 1226(e), there is no review of detention, right? Tell me why there would still be habeas corpus relief.

MR. DRESCHER: As I indicated, there are -- courts will exercise habeas jurisdiction in the immigration context when the challenge is not to the legality of an individual's -- when the challenge is not to the executive's exercise of discretion to detain a noncitizen who's in removal proceedings.

Rather, when the challenge is to a statutory scheme or the challenge is whether there is authority at all to be exercised in that case. I think this is the -- these are the -- these are the lines that are drawn as I read them in the habeas, in the cases where there is habeas jurisdiction asserted over detained -- detained noncitizens under 1226.

THE COURT: And there is no question that if you take habeas relief as proposed by the

petitioner or, you know, I think by the Circuit in Velasco, that courts address the fundamental question about whether there's a constitutional violation and, if so, the remedy is to release that person.  The remedy is not to impact in any way the removal proceedings but to release that person.

MR. DRESCHER:  And I --

THE COURT:  That's the fundamental distinction.

MR. DRESCHER:  Well, I appreciate that, but I think -- I don't think that's the issue.

The fact that removal proceedings can continue does not disconnect the detained status of the petitioner from the fact that there are removal proceedings, and it's that connection which is what triggers these provisions in the INA.

THE COURT:  But would you then agree that your position is that because of 1226(e), that the impact on detention in a removal proceeding, that essentially the petitioner here has no remedy under habeas?

MR. DRESCHER:  That's what Congress says, and --

23

THE COURT:  Okay.

MR. DRESCHER:  And because of -- because of the extraordinary complexity that is -- that surrounds the operation of our immigration laws, Congress has made that policy determination to vest judicial review, including constitutional review, in the petition for review at the end of the proceedings.

THE COURT:  And that if we found some law, some judicial history -- well, actually legislative history, the legislative history to the INA which suggests that the INA does not really impact the fundamental right to bring habeas, so that is somewhat distinct, if there is something mentioned in legislative history to suggest that the right to habeas remains, despite the passage of the INA, you would find that extraordinary?

MR. DRESCHER:  I think the INA speaks clearly that habeas relief is not available in contexts where the immigration laws are being administered.

THE COURT:  All right.  So I wanted really to address that fundamental question because I wasn't sure exactly what the

24

government's position is.

Now it's pretty clear that basically what you're suggesting is that at least in regard to detention under 1226(e), you feel that the Court really has no jurisdiction, just generally, as a general matter, and we'll get into the more specific.

MR. DRESCHER:  Yes.  And, your Honor, I recognize that in many respects that's a counterintuitive set of rules.

THE COURT:  Yes.

MR. DRESCHER:  But it's also a very counterintuitive area of the law given -- given the intricacies of how our immigration system operates and given Congress's judgment in terms of at what point is it appropriate for the judicial branch to involve itself in that, in the administration of that area of the law.

I want to, by way of example, the 2nd Circuit's case in Ragbir, which I think does a lot of work for both sides in this case, you know, in that case the Court concluded that there was -- although in the end the Supreme Court vacated this part of the ruling.

THE COURT:  But that was on a

25

different -- that was on a totally different issue, right?

MR. DRESCHER:  Well, it had to do with the nature of the relief that was being granted in habeas.

THE COURT:  Yes.

MR. DRESCHER:  But the Court concluded like it would be okay for there to be habeas jurisdiction in that First Amendment challenge to the execution of a removal order.

The only reason why the 2nd Circuit concluded that was because at that point in the proceedings there was no prospect of a petition for review at the appropriate circuit court level.

Because by that time in the -- in the immigration history of Mr. Ragbir, the final order of removal had already issued.  There was no way -- and the timing for her seeking petition for review had expired.

The only reason why the 2nd Circuit said there could be habeas jurisdiction in that case was because the provisions of 1252 sending the constitutional review to the Circuit Court of Appeals couldn't apply.

26

THE COURT:  Right, but that's an extraordinary circumstance in which there is no judicial review at the circuit level after there's an order of removal.

So this is -- this is -- Ragbir is sort of, it seems to me, sort of suggests that in habeas kinds of cases they're flexible. Sometimes there are extraordinary circumstances.

In this particular case, in Ragbir, there was the extraordinary circumstance of no judicial review once an order of removal has been approved by the IJ, the immigration judge, and so as a result in this extraordinary circumstance you actually can review an order of removal.

I mean, clearly they're not seeking to be able to review an order of removal.  This has nothing to do with immigration, at least according to what the petitioner is saying. This just has to do with what happened when she was arrested and was the arrest pursuant to a violation of the First Amendment.

Anyway, so we could stand debating this for I think probably -- not debating.  I'm trying to learn, but --

27

MR. DRESCHER:  You and I both, your Honor, and I appreciate -- you know, I think I've said most of my piece with regard to the operation of the INA in that context.

THE COURT:  Right.

MR. DRESCHER:  I don't want to lose sight of the threshold habeas questions that are triggered by Padilla, and I think they're intractable, another very difficult jurisdictional problem for this Court.  I think they make it necessary --

THE COURT:  We're talking about the arrest and her being brought to Metheun, Massachusetts, then New Hampshire and Vermont, and the filing of the petition at 10:02 in Massachusetts when, in fact, the petitioner's lawyers did not know where she was.

And what's your argument?

Well, tell me what your argument is.

MR. DRESCHER:  My argument is simply that under Padilla in order for a court to have habeas jurisdiction, meaning being the appropriate venue for a habeas case to be filed, that the petition has to be filed against the petitioner's immediate custodian over whom the

28

Court would have jurisdiction, and the petitioner has to be in the district of -- the district where it's filed has to be the district of confinement.

THE COURT:  And are there any extraordinary circumstances in which the district of confinement or the immediate custodian, those are the rules in habeas; that you have to file in the district of confinement and that you have to actually identify the immediate custodian as opposed to the Attorney General, et cetera?

That's the rule.  Are there any exceptions to that rule?

MR. DRESCHER:  The Supreme Court has recognized what I would consider two sets of exceptions.

One is the rule of Endo, which is when the petition is initially filed in the appropriate district against the immediate custodian.  Habeas jurisdiction attaches at that time when -- if it's filed when the petitioner is there.

If the petitioner in the custody -- if the executive branch then moves the petitioner

29

away, jurisdiction doesn't move.  But that requires the petition to be filed in conformity with the immediate custodian rule when it's filed.

THE COURT:  Okay, so let's first address the facts.

The facts here; she's arrested at, I think 5:35, and she's taken to Methuen, Massachusetts, et cetera.  The petition is filed at 10:04 or, I'm sorry, 10:02.  And at 10:02 she is actually in a vehicle being operated by law enforcement officials on her way.  She's in Vermont, but she's on her way to St. Albans; is that right.

MR. DRESCHER:  That's my understanding; that she was in transit at the time the petition was filed.

THE COURT:  Okay.

MR. DRESCHER:  And in Vermont.

THE COURT:  So she's not in Massachusetts for sure.

So do you agree that counsel for the petitioner had no idea where she was; that counsel for the petitioner had called DOJ, ICE, et cetera, trying to locate her.  Nobody would

30

respond and, as a result, she had no idea or they had no idea where she was. And then chose to file in Massachusetts because Massachusetts was the last place where she was located, and because she had no -- they had no idea who the custodian was, they filed against the Attorney General. Is that correct?

MR. DRESCHER: I don't think there's any factual dispute about what happened and why things happened the way they did in terms of where the petition was filed.

THE COURT: Okay. So clearly there's a -- clearly they filed a petition in Massachusetts. They seek -- they seek an exception to be able to file in Massachusetts because they had no clue where she was and -- but she, in fact, is in Vermont.

So in regard, first of all, to the immediate custodian, who is the immediate custodian at the time of the filing?

MR. DRESCHER: It would have to be somebody now who was other than a supervisory official over the people in whose custody the petition was. I don't have a name for you right now, but Padilla makes clear it has to be

31

somebody with immediate custody.

It's not just an official located in another city or even in Washington, D.C. That's one of the clear holdings of Padilla.

THE COURT: Yeah, so ordinarily in all the cases I've been involved in, usually the warden, the warden of the prison, that's the supervisory personnel, but it's the person who has the ability to release -- release her.

MR. DRESCHER: Right.

THE COURT: Why wouldn't that be the head of the field office of ICE?

MR. DRESCHER: Your Honor, I'm just repeating the holding of Padilla; that it can't be somebody with legal authority. It has to be the person with immediate custody.

If you're asking why that's the reason, I'm going to circle back to it's because that's what the Supreme Court says.

THE COURT: Well, now you have a second amended petition which identifies a number of people, and one of them is the head of the field office for the northeast area, which controls all of New England.

MR. DRESCHER: I think even Judge Casper

32

acknowledges in her decision that that -- that that wasn't sufficient under the immediate custodian rule in terms of --

THE COURT:  So you don't think the identification of Ms. Hyde as the person who's the head of the office would be similar to a person who was a warden of a prison?

MR. DRESCHER:  Right.

THE COURT:  Okay.

MR. DRESCHER:  To your Honor's point about what counsel knew or didn't know, again, I think that issue is taken up in Padilla, and I want to point the Court specifically to Footnote 17 in Padilla where the Court specifically rejects the idea that it's okay to file in the Southern District of New York because counsel was not -- did not know at that time that the petitioner had been moved to South Carolina; that what's known or not known to plaintiff's counsel.

And I hope nobody in this room hears me to be -- to be criticizing the performance of counsel.  They were trying to represent their client, but they didn't know where she was, just like the petitioner's counsel in Padilla did not

33

know where he was.  They filed in the district which was, you know, for lack of a better set of words, their best estimate of where their client was located.

But in this case she -- and in <u>Padilla</u> he -- was not located there.  And the Supreme Court specifically said habeas jurisdiction does not attach under those circumstances.

And the fact that counsel didn't know does not affect that analysis.  It's -- and that being the case, that being the case the petition and the amended petition here have never conformed to the requirements of <u>Padilla</u>.

THE COURT:  But perhaps they didn't -- well, they clearly did not know, but one of the things they would say is that they really made all of these efforts to contact the Department of Justice and ICE and calling numerous places to try to get some information about where she was.  And -- and it may be for legitimate purposes.  It may be because of security concerns.

I think part of your pleadings why, ICE was very concerned about security and, as a result, would not want to disclose where they

are.  But the fact is they continued to refuse to tell counsel where she was, and does that make a difference?

MR. DRESCHER:  No, I don't think it does. And I don't think it does, just like in Padilla it didn't make a difference.

And I appreciate your Honor, you know, recognizing the point we made in our filing that there are legitimate security reasons not to disclose the location of somebody who's been detained while that person is in transit.

And, you know, as -- and I can speak from personal experience in the criminal context. Sometimes somebody who has been arrested and charged with a crime is, you know, held without an opportunity to connect with family or a lawyer for a period of, you know, a day or more.

If the system operated more efficiently, nobody would be complaining about that, but this is sort of the reality of when people get arrested and get transported to a holding facility.  I appreciate why that's frustrating to counsel.  I appreciate why that was frustrating to the petitioner in this case, but it's not unusual for somebody who's being

35

arrested to be deprived of the ability to communicate for most of a day following an arrest.

THE COURT:  Right.  I suppose that they could recognize why ICE would not necessarily want to reveal the location, but then what their argument would be, but we're prejudiced by the fact that no one told us where she was.  Because if somebody had told us that she was in Vermont, they could very well have filed the same habeas petition in Vermont that they filed in Massachusetts.

MR. DRESCHER:  Well, I appreciate not knowing where their client was located, they did not know where to file a petition.

And I appreciate that one follows the other, but that doesn't mean it's improper to not disclose the location of their client until she reached her final -- her final facility.

THE COURT:  All right.  There's one other -- there's one other area of this particular point in the story.  That is, when she is filing her petition in Massachusetts, 10 o'clock, 10:02, the Massachusetts court responded relatively quickly and, in fact, there

36

was a judicial order signed, I think at 11 o'clock, approximately 11 o'clock, certainly well before her transport from Vermont to Louisiana, in which they said, Don't move her. They clearly expressed in a judicial order from an Article III judge a desire to maintain jurisdiction, keep her in Massachusetts. At that point they thought it was Massachusetts. Don't move her.

And that was filed with the parties, so the Department of Justice and ICE had notice of this ruling and this order as of -- you know, on the 25th, and yet that order had no impact.

And I'm interested to know, first of all, if ICE knew about that order. I know that counsel made an effort to contact the lawyer for the government so I just assume that they knew of this order, and yet that seemed to have no impact upon what ultimately happened to the petitioner.

I'm wondering whether you acknowledge that you, in fact, or the government, not you particularly, but the government knew about the order in the U. S. District Court in Massachusetts and how you responded?

37

MR. DRESCHER:  I don't know who learned about that order and when.  That's my threshold answer.  I just don't know.  I'm not able to speak to the factual flow of information.

My only observation, and I appreciate this is pertinent to your Honor's point but not -- it's pertinent to your Honor's point.  My only observation is it's my -- it is my understanding that order was to not remove the petitioner from Massachusetts.

And at the time that order issued, she was already out of the District of Massachusetts, making, you know -- and so it's -- it created some complications for what to make of that order.

Now I'm speaking about that as an educated observer who's aware of that aspect of the record but, again, you know, without -- without having information about who knew what and when, if there's a court order that says, you know, don't leave Burlington but you're already in Rutland, it's not clear if it's possible to comply with that court's order.

And as I understand the order your Honor is referring to, that's sort of -- that's sort

of the predicament that was existing then.

THE COURT:  Well, the spirit of the order clearly was that the Massachusetts judge, the U. S. judge in Massachusetts wanted to maintain jurisdiction on the habeas.

MR. DRESCHER:  I assuming incorrectly that -- that that court had jurisdiction under _Padilla_ at the time the petition was filed.

The other thing I'd point out, and I know your Honor confronts this all the time in the criminal context; that it would be extremely unusual for a court to dictate to the branch of the executive, the agency of the executive branch specifically, where to house somebody who's in custody.

In the criminal case the marshal service makes those calls based upon all sorts of reasons.

In this case the record is that the folks at ICE had canvassed the available -- potentially available facilities in New England. I believe this is Paragraph 6 of the Wessling declaration, Docket 19-1, I believe, and ICE had concluded there was no available bed space in New England.

39

And under those circumstances, you know, they -- you know, managing bed space is a recurring issue, and --

THE COURT: So your position is that they decided to use this rather unique proceeding, taking her to Metheun, Massachusetts, to just a really quick stop and then -- then New Hampshire and then Vermont, that was all because of lack of bed space?

And you know that there's some affidavits that were submitted by petitioner which described the available bed space in all of New England, which was contrary to what you just said.

But what you're saying is that -- is that the ICE agents in this particular case actually looked into whether there was space. They didn't want to treat her any differently than anybody else, but they saw that there was no space available?

MR. DRESCHER: I don't want to talk -- I can't speak to what they wanted.

I can speak to what's in the Wessling declaration. And my recollection of that declaration is that there was no available bed

40

space and that managing bed space was one of the factors that contributed to why things played out the way it did.

Now, I appreciate that there are -- that there are -- you know, in the declarations that your Honor referenced there are descriptions from immigration advocates about their familiarity with people who are in immigration detention being housed in different facilities around New England.

But as your Honor knows, at any given time the availability of bed space is a fluctuating thing; that my recollection is that there was an affidavit from an advocate or a declaration from an advocate in Maine who explained she had sort of regular information flow from one of the local jails in a county jail in Maine. I have no reason to dispute the fact that she had access to those flows, but the fact --

THE COURT: My memory is that she said there was 19 beds available, right?

MR. DRESCHER: That was her assessment.

It's -- ICE's assessment was that there was no bed space available for -- based upon the

41

Wessling declaration.  I appreciate that, and I -- you know, ICE is going to have a perspective different than an immigration advocate in terms of communication with the jails.  I can't speak to those, but the statement of an immigration advocate about what she assesses in terms of the availability of bed space I don't think should be cause for, you know, questioning the accuracy of the declaration from the ICE official, whose job it is to manage bed space and take in all sorts of, you know, the day-to-day issues associated with that.

THE COURT:  Okay, but at least in this broad issue about whether there can be flexibility in habeas cases, and in particular in extraordinary circumstances adjustment as to the rules so that in the interest of justice cases can be filed and then adjusted, do you have any more to say on that?

MR. DRESCHER:  I think -- well, if your Honor is asking about 1631 --

THE COURT:  Right, so now we're getting into 1631.  That was the bridge to 1631.

MR. DRESCHER:  Thank you.  I'm glad I

42

picked up on that.

1631, the 2nd Circuit has observed that 1631 does not cure defects that -- such as if something is filed out of time.  It does cure if something is filed in the wrong court but on time.

In this case there are defects in terms of filing in the wrong court, not naming the right petitioner, and using 1631 to -- in the words, of the district judge in New Jersey, as a time machine to sort of -- to declare that the case will proceed as if it was filed somewhere else at a particular time is -- you know, is counterintuitive and I believe is contrary to the rule of Padilla.

You know, 1631 uses the verb "shall" in the interest of justice and, you know, there's no mention of 1631 in Padilla.  1631 existed at that time.

If 1631 was supposed to apply in that context, then you would have expected it to have at least come up in discussions in some fashion.

As we note in our papers, the district judge in New Jersey who accepted the transfer from the SDNY under 1631 recognizes that it's a

43

potentially thorny issue that -- and has certified the question of its jurisdiction as the basis for an interlocutory appeal to the 3rd Circuit.

And, you know, taking another half a step back, if 1631 were allowed to fix a habeas petition any time it was filed in the wrong district, especially during the time of transit, when the petitioner is in the time of transit, courts would be engaged in -- you know, for example, when this case, when the petitioner was flying and had a stop in Atlanta, as I understand it, if the petition had been filed while -- while she was in the air would it be the Court's job to figure out what state she was over at that point?

Or if she was going through, you know, the Hartsfield Airport, does that mean that Massachusetts could have conveyed it, transferred it to -- it creates a host of problems and basically, you know, undermines the reason for the Supreme Court's attention to the immediate custodian rule in Padilla.

THE COURT:  But isn't that an argument for the opposite of the point that you want to

44

make?

That's an argument for flexibility. That's an argument for a person, let's say who's in transition. You don't know where they are and, quite frankly -- well, you know, a person is in transition. You don't know exactly what jurisdiction would be the final call, but you know that if a person is in a particular place, at that particular place they got a right to file a habeas.

And then it's fair to say, I mean, I can think of probably many cases in which people have filed habeas in Vermont and the case is then transferred to the appropriate jurisdiction in the interest of justice, assuming it's in the interest of justice. And, you know, that happens quite regularly.

People file in the wrong place and, as a result, it's moved over to the place in which it should be filed. And it's never been a big deal, frankly. And you're suggesting that it's not appropriate here and --

MR. DRESCHER: I'm suggesting that, you know, that what is known to petitioner's counsel at the time the original petition files and

petitioner's counsel making her best effort to file it in the place of confinement, Footnote 17 of Padilla makes clear that that doesn't matter for purposes of habeas jurisdiction.

THE COURT:  Okay.

MR. DRESCHER:  If your Honor has any other questions, I'll try to field them. Otherwise, I'll sit down.

THE COURT:  Okay.  All right.

Who's going to argue on behalf -- well, we've been going for an hour.  How about if we take a fifteen-minute recess, and then you can figure out who's going to argue first.

Okay.

THE CLERK:  All rise.

(A recess was taken from 10:31 a.m. to 10:49 a.m.)

THE COURT:  Good morning.

MS. ZAFAR:  Good morning, your Honor. Noor Zafar for Petitioner Rumeysa Ozturk, and I'll be addressing the INA judicial bars.

I'd like to make three points with respect to the bars.

First is clarify the nature of the relief that we're seeking today.  Second is to explain

46

why the petition for review process is an inadequate substitute for this Court's habeas review.  And then, finally, just to note for the record that Ms. Ozturk did, in fact, submit a bond application this morning but, regardless, the Court does not need to wait for that process to play out because exhaustion here would largely be futile.

THE COURT:  She has filed a bond request --

MS. ZAFAR:  Correct.

THE COURT:  -- in Louisiana?

MS. ZAFAR:  Correct, as of this morning.

So first with respect to the relief that we're seeking.  What Ms. Ozturk seeks here is relief from unlawful detention.  Her claim arises from detention, not from her removal proceedings.

THE COURT:  Okay, so let me ask you about the remedy that you're seeking.  You're arguing that based upon the constitutional violations, the First and Fifth Amendment violations in particular you're arguing happened, you're arguing for release on this particular petition?

MS. ZAFAR:  Correct, your Honor.

47

THE COURT: So is she being held on this order, or is she being held on the order of the immigration court?

MS. ZAFAR: She's being held -- our argument is that she's being held in retaliation for her speech. And so we're not -- we're not contesting the general authority that the government has to detain people pending removal. We're not challenging that discretion.

THE COURT: Okay, so you take a look at 1226(e). The issue of detention is delegated to the immigration authorities, and the argument that Mr. Drescher is making is that immigration has decided she should be detained for the removal proceedings.

Now, you are arguing that her detention violated the First and the Fifth Amendment?

MS. ZAFAR: Correct.

THE COURT: And the remedy that you're seeking is release from detention.

And my question is if the Court released her from detention on her habeas petition, does that have any impact on her detention which has been ordered by the Immigration and Naturalization Act by ICE?

48

In other words, they could very well say -- and obviously we were addressing that question. They could very well say you have no authority to tell ICE that they can release her in the removal proceedings.

MS. ZAFAR: So that, your Honor, simply conflicts with established Supreme Court law and the law of the Circuit which makes clear that when a petitioner is challenging the legal basis for their detention, which is what Ms. Ozturk is doing here; she's saying that the government does not have any legal authority to detain people in retaliation for their speech. When the question is of what is executive's legal authority, that is something that this Court has jurisdiction to review, and that's been made clear, again through Supreme Court case law and through case law in the 2nd Circuit and other courts in this district.

THE COURT: Okay. So you say case law in which the granting of the habeas petition resulted in the release of a defendant -- I mean of a petitioner who is, in fact, in removal proceedings?

In other words, something directly on

49

point.  That is, if the Court finds habeas violation, violation of the First and the Fifth Amendment, I'm going to order her release, do you have precedent to say that order ordering her release would then impact the ICE authorities in the removal proceedings?

MS. ZAFAR:  So, your Honor, the government sites the Delgado case, which there the Court -- so there it was not a detention habeas, but basically the principal that was articulated in Delgado was that the relief that the petitioner was seeking there, if it were granted, would directly result in the nullification of removal proceedings.  That's not what we have here.

If the Court grants release here, her removal proceedings will proceed as they are and there would be no impact on that.  So the detention claim is really collateral to and independent of the removal proceedings that are happening.

THE COURT:  Okay, so let's assume that she is released here on this habeas petition.  She's no longer in ICE custody.  She's released.
Does the proceeding continue?

MS. ZAFAR:  Yes, the proceeding continues because the release order would have no bearing on whether her removal proceedings are lawful.

THE COURT:  Okay, so the removal proceedings would continue.  I assume she would appear virtually?

MS. ZAFAR:  Yes.  She could appear virtually, yes.

THE COURT:  Okay.  What about the impact on detention?

When you look at the INA, which basically says the Court should not -- it has no jurisdiction over detention in a removal kind of setting, doesn't this suggest that there is some impact on detention?

That's the detention order made by ICE?

MS. ZAFAR:  There would be impact generally if we're talking about the discretionary decision to detain pending removal.  But where -- our claim is not with respect to the discretion to generally detain.  It's about the legal authority to detain in the first place.

THE COURT:  Okay, but still that's going to impact their discretionary decision on

51

detention, is it not?

MS. ZAFAR:  It will, but -- but the courts have recognized that when it comes to unlawful detention, the Court, the District Court has habeas jurisdiction to review that.

THE COURT:  Okay, so what you're saying is that when you have habeas jurisdiction and you rule that there's a constitutional violation in the beginning of the prosecution, the beginning of the removal proceedings, that is there's a violation of the constitutional right, that person cannot be held so there is going to be impact upon the ability of ICE agents to order detention?

MS. ZAFAR:  There will be an impact on their ability to order detention but not to carry out removal.

THE COURT:  How about discretion?

How about when the INA says, oh, that they have discretion or they have the ability to make decisions which are discretionary and those are to be upheld and not reversed by courts, does that impact your argument?

MS. ZAFAR:  Well, your Honor, there's no discretion to violate the Constitution so,

again, we're not talking about a discretionary decision here.

THE COURT:  Well, there is a discretionary decision in regard to detention. And in the removal proceeding when they make the discretionary decision about detention, that isn't necessarily violating the Constitution.

The Constitution was violated well before when -- at the very beginning of the process.

So does that constitutional violation continue?

MS. ZAFAR:  Yes, your Honor, and I can point the Court to a case that we cite from the Southern District of New York, the Michalski case, and there the petitioner brought a similar challenge in that he was challenging the initial legal authority for ICE to detain him.

And the government raised similar jurisdictional bars about why the INA would strip the District Court of habeas jurisdiction, and the Court found that because the petitioner was challenging not a discretion decision to detain pending removal but the very legal authority and basis for his detention in the first place, that the INA did not strip habeas

53

review.

So really the distinction comes down to whether there's a challenge to a discretionary action, which is not what we have here, or if there's a challenge to the executive legal authority to carry out certain actions.

THE COURT:  But that sort of turns the argument on its head because then they're likely to say, the government may very well be likely to say the Court made a decision about habeas, about the beginning of the process but, in fact, the reason that she's being held right now is because of the detention order in the removal proceedings that was made by the IJ or, you know, by ICE.

There, that's the decision that is holding her right now, and you are acknowledging that this Court has nothing to do with that decision, is not reversing that decision.

So does that give them the ability to say you haven't overruled our decision, our discretionary decision about detention and, therefore, that ruling is in effect?

MS. ZAFAR:  Your Honor, I would just again reiterate that we're not challenging a

54

discretionary decision here. We're really challenging ICE's authority to detain.

And I'll just note that in the typical visa revocation, ICE does not detain. Usually those -- in those cases there's no detention, and there's frequently not even a removal order.

What we have here is really extraordinary circumstances where a decision was made by ICE, not by the IJ, by ICE to detain her in retaliation for her speech.

THE COURT: Okay. All right.

MS. ZAFAR: And then just to move to the second point about why a petition for review would be inadequate substitute for -- for this Court's habeas review, so in Jennings the Court made clear that when the channeling provision at 1252(b)(9) would essentially result in a court not being able to provide meaningful relief, that channeling is not appropriate and the District Court has habeas jurisdiction.

And the 3rd Circuit and the 1st Circuit have sort of distilled that principal into a now-or-never principal, which basically says that if waiting for the PFR process to play out would preclude effective relief, then District

55

Court review is available.

And here we have the sort of prototypical now-or-never claim. We have, one, the irreparable harm from her detention but then, in addition to that, we also have the harm to her speech. Every minute that she's detained her speech is being chilled, and that's why review from this Court and relief from this Court is so important.

Secondly, there are some built-in limitations to the nature of the review that could take place in the immigration courts.

So, first of all, the immigration judge and the BIA are not empowered to consider constitutional claims, which is exactly what we have here. We're challenging the constitutionality of her detention, but the IJ and the BIA simply would not have the power to consider those claims as part of her removal proceedings.

And then, in addition to that --

THE COURT: I mean, they can never consider constitutional issues and at least as a part of their review?

MS. ZAFAR: No, your Honor, they're not

56

empowered to consider constitutional claims. Their review is limited to whether the charge of removability has been met.

And here the government says she's removable because her visa was revoked, so their -- the scope of their review would be limited to that question.

But, of course, we say that there are constitutional questions implicated in that, but those constitutional questions are not something that the immigration judge or the Board of Appeals would be empowered to consider.

THE COURT:  Okay.

MS. ZAFAR:  And then, finally, the ability of the IJ and the BIA to create a factual record, an evidentiary record is also very limited.  So there's limited authority to call witnesses and to issue subpoenas.

And, again, that would really have an impact on, once the ruling actually gets up to the Court of Appeals which can review the constitutional issues in the first instance, the record developed would be largely inadequate for a robust review of the constitutional issues.

THE COURT:  Well, what about the

57

requirement that they notice you, notice the petitioner or notice you in a removal proceeding about the nature of the charges?

About what evidence they have to bring the petition and to seek removal.  Do you have a right to a full disclosure of what they are alleging?

MS. ZAFAR:  Yes.  I mean, they can submit their evidence and the petitioner has some time to review that but, you know, I would like to sort of refer to a recent example of a case that I think has a lot of parallels with Ms. Ozturk's case, and that was the case of Mahmoud Khalil, who just had his merits removability hearing on Friday.

And there the government presented its evidence, and the petitioner was given 48 hours to review and respond to that evidence, which of course is inadequate.

And there were other, you know, defects with that proceeding that I can get into, but just because the government presents its evidence does not mean that the petitioner will get an adequate time to review and respond.

And I'll just note in that case the

58

petitioner made several evidentiary requests, all of which were denied. So there really is a concern that if these claims were to be raised exclusively in the PFR process, that petitioner would not get a robust and meaningful hearing of her claims.

THE COURT: All right. So what is the evidence that has been disclosed to you about the basis of the government's request for removal?

MS. ZAFAR: Well --

THE COURT: Is it just the article?

MS. ZAFAR: To this point, and I am not working on the immigration proceeding so I don't want to speak to something I don't have direct knowledge of, but at this point the only thing that's happened is that Ms. Ozturk's master calendar hearing has been scheduled for this Wednesday. And that's the hearing where the petitioner and the government will determine a schedule and sort of how to proceed with the actual merits hearing. So so far there hasn't been evidence submitted by the government.

THE COURT: Well, there was a submission that you filed with the Court on Friday

indicating that really the basis of this claim is all within the Tufts article and that there was no other evidence of your client engaging in anti-Semitism or advocacy for terrorists groups, right?

There's no evidence of that?

MS. ZAFAR:  Correct.  Correct.

THE COURT:  Is that -- have you been told that?

Is that what the government's position is?

MS. ZAFAR:  As far as -- as far as I know that is the entirety of the government's case, is that she is -- her visa was revoked, and she's been detained because she co-authored an op-ed in her school newspaper.

THE COURT:  And that's it?

MS. ZAFAR:  As far as we know.  The government has not presented any additional evidence.

THE COURT:  And do you anticipate that any additional evidence or claims to be made by the government would be filed on Wednesday?

MS. ZAFAR:  It's possible.  I'm not sure if the government would submit evidence on

60

Wednesday. You know, it could introduce additional charges for removability, but at least -- I mean, so far we don't have any evidence from the government except for that one State Department memo.

THE COURT: Thank you.

MS. ZAFAR: And then, finally, I just want to turn to the bond hearing process and why this Court does not need to wait for that process to play out before ordering relief here.

So, first of all, exhaustion here is not a statutory or regulatory requirement. It's purely production, and it would be futile for a couple of reasons.

So, first, as I mentioned, the IJ and BIA is only limited to considering whether she's a flight risk or danger in the context of a bond hearing. They cannot consider any of the constitutional claims that we are bringing with respect to her detention.

Secondly, even if she were released on bond, that would not remedy the First Amendment harms here because the government under the relevant regulations has wide-ranging discretion to re-detain her, including if she wrote another

61

op-ed that the government disagreed with.  So release on bond would not be a sort of meaningful remedy because she could easily be re-detained.

And then, finally, even if bond were granted, the government can appeal it to the BIA but, more importantly, it can also obtain an automatic stay, which would stay the decision to release her on bond from at least 90 days up to almost 200 days.

And, of course, during this whole time Ms. Ozturk would be detained and the irreparable harm, detention, and the chilling of her speech would be accruing.

So, you know, for these reasons we don't think it's appropriate for this Court to wait for that process to play out because it doesn't offer a meaningful remedy.

THE COURT:  Okay.  All right.

MS. ZAFAR:  Thank you, your Honor.

THE COURT:  Okay.

Okay, who's next?

(Ms. Lafaille approached the podium.)

THE COURT:  Good morning.

MS. LAFAILLE:  Good morning, your Honor,

62

I'm Adriana Lafaille.  I'm here to speak to the venue, habeas jurisdiction issues.

THE COURT:  Okay.

MS. LAFAILLE:  As your Honor pointed out, habeas is a flexible and equitable remedy.  And every case that the government has cited and that's in the party's papers demonstrates over and over again that although there are ordinary rules, the ordinary rules bend to ensure the availability of The Great Writ, that sacred remedy of habeas corpus.  This case falls squarely within the letter of 1631.

The District Court determined that jurisdiction was wanting, transferred it to the Court in which the action could have been brought, and now this action must proceed as if it had been filed in this Court at 10:02 p.m. on March 25th at a time when the petitioner, Ms. Ozturk, was unquestionably in this district.

THE COURT:  And she was in a vehicle; is that correct?

Am I right about the facts there?

MS. LAFAILLE:  Correct, your Honor.  Yes, that's what we understand from the government's declaration.

63

THE COURT:  And who would you think would be the immediate custodian of her at that moment?

MS. LAFAILLE:  So we think we've named the immediate custodian.  We think it's Patricia Hyde, the field officer/director for the New England region.

This is a petition case where the government has said over and over again "not that custodian" but they refuse to say, well, then who is the custodian that they will acknowledge as correct.

It falls -- you know, if anything, if not Ms. Hyde then, of course, this case has to fall squarely within the unknown custodian exception, because the custodian appears so unknown that it cannot even be named by government counsel in this proceeding.

THE COURT:  And what does the unknown custodian exception say?

MS. LAFAILLE:  That exception allows a case to be brought against supervisory officials when the custodian is unknown.

THE COURT:  All right.  So if the custodian is not known and it's without fault of

64

the petitioner, then the fallback or default position would be, in fact, to sue or to name the Attorney General, the head of ICE, some removed official because you can't figure out who is the immediate custodian, and has that been established in precedent?

MS. LAFAILLE:  Yes, your Honor, and here we've named all of those individuals of the chain from the local district director, Patricia Hyde, to the DHS secretary, who might be thought of as the ultimate legal custodian here.

So the custodian has been named either because the custodian -- either because Patricia Hyde is the immediate custodian or because the immediate custodian is someone else, and these principals have to be allowed to bend to allow us to amend in that person and to require the government to tell us who that person even is.

THE COURT:  And the Court would have the authority to open up the pleadings to let you amend the pleadings when you, in fact, have identified the immediate custodian; is that right?

MS. LAFAILLE:  Yes, your Honor.  That would be replacement of the -- adding immediate

65

custodian would be standard, is the kind of thing that's done routinely in habeas cases.

THE COURT:  Okay, so I want to ask you a little bit about the facts.

MS. LAFAILLE:  Yes, your Honor.

THE COURT:  So the filing was at 10:02, and your pleadings have said that you didn't know where she was; that what efforts were made to contact the government, and can you just describe what efforts were made prior to 10:02 to identify the district of detention and the immediate custodian?

MS. LAFAILLE:  So, your Honor, the -- and I'll refer the Court to the declaration of Mahsa Khanbabai, the attorney who filed the habeas case.

Attorney Mahsa Khanbabai was calling ICE multiple times during the course of those -- of those -- of that day beginning on the March 25th and continuing into March 26th.

THE COURT:  Well, she was taken into custody about 5:30.  So between 5:30 and 10:00 he was making constant contact with ICE?

MS. LAFAILLE:  Your Honor, I'm not sure about that point.  I'll have to clarify that

66

with Attorney Khanbabai.

There were continuous efforts to locate Ms. Ozturk, but there was no reason to think that so quickly after her arrest that she might be outside the jurisdiction other than the practice in, your Honor, the Khalil case to transfer quickly.

THE COURT:  Okay, but then there was a judicial order, was there not?

MS. LAFAILLE:  Correct, your Honor.

THE COURT:  So tell me about that.  What happened there?

MS. LAFAILLE:  And that is one of the features of this that I find most troubling.

There was a judicial order close to 11 o'clock, which was transmitted to counsel for the government, and --

THE COURT:  How was that done?

MS. LAFAILLE:  Through the emergency clerk.

This is -- so the clerk informed Attorney Khanbabai that they had let the United States Office know about the petition and the -- they were sent, also, the order.

Now, we discussed this order at length in

67

our proceedings in the District Court of Massachusetts. Not once has the government come forward to say we didn't receive the order in time; we didn't know about the order.

What the government has said was, well, the order was issued after she was out of Massachusetts. Mr. Drescher just said, you know, complications or what to make of that order would arise at that point because she was no longer in Massachusetts. And, you know, Mr. Drescher was being not clear if it was possible to comply at that point.

And the government receiving an order from a court to keep someone in Massachusetts when that person has already crossed state lines into Vermont has a couple of choices. One might be to bring petitioner back to Massachusetts to be in conformity with the order.

Another might be to seek clarification from the Court and say actually this person is outside of Massachusetts.

But the purpose of the order was very clear, and it was to preserve the status quo. And that phrase is in the order itself.

And the government having received --

THE COURT:  It was to preserve the status quo for the habeas petition --

MS. LAFAILLE:  Correct, your Honor.

THE COURT:  -- which had been filed in Massachusetts?

MS. LAFAILLE:  Yes.

THE COURT:  So the judge then ordered that she was not to be removed from Massachusetts.

So how do you address the argument that the government is making that she's already outside the state and this is an order which is, I guess, impossible to comply with?

MS. LAFAILLE:  General -- generally the order is intended, and there's law in the 2nd Circuit about violation not just of the letter but of the spirit of the order.

THE COURT:  So where is that in case law?

MS. LAFAILLE:  I'd have to get your Honor the cite.  I don't have it right with me.

THE COURT:  Okay.  So in the immigration context there is case law to suggest that in this kind of situation the government is on the obligation to say the spirit of this order, in addition to the letter of the order, requires

69

this person not to be moved?

Is that --

MS. LAFAILLE:  It's not so specific as that, your Honor.  There's case law about following the compliance with the spirit of the order, not just the letter of the order, but --

THE COURT:  So what is the remedy that you seek for a violation of that order?

MS. LAFAILLE:  My point here is that this is one of the factors that goes to these equitable considerations that we were talking about when we think about the habeas jurisdiction issues that have been brought up here.

This is a case in which someone has been locked up for writing an op-ed, grabbed off the street in, you know, something that should really shake all Americans, and we're almost three weeks into her custody with every judge that has touched this case moving as expeditiously as possible.  And, you know, still Ms. Ozturk is -- you know, still has not, until today, had the opportunity to have the merits of her case presented to a federal court.

THE COURT:  Well, I'm interested in your

request to have her transferred back to this district.

You make this argument that -- almost a totality of circumstances argument. That is, because you have such a strong case and because of the circumstances of this situation where there was only one article and that was an article which, according to you, basically was critical most of the authorities at Tufts University, and those combination of factors, together with the fact that you need to have her here to prepare for your trial or your hearing warrant her being moved.

I guess my question is if you argued that there was a judicial order that she not be removed, and at least a part of your solution would be to enforce that order?

MS. LAFAILLE:  Yes, your Honor, and in the first -- my colleague, Jessie Rossman, can speak to the bail and transfer issues.  In the --

THE COURT:  All right.

MS. LAFAILLE:  In the first instance we asked for her to be released.  Only as an alternative to that would we propose that she be

71

brought back to Vermont.

But with regards to the question of habeas jurisdiction, I think the conduct of the government with regards to the order as well as the very peculiar manner, to put it mildly, in which the government handled her movements that evening certainly warrant exercise of this Court's habeas jurisdiction. It's within the equitable powers of the Court, the flexible nature of the habeas remedy.

THE COURT: So are you relying upon the Kennedy concurring opinion or --

MS. LAFAILLE: I'm not relying on -- I think those -- we could allow them, but that's not my primary basis, your Honor.

THE COURT: You don't need to rely on the Kennedy --

MS. LAFAILLE: We don't. We don't, your Honor.

THE COURT: Kennedy requires -- and Justice O'Connor was concurring as well, and that requires essentially an onus on you that the government did this as a, sort of an intentional way of trying to subvert your ability to file habeas petition, right?

That's essentially what Justice Kennedy said, and that has not been adopted by other courts. It hasn't been rejected either, but you're not relying upon that. You're just relying upon the exceptional circumstances of this situation, right?

Is that right?

MS. LAFAILLE: Yes, your Honor. Primarily we're relying on 1631 to say that this is a case that could have been brought in New Hampshire -- excuse me, in Vermont at the time it was filed.

THE COURT: You're in Vermont now. I appreciate -- yeah, you're in Vermont.

MS. LAFAILLE: Thank you, your Honor.

Obviously our client undertook a multistate journey that night, but this was a case that could have been brought in Vermont and, therefore, straight under the letter of 1631 this case has been properly transferred here and now should be treated as if filed in Vermont on that night. So that's our primary basis.

And then Endo, the Supreme Court's decision in Endo talks about the government not

73

being able to defeat habeas jurisdiction from subsequent movements after the filing of a habeas petition.

THE COURT:  Okay, so once habeas is established in Vermont, according to your argument, then the transfer to the south would be irrelevant because you can't transfer jurisdiction.

So the fact that she's in Louisiana now does not defeat the jurisdiction, which is already established in Vermont under the Endo rule; is that right?

MS. LAFAILLE:  Correct, your Honor. Correct, your Honor.  And that rule is one --

THE COURT:  That was 1934, and you know that's still in -- still being credited?

MS. LAFAILLE:  It is, and it was referenced in Padilla, of course, as one of the bedrock exceptions to the ordinary rule that you sue where the immediate custodian, the jurisdiction of confinement.

Of course, if the person has been moved during the pendency of the habeas then you're no longer in the jurisdiction of confinement, but that doesn't matter as long as the habeas was

74

filed, or in this case was treated as if filed, in the jurisdiction of confinement at the time of the filing.

So that -- that's our, the primary thing we're relying on.  And, you know, the only defect that the government can attach here is that the custodian theoretically wasn't named. And that's where I'd point to the flexible nature of these remedies and the fact that, you know, to this day the government has not even said who the appropriate custodian is that could be named.

It's difficult to fault -- to fault Ms. Ozturk for not naming someone that the government themselves has not been able to name. And to suggest that because of that this petition should be dismissed and have to be re-filed really runs counter to the weight of all of this law that says the habeas remedy must be preserved.

And even though we have these basic rules for the general case, we have to bend them when her unknown custodians -- when the government is doing things that make it difficult for the ordinary rules to be followed.

75

THE COURT:  Okay.

MS. LAFAILLE:  Thank you, your Honor.

THE COURT:  All right.  And you have a third presenter?

(Ms. Rossman approached the podium.)

THE COURT:  Is it Ms. Rossman?

MS. ROSSMAN:  Yes.

THE COURT:  And you're going to be addressing the release or transfer?

MS. ROSSMAN:  Yes, your Honor, both release and transfer.

THE COURT:  Okay, so the argument in regard to the motion to dismiss is then --

MS. ROSSMAN:  That is correct, your Honor, so I didn't know --

THE COURT:  So now we're going to go into the request that you are making for her release or, alternatively, for transfer to this jurisdiction?

MS. ROSSMAN:  That's right, your Honor, and I wasn't sure if you wanted Attorney Drescher to address any response to them, or I can move directly into release and return.

THE COURT:  I think you can move directly into it, and then we can give Attorney Drescher

76

a response to the motion to dismiss and also a response to your argument.

MS. ROSSMAN:  Thank you, your Honor.

As numerous declarations in this record make clear, this is not a case of ordinary immigration enforcement.  And I know there's been a lot of discussion today about the discretion that the government has, in particular components of immigration re-enforcement, but there is not discretion, even within immigration law, for the government to violate the Constitution.

And it's not unusual even outside of the immigration context to have situations where an individual has discretion; for example, at-will employment, but that discretion is confined by constitutional limitations.  You can't fire someone for an unconstitutional reason.

And the 2nd Circuit has similarly said in the Velasco Lopez decision, recognizing the government power, that there are important constitutional limitations on that discretion.

So in this instance -- and Velasco Lopez, I should say, excuse me, your Honor, goes on to say that the discretion to detain is confined by

the legitimate purposes which can be for flight or for a finding of dangerousness.

And the 2nd Circuit has also said, even outside of the context of the immigration, again that it's almost a tautology to say that federal agencies can't have the discretion to violate the Constitution. And that's both at the Bates vs. Town of Cavendish case that we have cited in our brief, your Honor, as well as the Myers & Myers decision.

So here at every step along the way what has been made clear is the government's actions was not an appropriate exercise of discretion but actually is an unlawful use of the immigration law as a cudgel to punish the petitioner, Ms. Ozturk, and to also send a clear message to all other noncitizens in this country that if you express opinions that the government disagrees with, you will be punished.

THE COURT: But see the problem with your argument is that you fuse the -- you fuse addressing the constitutional issue at the beginning, that is the First and Fifth Amendment claims that you have suggesting that the detention is inappropriate, to then how the

removal proceeding is going along, is proceeding.

I thought that your argument was you're not dealing with that; that the question as to whether the proceeding should involve various aspects is within the discretion of ICE.

Technically there is an ability to address detention or non-detention in the removal proceedings.  But those are separate and apart so that when you get into the arguments about how she's being treated at this particular point during the removal proceedings, that's not relevant to your argument about the constitutional violation in your habeas proceeding, is it?

MS. ROSSMAN:  The continued detention of Ms. Ozturk right now is relevant to our constitutional argument that we're making within habeas.

Your Honor is correct that that's separate and apart from the removal proceedings, and you had asked earlier about an indication when there -- is there case law to look to where there's a habeas that's been considered at the same time that removal proceedings have been

79

ongoing. Because I understand we've already spoken about Ragbir, but that was a slightly different procedural posture.

I would point your Honor's attention to the Bello-Reyes case, your Honor. That was out of the 9th Circuit, and in that instance there were ongoing removal proceedings and at the same time the Court went through and addressed the arguments that the continued detention during those removal proceedings violated the First Amendment and found that habeas could be granted under those circumstances.

Now, in that instance the Court remanded to the District Court to apply the appropriate determination of retaliation, but explicitly at Footnote 4 the 9th Circuit said this is not about other instances where people have brought cases that are getting into the removal proceedings.

Quite to the contrary, Mr. Bello-Reyes is continuing on his removal proceedings right now, and his seeking of a habeas petition on the constitutional matter of his continued detention is separate and apart.

So that was an instance where the Court

80

has recognized when there are constitutional matters at issue and specifically with respect to the First Amendment like we have at issue here, we can have a separate removal consideration and that does not constrain the Article III judge's ability to issue a habeas, which is what really necessary here.

THE COURT:  Okay, so let's talk about the process of release ever making -- for the Court making a determination of release into the community.

The standard way judges address issues of release is to have a hearing, have a full bail hearing, and at that full bail hearing have a number of things addressed.  Where is she going to live?  What's she going to do for work?  As well as issues of dangerousness and risk of flight.

And ordinarily in this bail hearing you provide the ability for both sides to introduce evidence about those conditions which would assure her non-flight and ensure against dangerousness to the community.

And the government would have the ability to introduce evidence to reflect the fact that

81

she would be a danger to leave or a danger to the community.

Ordinarily a bail -- in a bail hearing probation officers have checked out where a person lives, have checked out their resources, have made a recommendation as to whether or not this person with these conditions would create a risk. You know, I appreciate we aren't at that stage yet, but ordinarily that's the way bail hearings are done.

And, in fact, there is case law to suggest that when we are addressing a habeas situation and addressing the question of whether she should be released, there are these -- all of these factors about the person's life, and the nature of the allegations from the government that need to be addressed.

And my fear is that in argument of counsel here I've not had an opportunity to address those, or the government hasn't had an opportunity to really address the dangerousness question. All they're saying is they're relying upon, you know, this one article, at least at this point.

There may be, at least according to your

submission just a couple of days ago that was -- it was among other, is among the possibility of other allegations that they may have.

So I guess my question is, before we address the question of release don't you think there should be a bail hearing?

MS. ROSSMAN:  Your Honor, I think one place to look is at the Mapp decision here in the 2nd Circuit and how they proceeded to analyze a bail consideration within the immigration context.  And that remains good law, your Honor, both the Real ID Act passage -- the Real ID Act was passed after Mapp.

I know there was some suggestion in the government's papers that perhaps that raised a question about Mapp's continued viability, but the 2nd Circuit already directly addressed that in the Elkimya decision in 2007 and said explicitly that the Real ID Act's silence regarding our holding in Mapp constitutes an implicit adoption of our interpretation.

So the Mapp framework is still good law in the 2nd Circuit, and we've seen it applied time and again in the District Courts as well, and what that court says is within this context

83

you look at whether or not there are substantial claims and whether or not bail is necessary in order to ensure that habeas is effective relief.

And as a part of the extraordinary circumstances one of the things the Court can analyze is whether there has been any showing of the government in terms of danger or risk of flight.

And I would say here, your Honor, in fact, we've had numerous submissions before both this Court and also the Court in the District of Massachusetts where the petitioner has raised her bail request and has submitted record evidence that she's not a danger and that she's not a flight risk.

Quite to the contrary, she is desperate to return to Tufts so that she can continue with her education.  She has nine months left of her doctoral program that she's been working towards for five years.  She has several critical dates that are coming up in the spring and summer. She desperately wants to return, and there are nearly two dozen declarations, sworn declarations that attest to that fact.

On the other side of the aisle, the

84

government had opportunity to submit sworn declarations if there was any evidence that they wanted to put forward. They were certainly on notice that the petitioner has been requesting bail now for over two weeks, and there's been no such submission from the government. And we have no reason to believe at this point, your Honor, that there would be able to do so.

There's been the single declaration from Wessling, Officer Wessling, which made no allegation that Ms. Ozturk was a danger or that she was a flight risk.

And I would point, your Honor -- I know you had mentioned sort of one of the reasons that we've heard so far from the government about the reasons for her detention, you referenced, I believe, the filing from Friday night, which was the March 21st memo from the Department of State, which again states and only identifies the op-ed as the basis for the visa revocation.

THE COURT: Well, if you look at the language of that submission, I thought it listed the op-ed obviously, and I think right before that is a comment with dangerousness as

85

reflected in -- I thought you could read that sentence as suggesting there may very well be other things that they want to submit, although they were not identifying them.

MS. ROSSMAN:  So I would submit, your Honor, it's really helpful to look at this memo alongside the Washington Post article that was placed yesterday that we filed in court.  It references two memos that the government hasn't produced, so we don't have those documents to give to the Court, but --

THE COURT:  Okay.

MS. ROSSMAN:  But what it references is an initial memo where there was a recommendation from DHS for the revocation of Ms. Ozturk's visa.  And it specifically cited the provision of a deportation of a foreigner if the Secretary of State has reasonable grounds to believe that the person's presence or activities has adverse policy consequences for the United States.

In response to that, and that is what's referenced in the Washington Post article, after the State Department received that from the Department of Homeland Security, the State Department found that while Ozturk had protested

86

Tufts's relationship with Israel, neither DHS nor ICE nor Homeland Security investigations produced any evidence showing that Ms. Ozturk had engaged in anti-Semitic activity or made public statements indicating support for a terrorist organization.

And it goes on to say that the memo said that a search of U. S. government database on Ms. Ozturk did not produce any terrorism-related information about her.

And it was on the heels of both of those statements, your Honor, that then this final memo was produced that again only references the op-ed.

THE COURT:  Okay, so this is an internal memo, as I understand it, suggesting that as a result of a full investigation there was no evidence of anti-Semitic behavior, no evidence of -- focusing on terrorists organizations, is that what that article says?

MS. ROSSMAN:  According to the reporting, your Honor, from Washington Post.

THE COURT:  So there is a memorandum within the Department's possession that has not been turned over to you?

MS. ROSSMAN: There is a memorandum that the government has not produced, your Honor, that's correct. And I believe, your Honor, it's actually two different memorandums that have not been yet produced.

The third memorandum, which is the March 21st memo that we filed on Friday, had been resubmitted in the removal proceeding so that was the one of three, but there are two that have not been produced by the government.

THE COURT: So I asked you -- you haven't been talking about the removal proceedings, but apparently there is at least a hearing or submission on Wednesday?

MS. ROSSMAN: Yes, your Honor.

THE COURT: And what does that involve?

MS. ROSSMAN: Unfortunately you're going to hear partially --

THE COURT: Probably going to the wrong person. I'm sorry.

MS. ROSSMAN: No, but the one thing I will say, your Honor, is that the master calendar has been reset for Wednesday.

I will reiterate what one of my colleagues said, which is that with respect to a

bond termination, your Honor, there are several reasons why that is not a barrier to this Court granting bail and, in fact, it is certainly important that the Court exercise its discretion here to grant bail if you look at what has been happening in other cases around the country.

THE COURT:  Right, so I'm not -- I wasn't thinking about the bail situation at this point.

What I was thinking about is whether or not those reports within the government's possession are going to be disclosed to you as a part of the removal proceedings?

MS. ROSSMAN:  That's something I wouldn't be able to answer here today, your Honor.

THE COURT:  All right, that's fine.  Yes.

MS. ROSSMAN:  Of course, the government could also produce them within this proceeding as well and has had opportunities in the past to do so with its submissions and could do so again in the future.

THE COURT:  Okay.

MS. ROSSMAN:  It might -- would it help your Honor for me to speak a little bit about within the context of the Mapp structure for that bail determination?

89

THE COURT:  Yes.

MS. ROSSMAN:  We both need to address the substantial claims as well as exceptional circumstances.

Petitioner believes that all of the claims that she's raising in her petition are substantial, but for the purposes of this Court's analysis only one is necessary.  And given the context of what we've been talking about here today, I think it might be the most hopeful to focus, as your Honor has done, on both the First Amendment and the Fifth Amendment claims in particular to the respect to the arrest, transfer, and detention of Ms. Ozturk.

So I can start with the First Amendment, your Honor.  The First Amendment really acts as an element on the government's ability to suppress particular viewpoints, and that's exactly what is happening here.

About a year ago, as your Honor referenced, Ms. Ozturk coauthored an op-ed in her student newspaper, and it was really speech that is of the highest form of protected speech. It was about a matter of public concern about ongoing human rights violations in Gaza, and it

90

was also something that was in the press. It was in the newspapers and part of the media.

And this is the sole basis for her arrest, transportation and transfer, as we've just been discussing. The government over more than 20 days of her detention has not put forward any other basis for why this has occurred.

And if you look -- we were speaking about the 3/21/25 memo. Your Honor had referenced this language as well; that it included coauthoring an op-ed that found common cause with an organization that was later temporarily banned from campus.

The only language --

THE COURT: Is there any evidence to suggest that she was a member of that eventually temporarily banned organization?

MS. ROSSMAN: No, your Honor, there is not.

And the only sentence that this can be referencing is within her op-ed, the sentence -- and this is a co-authored op-ed; Graduate Students for Palestine join Tufts Students for Justice in Palestine, the Tufts faculty, and

91

staff coalition for ceasefire and pledges Students for Palestine to reject the University's response.

That sentence is the only sentence of the memo that could possibly be referencing.

And this guilt by association, and not just guilt by association but guilt by association that would have had to be prescient that a group was going to be banned in the future by the administration is a really chilling example of a First Amendment violation, and it's an eerie comparison to some of what the government was attempting to do during in the Red Scare in the 1950s.

We have cited in our papers, your Honor, the Bridges case from the Supreme Court, and there Congress had passed an act to enable the deportations of noncitizens who were affiliating with communist enterprises.

And under that statute the government had tried to deport Mr. Bridges based on his running a newspaper that sometimes was just called The Waterfront Worker that worked with the union that was found to both be a legitimate union but also have -- also be a communist organization.

92

And the Court rejected the government's attempt to do this.  It read the statute in a way that could not be applied to Mr. Bridges's behavior.  And the reason why was to do so, the Court found, would have violated the First Amendment.

They used language to say, and this is a direct quote, The link by which it sought to tie him to subversive activities is an exceedingly tenuous one.  It relies upon inferences upon inferences.

And he published a newspaper that engaged in protected speech, and cooperation with the communist group for the attainment of lawful ends cannot be something for which someone is punished without violating the First Amendment.

And, as a result, they did not allow the government to use their immigration laws to violation the free expression of Mr. Bridges.

And this Court should similarly ensure that the government does not use immigration laws to violate the First Amendment as part of its policy to target speech.

There are more recent examples than the 1950s.  We've spoken already about Ragbir, your

93

Honor, as well as the Bello-Reyes case.

I also wanted to point your Honor to the Guitierrez case, which is cited in our papers as well. All of these recognize that the Court has habeas authority when there is a violation of the First Amendment.

THE COURT: So the Court has habeas authority to address the question as to whether it was a First or Fifth Amendment violation, but when you start arguing about ICE using this in the removal proceedings, that really creates a concern.

You have the INA, which basically says that the courts should not get involved in the bringing of charges before the immigration court, the prosecution, as well as the enforcement. And I think those are the three things.

And so when you suggest that they are violating the Constitution in the prosecution, in the court, you raise concerns because there is, in fact, the engagement of a third -- of a judicial branch in that prosecution itself.

That is, ultimately if I -- if the IJ decides for removal, the appeal goes to the

94

U. S. Court of Appeals or Circuit.  So there is some engagement of the third -- of the third branch; the judiciary.

And so when you make the argument about you can't bring the charges or you are entitled to withdraw from prison based upon a constitutional violation, that clearly is covered by constitutional law.

But when you start talking about the removal proceedings and those processes, I think that the INA gives you difficulty.

Do you understand the distinction that I'm trying to make?

MS. ROSSMAN:  I believe so, your Honor, but please tell me if I'm going off track.

THE COURT:  Yeah, right.  Right, so I mean I think this is a really confusing area of the law because you're sort of overlapping issues, both from the Constitution dimension in habeas, together with what's happening in a removal proceedings.

A removal proceeding does have judges involved, and they are on the appellate level.

MS. ROSSMAN:  That's right, your Honor. I think part of the distinction, however, is, as

you had referenced earlier on -- or almost this afternoon but right now it's still this morning, earlier on this morning our petition, and in particular what we're speaking about with respect to the bail request is focusing on challenging the arrest and detention.

Neither the arrest, nor the detention, was required by the revocation of the student status or the revocation of the visa.  And the continued removal proceedings against Ms. Ozturk does not require her continued detention.

And, again, the Bello-Reyes case is a perfect example of this where the Court was recognizing the ability of the petitioner there to be out of custody under the Article III jurisdiction of the habeas court while continuing to participate in the removal proceedings within the context of the immigration court.

THE COURT:  There is no difficulty in doing that?

There's no difficulty in having her removed from custody of the immigration court but then continuing on with the process?

MS. ROSSMAN:  That is correct, your

96

Honor.  There are -- it is not required to be in detention in order to continue on removal proceedings and, in fact, one of the declarations by Attorney Young speaks to the fact that with respect to F-1 visa revocations, which is the visa revocation at issue for Ms. Ozturk, in her experience in over 17 years of immigration practice it is not typical for someone with an F-1 visa revocation to be arrested.

And that's what we're focusing on here; is that the -- setting aside for a moment the visa revocation and the student status revocation, the response of the government in every step along the way to that, which included both not notifying Ms. Ozturk of the fact that she had a visa revocation, which is not typical, and led to an understandably terrified response when six plainclothes officers approached her. She had no reason to believe that anything had been revoked and then placed her into an unmarked van.

She said in her declaration at the time she thought they were going to kill her because she had no idea who these people were and having

97

given no reason to understand why the police would be arresting her.

THE COURT:  Well, if -- she did say that she saw a badge, although she did not know what the badge was.  But she saw a badge but then thought, of course, she was being killed.

MS. ROSSMAN:  And placed in an unmarked van.  And then so that's the arrest, your Honor.

The second piece is everything that happened over the course of the next 20 hours, which I know you've already spoken with, with other counsel here today, but that unusual circumstance of hop-scotching across multiple state lines and then getting taken to Louisiana really early the next morning.

The declarations that we have in the record, your Honor, combined more than 40 years of immigration experience in the New England area, and all of those practitioners say that they have never seen, nor heard, of someone get taken in three different states over the course of just a few hours.

And practitioners here in Vermont, too, have said both -- excuse me, Attorney Stokes and Attorney Diaz, that neither of them had seen

98

someone taken out of state and placed in St. Albans. And that was particularly important because St. Albans is the only location where someone can be held in immigration detention and not be on the Vermont Department of Corrections public website within an hour. So, again, that's another set of circumstances which was highly unusual.

Even taking the government at its word, which there is directly contradictory evidence in the record that there were bed space available in New England, so that's something that petitioner heavily contests.

But even, for the sake of argument, taking of the government at its word, why did Ms. Ozturk need to be taken three different states away to get a plane from the Burlington airport rather that being held in Burlington, Massachusetts, which is the typical course of practice and then get taken from Logan Airport to Louisiana?

All across the board, your Honor, these were unusual steps that were designed to punish Ms. Ozturk for her protected speech, chill her speech, and send a very chilling message to

99

everyone who was watching -- and the government does know that people are watching -- that if you engage in speech that the Administration disagrees with, you are going to be punished.

And that chilling aspect was something that was recognized both by the Ragbir court and by the Guitierrez court as something that sends a message not just to the petitioner themselves but to other noncitizens.  That's an additional First Amendment injury that's appropriate for the Court to address in a habeas proceeding.

THE COURT:  Okay.  So let me just ask you about your alternative proposal.

MS. ROSSMAN:  Yes, your Honor.

THE COURT:  You know, you've heard what the standard procedures are here for establishing bail.  I mean, to get a full hearing, to have a full hearing in regard to all of the conditions that have to be imposed to make sure that a person does not provide a risk to the community and a risk of flight ordinarily requires a lot.

And it also gives the parties an opportunity to introduce the evidence that they want to introduce, including the evidence that

you want to introduce in regard to how this was unusual. That may be relevant to the issue of whether she should be released. That is, the viability of her due process claim.

All right?

MS. ROSSMAN: Uh-huh (affirmative).

THE COURT: So that could happen.

The second proposal that you have is to have her transferred back here, both for assisting your representation for the hearing, the ultimate hearing but, also, for a bail hearing. And that is, to have her present so that you could address all these various issues that the Court addresses whenever it releases a person into the community.

So what is your -- I mean, I know that this is an alternative, but what is your objection to essentially an order that she be transferred back here and that we have a bail hearing in regard to her release on the habeas case and then ultimately have her here for the hearing?

MS. ROSSMAN: So if I'm understanding your Honor correctly, what you're suggesting as an alternative is sort of what is our response

to you, rather than automatically getting bail --

THE COURT:  And I'm going to ask the other side the same.

What's the problem with that?

MS. ROSSMAN:  And as a part of that suggestion, your Honor, are you suggesting that Ms. Ozturk would be immediately returned to the District of Vermont during the pendency of those proceedings?

Is that what --

THE COURT:  Well, that's what you're seeking.

MS. ROSSMAN:  That is our alternative, that is correct, your Honor.

Well, of course, petitioners do believe that there's already a record right now that would enable a determination of bail, particularly given the multiple opportunities the government has had to put record evidence in to oppose any seeking of bail, and they have never done so.

We have no reason to believe, nor does this Court have any basis to believe that they would put forward something to counteract the

showing that Ms. Ozturk has made that she has satisfied the bail requirements.  So we do think that has been satisfied on the papers.

That being said, under our alternative of having Ms. Ozturk returned here, we think it's well within this Court's authority, both as an equitable habeas court, which your Honor has already recognized has flexibility in terms of orders, and under the All Writs Act to order Ms. Ozturk to be immediately returned to Vermont so that she could have access to counsel.

And, of course, I think one additional component we would say, your Honor, is if the Court is inclined to set an additional evidentiary hearing for a bail proceeding, which our suggestion would be that our papers submit, but if your Honor would want to have additional hearings, that that occur, as everything already has with this Court, as expeditiously as possible, particularly in light of some of the educational deadlines that Ms. Ozturk has.

There are proceedings within her -- she has a conference that she's meant to be attending at the end of this month, and she also has specific dates with respect to her doctoral

review that is also in the upcoming month.

Every day that she remains in detention, your Honor, is both harming her in terms of her ability to continue with her education.  It's also a continued First Amendment violation of both her rights and sends a very dangerous message to everyone else that if you do something against the government in terms of your speech, you're going to be punished.

THE COURT:  All right.  Thank you.

Okay, Mr. Drescher?

MS. LAFAILLE:  Your Honor, with Mr. Drescher's indulgence, I just wanted to respond to a couple of points.

Your Honor asked me about Attorney Khanbabai's efforts to locate Ms. Ozturk prior to 10:02.  The declaration at Paragraph 6 and 7 talks about efforts that evening, but just to confirm, that prior to 10:02 Attorney Khanbabai had also done those things; calling ICE Enforcement and Removal Operations and calling ICE Homeland Security Investigations, ICE HSI and ERO to look for Ms. Ozturk and checking the detaining locator.

And then in response to your Honor's

colloquy to Mr. Drescher about the spirit of the order and the letter of the order, the case I had cited to your Honor is Stetson, which is cited on Page 23 of our bail and return motion.

THE COURT:  Okay.

MS. LAFAILLE:  Thank you.

THE COURT:  All right.  Okay.

MR. DRESCHER:  Before I get into the question of bail, on the question of what to make of the Court's order in Massachusetts, it occurred to me after I sat down that the District of Massachusetts has had a chance to deal with its perception of what happened there and could have investigated it further, could have done -- could have made a finding about that, and what they did was they transferred the case up here.  I just wanted to sort of note that as another consideration.

THE COURT:  Interesting.  They transferred the case up here and then basically made a conclusion that filing in Massachusetts was really just like filing in Vermont because obviously this is the district of confinement and that essentially the whole record would be as of the 10:02 filing date.

105

And essentially what they would be suggesting is, I think they are suggesting that it's filed in Vermont as of 10:02. I thought that was the thrust of Judge Casper's opinion.

MR. DRESCHER: I agree that that was the thrust of her opinion, but she also noted that it was going to be for this Court to figure out whether it had jurisdiction.

THE COURT: Yes, absolutely, and I think that that's true of 1631 always; that when you transfer it, it's your assessment that that jurisdiction or that court would have jurisdiction, but that's up for that court to make a determination and that's why we're here.

MR. DRESCHER: On the question of bail, our threshold position is that especially in light of subsequent statements in Jennings and Velasco Lopez that are more recent than both Mapp and Elkimya, I think there is a legitimate question as to whether the INA would permit the Court to release petitioner on bail. A lot of that dovetails with the same jurisdictional arguments we've made.

THE COURT: Right.

MR. DRESCHER: And which is our appeal,

our threshold position that the Court does not have habeas jurisdiction and, therefore, does not have inherent authority to release petitioner on bail.

With regard to the questions of the Mapp factors, I just have a couple of responses.

One of the arguments that has been made, I believe, in the papers and today, is that being detained stifles a person's ability to speak and is inherently a violation of the First Amendment. I don't think that -- I don't think that's a tenable argument.

If that were a tenable argument, being detained, anybody who's detained is having their First Amendment violated and so -- and it's certainly not an extraordinary circumstance among people who are detained. They -- it's part and parcel of being detained. You know, you have -- you have less of a voice.

THE COURT: Well, there are a couple of concerns in regard to the First Amendment, so -- and they're different.

It seems to me that what the petitioners are raising here is an argument that her violation -- her First Amendment rights were

107

violated. It's not based upon the fact that other people would be discouraged in regard to whether they would make statements in the community. It is her particular rights that are -- that are at risk.

And, you know, frankly, I would focus mostly on the time of detention. At that particular time their argument is, first, that her First Amendment rights are being prosecuted -- are being violated, and that's obviously the basis of their claim for release.

And then, second, is how it happened, how the arrest took place, whether she was permitted knowing where she was going or her lawyers knowing where she was going, or the fact is that she was really sort of denied the ability to get to a court. That's her second Fifth Amendment claim.

I'm not so sure the impact in the community about other people's First Amendment rights being impacted is the core of their argument.

MR. DRESCHER: Okay.

So, yeah, going through the Mapp factors, I appreciate that she's making an argument. Her

108

habeas theory is that her detention is a violation of her First and Fifth Amendment rights.  I appreciate that the circuit in Ragbir articulates that that can be a basis for habeas jurisdiction but only in the absence of the availability of a petition for review, which we've already gone over.

THE COURT:  Can I ask you, throwing out this possibility of having her coming back here to address her constitutional claims, her habeas with an order, of course, that it would have no impact on the removal proceedings.  It would be necessary to have her here because we would be addressing issues about release, and this would be for the hearing on her claims and she would be able to assist counsel.

My question is, how are you prejudiced by that proceeding?

MR. DRESCHER:  I believe the papers make -- state our position that -- well, I'm going to take a half a step back.

Generally speaking our papers argue that the law is clear that the Court doesn't have jurisdiction to like dictate place of confinement.

THE COURT:  Correct.

MR. DRESCHER:  But I appreciate your point.

THE COURT:  This is the hypothetical to say that the Court has jurisdiction.  The Court would take Velasco Lopez and Ragbir and say, okay, we have jurisdiction to address the habeas issue.  Why not do that at the same time that the removal proceedings continue on?

And why are you prejudiced by that?

MR. DRESCHER:  I don't know -- I mean, if your Honor wants to writ petitioner to Vermont for purposes of being present in court for a hearing, other than the extent to which that interferes with ICE's ability to dictate where she would be held, you know, as an advocate, I don't think that would be prejudicial.

You know, we have defendants or plaintiffs personally in court all the time.  If there is a prejudice, then I'm really not prepared to get into the nooks and crannies of this because I didn't anticipate your Honor's question.

It would be in the operations of, you know, immigration detention whose custody would

110

she be in. Where are there beds? Those types of -- those types of issues that, you know, in the criminal context, as your Honor knows, she could be housed in Rhode Island or upstate New York or any number of other facilities. Or down the street as well, for sure, in the criminal context.

What is available if she's in ICE custody is not clear, and there could very well be prejudice to ICE's operations in that regard.

But I also don't want to get ahead of myself. You know, the -- I don't know the extent of potential prejudice is sort of the threshold answer to your Honor's question.

THE COURT: No, I appreciate that honest response.

MR. DRESCHER: And so, yeah, we don't think that she's -- I appreciate, you know, in the verbiage of Ragbir she makes a constitutional claim and that's, of course, something that -- something that the 2nd Circuit has acknowledged can be concerning and can be the basis of habeas in the absence of petition for review.

The viability of success on that claim

111

given the jurisdictional challenges, given the presence of the INA, given the actual rational in Ragbir, relying on the absence of a petition for review as a basis for asserting habeas jurisdiction I think calls into question, there's sufficient jurisdictional concerns about what this -- if this Court were to assert habeas jurisdiction, it certainly calls into question the prospect of success were the Court to issue habeas relief.

Even the 1631 transfer, albeit it's happened before, it happened from New York to New Jersey recently, you know, as the Court in New Jersey certainly suggested by certifying the question, it's some potentially shaky jurisdictional footing, and that also undermines the prospect of success in court on a habeas theory.

And, your Honor, if your Honor has additional questions --

THE COURT:  Okay, so I'd like to change -- I appreciate that and, you know, I think the argument is over.

I'd like to ask both counsel how long you would anticipate a habeas hearing to last if I

was to assume jurisdiction?

And, in particular, you've noticed that this Court has made a real effort to move this along quickly. And whether or not the petitioner is here or not, if I assume jurisdiction, the case is going for a habeas hearing, and my question is how long would the hearing last?

And I would anticipate scheduling this hearing in May, and my question is whether that is realistic.

So first from the government.

MR. DRESCHER: This is another "I don't know", and I would have to consult with lawyers more experienced in habeas than I am.

You know, it may be -- I don't know what the evidence would look like. I mean, I appreciate what's in the record. It may be that you don't have to take testimony if the record can be made on the papers, but I don't know that and I would ask for a chance to get back to the Court on that.

THE COURT: Okay. Yeah, if you can notify the Court.

So how about from the petitioner?

MS. ROSSMAN:  Thank you, your Honor.  I think we, similarly, would want to, with your indulgence, make sure we speak with immigration counsel as well and perhaps submit a short supplement to answer your question.

THE COURT:  Yeah, so let me ask both sides just to have a short supplement.  If the Court were to accept habeas jurisdiction, schedule a habeas hearing, I would hope to do that in May.

Tell me if that is viable, a viable schedule in light of the complexities of this case, in light of the evidence that you would hope to introduce.

MS. ROSSMAN:  Thank you, your Honor.  I will say the two things that I can say for certain right now is from petitioner's side we both appreciate how quickly the Court has been moving on this and that we, as well, would move at as quick a speed as this Court could do to make it happen.

So in terms of timing, we would be ready at the Court's earlier convenience to have a hearing and would make ourselves available to do so.

114

With respect to the amount of time that the hearing itself could take, we can submit a supplement.

THE COURT:  Okay.  Well, I really appreciate the professionalism of the argument. This was very well argued, and I'll take the matter under advisement.

Are there any other issues that you want to address at this point?

MR. DRESCHER:  Not from respondents, your Honor.

MS. ROSSMAN:  Not at this time, your Honor.  Thank you.

THE COURT:  Okay.  Thank you very much.

(End of hearing at 12:15 p.m. and end of transcript of same.)

115

CERTIFICATE

I, SARAH M. BENTLEY, Certified Court Reporter, Registered Professional Reporter and Notary Public, do hereby certify that the said proceedings were taken in machine shorthand by me at the time and place aforesaid and were thereafter reduced to typewritten form under my direction, Pages 1 - 115; that the foregoing is a true, complete, and correct transcript of said proceedings.

I further certify that I am not employed by, related to, nor counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature and seal this 15th day of April, 2025.

/s/ Sarah M. Bentley, RPR
_____
SARAH M. BENTLEY, CCR-B-1745