UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RUMEYSA OZTURK,                          )
                                         )
          Petitioner,                    )
                                         )
     v.                                  )   Case No. 2:25-cv-374
                                         )
DONALD J. TRUMP, in his                  )
official capacity as                     )
President of the United                  )
States; PATRICIA HYDE, in her )
official capacity as the New )
England Field Director for               )
U.S. Immigration and Customs )
Enforcement; MICHAEL KROL, in )
his official capacity as HSI )
New England Special Agent in )
Charge, U.S. Immigration and )
Customs Enforcement; TODD                )
LYONS, in his official                   )
capacity as Acting Director, )
U.S. Immigration and Customs )
Enforcement; KRISTI NOEM, in )
her official capacity as                 )
Secretary of the United                  )
States Department of                     )
Homeland Security; and MARCO )
RUBIO, in his official                   )
capacity as Secretary of                 )
State,                                   )
                                         )
          Respondents.                   )

## OPINION AND ORDER

Petitioner Rumeysa Ozturk was arrested by United States

Immigration and Customs Enforcement ("ICE") agents in

Massachusetts on March 25, 2025 and is currently in immigration

detention at a correctional facility in Louisiana. Ms. Ozturk

filed this habeas petition under 28 U.S.C. § 2241 against

Respondents Donald J. Trump, Patricia Hyde, Michael Krol, Todd Lyons, Kristi Noem, and Marco Rubio (collectively "the government"), alleging she was arrested and detained in violation of her First Amendment and Fifth Amendment rights and the Administrative Procedure Act ("APA").

Ms. Ozturk's original petition (the "Petition") was filed in the District of Massachusetts. Because Ms. Ozturk was, at the time of the filing, detained in Vermont, the Massachusetts district court transferred this action to the District of Vermont pursuant to 28 U.S.C. § 1631. ECF No. 42.

The instant matter concerns the government's motion to dismiss this case. The parties dispute whether this Court has jurisdiction to grant Ms. Ozturk the relief she requests. The matter also concerns Ms. Ozturk's motion for an order of immediate release pending the adjudication of her habeas claims or, in the alternative, an order transferring Ms. Ozturk back to the District of Vermont.

For the reasons set forth below, the Court finds that it has jurisdiction to consider Ms. Ozturk's habeas petition. The Court further finds that Ms. Ozturk has raised significant constitutional concerns with her arrest and detention which merit full and fair consideration in this forum. Accordingly, the Court denies the government's request to dismiss the Petition and orders that Ms. Ozturk be transferred to ICE

2

custody within the District of Vermont pending further hearings on this matter.

**Factual Background**

**I.    Ms. Ozturk's Op-ed in a School Newspaper**

Ms. Ozturk and three other students coauthored a March 26, 2024 editorial in the Tufts University school newspaper, *The Tufts Daily*. The editorial, which to date still appears on the *Tufts Daily* website, criticized the university administration's dismissal of several resolutions passed by the student senate that demanded the university acknowledge the existence of an ongoing genocide in Palestine, apologize for statements made by the university president, and disclose its investments in and divest from companies with ties to Israel.

The editorial criticized the university for "mischaracteriz[ing]" the student senate's stances as divisive and stated, "[w]e, as graduate students, affirm the equal dignity and humanity of all people[.]" Rumeysa Ozturk et al., *Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions*, The Tufts Daily (Mar. 26, 2024), https://www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj. It urged the university administration "to meaningfully engage with and actualize the resolutions passed by the Senate." *Id.* The op-ed expresses agreement between Graduate Students for Palestine and three other campus groups, including Tufts

3

Students for Justice in Palestine, about the university's response to the Senate resolutions. In the fall of 2024, Tufts University temporarily suspended Tufts Students for Justice in Palestine. Estelle Anderson, *Tufts SJP disaffiliates from Tufts after university suspends group until Jan. 2027*, The Tufts Daily (Nov. 21, 2024), https://www.tuftsdaily.com/article/2024/11/tufts-sjp-disaffiliates-from-tufts-after-university-suspends-group-until-jan-2027. Ms. Ozturk has not been alleged to be a member of that group, and the suspension occurred several months after the op-ed was published.

In an April 1, 2025, declaration, Sunil Kumar, the Tufts University president, attested that the opinion piece co-authored by Ms. Ozturk "was not in violation of any Tufts policies" and that "no complaints were filed with the University or, to our knowledge, outside of the University about this op-ed." ECF No. 26-1 at 67. The declaration noted that the newspaper also published other "op-eds on multiple sides of the issue with opinions that were shared just as strongly as the op-ed Ms. Ozturk co-authored." *Id.*

## II. Ms. Ozturk's Arrest and Detention

Ms. Ozturk is a Turkish national and doctoral candidate in Child Study and Human Development at Tufts University. ECF No. 42 at 1-3. On June 28, 2024, she entered the United States pursuant to a validly issued F-1 student visa. *Id.* at 3. On

4

March 21, 2025, the government revoked Ms. Ozturk's visa, potentially subjecting her to removal from the United States. ECF No. 91-1 at 6. Pursuant to 8 U.S.C. § 1227(a)(1)(B), "[a]ny alien who is present in the United States . . . whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201(i) of this title, is deportable."

Prior to her arrest, ICE determined that it would take Ms. Ozturk to a detention facility in Louisiana. According to ICE, "there was no available bedspace for [her] at a facility where she could appear for a hearing" in New England and "[t]ransfers out of state . . . are routinely conducted after arrest, due to operational necessity and considerations." ECF No. 19-1. Ms. Ozturk has submitted affidavits from several experienced New England immigration attorneys stating that immigration detainees are typically booked and processed at the ICE Boston Field Office in Burlington, Massachusetts before being sent to a detention facility. ECF Nos. 26-3, 26-4, 26-6. She also submitted an affidavit from an experienced Maine immigration attorney stating that based on the attorney's review of records from the Cumberland County Jail, the facility had at least sixteen open beds to house female detainees on March 25 and 26, 2025. ECF No. 26-5 at 3

Ms. Ozturk was not notified promptly of her student visa's revocation. On March 25, 2025, at approximately 5:25 p.m., Ms. Ozturk was near her residence in Somerville, Massachusetts when a hooded and masked officer in plainclothes approached her and grabbed her wrists. ECF No. 42 at 3. Five additional officers then surrounded her, took her cell phone, and handcuffed her. Ms. Ozturk was driven away in an unmarked vehicle. *Id.*

ICE agents took Ms. Ozturk to Methuen, Massachusetts, arriving at 6:22 p.m. that day. ECF No. 19-1 at 2. Shortly thereafter, the agents and Ms. Ozturk departed for Lebanon, New Hampshire. *Id.* At approximately 9:03 p.m., ICE agents began transporting Ms. Ozturk to the ICE Field Office in St. Albans, Vermont. *Id.* At approximately 10:02 p.m. on March 25, 2025, having been unable to speak to Ms. Ozturk or otherwise ascertain her location after attempting to do so, Ms. Ozturk's counsel filed a habeas petition in the District of Massachusetts. ECF No. 42 at 4. At that time, Ms. Ozturk was in Vermont en route to the St. Albans Field Office.

At approximately 10:55 p.m. that night, the District of Massachusetts court ordered that Ms. Ozturk "shall not be moved outside the District of Massachusetts without first providing advance notice of the intended move." ECF No. 3 at 2; ECF No. 42 at 5. The order stated that "[s]uch notice shall be filed in writing on the docket in this proceeding, and shall state the

6

reason why the government believes that such a movement is necessary and should not be stayed pending further court proceedings." ECF No. 3 at 2. The order noted that "[i]n order to give the court an opportunity to consider whether it has subject-matter jurisdiction, and if so to determine the validity of the habeas petition, the court may order [the] respondent to preserve the status quo." *Id.*

Both the Petition and the order were transmitted to the United States Attorney's Office on the night of March 25, 2025. ECF No. 26-2 at 2-3. When asked at oral argument about the government's knowledge of the order when it was issued, its counsel stated, "I don't know who learned about that order and when. . . . I'm not able to speak to the factual flow of information." ECF No. 98 at 37.

Ms. Ozturk arrived at the St. Albans Field Office at 10:28 p.m. on March 25, 2025 and was kept in custody there overnight. ECF No. 19-1 at 2. On the morning of March 26, 2025, at approximately 4:00 a.m., ICE agents transported Ms. Ozturk to the Burlington, Vermont airport and placed her on a plane to Louisiana. *Id.* at 3. Ms. Ozturk arrived in Alexandria, Louisiana at 2:35 p.m. and was taken to the South Louisiana Correctional Facility, where she is presently detained. *Id.*

Between the evening of March 25, 2025 and the afternoon of March 26, 2025, Ms. Ozturk's counsel repeatedly attempted to

7

ascertain her location, to no avail. ECF No. 26-2 at 3. Although Ms. Ozturk's attorney checked ICE's Detainee Locator System online several times, the "current detention facility" section was blank. *Id.* Counsel's inquiries about Ms. Ozturk's location to ICE's Enforcement and Removal Operations ("ERO") division in Burlington, Massachusetts and Homeland Security Investigations ("HSI") in Boston, Massachusetts went unanswered. *Id.*

When a representative of the Turkish consulate went in person to ICE offices in Burlington, Massachusetts on March 26 to inquire about Ms. Ozturk's whereabouts, the representative was told that ICE did not have information about where she was. *Id.* Ms. Ozturk's counsel also called Rayford Farquhar, the Chief of Defensive Litigation in the Civil Division at the United States Attorney's Office in the District of Massachusetts and emailed Assistant United States Attorney Mark Sauter on the morning of March 26 to ask about Ms. Ozturk's location and notify them that her asthma medication was not with her when she was detained. Mr. Farquhar and Mr. Sauter both responded that they did not know Ms. Ozturk's location. *Id.* Ms. Ozturk's counsel emailed them again in the early afternoon of May 26, and Mr. Sauter responded that he was still attempting to obtain information about Ms. Ozturk's whereabouts. *Id.* at 3-4.

That afternoon, Ms. Ozturk's counsel filed an emergency motion asking the District of Massachusetts court to order the

government to disclose Ms. Ozturk's location and permit her to speak to her attorney. ECF No. 42 at 6. The motion noted that counsel had just been informed by a U.S. Senator's office that Ms. Ozturk was in Louisiana but had not received confirmation of her location from ICE or the government's counsel. *Id.* At approximately 3:27 p.m., Mr. Sauter told Ms. Ozturk's counsel that ICE had informed him that she was transferred to Louisiana that morning and was en route to a detention facility. ECF No. 26-2 at 4. Mr. Sauter's email stated, "I continue to ask ICE for the detention facility that she will be placed and that she be permitted to contact you." *Id.* (internal quotation marks omitted). After Mr. Sauter and Ms. Ozturk's counsel exchanged several more emails, Ms. Ozturk spoke to her attorney at 9:45 p.m. on March 26, more than 24 hours after her arrest. *Id.* at 5.

## III. Ms. Ozturk's Revocation and Removal Proceedings

According to a memorandum by John L. Armstrong (hereinafter "Armstrong Memorandum"), a senior bureau official of the Bureau of Consular Affairs, the Bureau of Consular Affairs had approved revocation of Ms. Ozturk's F-1 visa pursuant to a request from ICE and the Department of Homeland Security ("DHS") on March 21, 2025. ECF No. 91-1 at 6. According to the memo, ICE and DHS had made an assessment that Ms. Ozturk "had been involved in associations that 'may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support

for a designated terrorist organization' including co-authorizing an op-ed that found common cause with an organization that was later temporarily banned from campus. . . ." *Id.* The memo also noted, "[d]ue to ongoing ICE operational security, this revocation will be silent; the Department of State will not notify the subject of the revocation." *Id.*

Ms. Ozturk was served with a Notice to Appear ("NTA") on March 25, 2025, while in custody. ECF No. 19-1 at 3. The NTA cites Section 237(a)(1)(B) of the Immigration and Nationality Act ("INA"), which applies to individuals whose nonimmigrant visas have been revoked, as the basis for her removal. ECF No. 12-2; 8 U.S.C. § 1227(a)(1)(B). A March 25, 2025 letter, which was addressed to Ms. Ozturk but not provided to her prior to her arrest, also cites the INA provision codified at 8 U.S.C. § 1227(a)(4)(C)(i) as a possible basis for termination of her Student Exchange Visitor Information System ("SEVIS") designation. ECF No. 42 at 7. This provision states that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(a)(4)(C)(i).

The government has not represented that revocation of Ms. Ozturk's visa was based on 8 U.S.C. § 1227(a)(4)(C)(i). In its briefing, the government acknowledges that the "statute is

mentioned [in the March 25, 2025 letter] as one of two possible reasons why Petitioner's SEVIS record was terminated" but states "that data entry into a DHS information system is not a State Department record, and does not speak for the State Department." ECF No. 83 at 21 n.5.

The NTA ordered Ms. Ozturk to appear before an immigration judge in Louisiana on April 7, 2025, although that hearing was later canceled. ECF No. 66 at 22. On April 14, 2025, Ms. Ozturk submitted a request for a bond hearing in immigration court. On April 16, 2025, an immigration judge denied her request for a change in custody status and provided "Danger and Flight Risk" as the rationale. ECF No. 101-1 at 4.

## IV.  **The Pending Proceedings**

Ms. Ozturk filed an amended petition and complaint on March 28, 2025. ECF No. 12. The same day, the Massachusetts district court ordered Ms. Ozturk not to be removed from the United States until further order of the court and ordered the government to file a response by April 1, 2025. ECF No. 16. The government timely filed a response, and Ms. Ozturk filed her reply on April 2, 2025. ECF Nos. 19, 26. On April 3, 2025, the District of Massachusetts held a hearing on the amended petition. ECF No. 41.

On April 4, 2025, the Massachusetts district court denied the government's motion to dismiss the petition and its

11

alternative request to transfer the matter to the Western District of Louisiana. The court instead transferred the case to the District of Vermont "in the interest of justice" pursuant to 28 U.S.C. § 1631.

At a status conference on April 7, 2025, this Court ordered the parties to submit supplemental briefing citing Second Circuit law on their jurisdictional arguments. ECF No. 60. On April 10, 2025, Ms. Ozturk filed a supplemental memorandum on the jurisdictional issues as well as a motion for her release, or in the alternative, a motion to return her to the District of Vermont. ECF Nos. 81, 82. The government filed its supplemental briefing in opposition on these issues. ECF Nos. 83, 84. The Court heard oral argument from the parties on April 14, 2025 and took the matter under advisement.

## Discussion

Pending before the Court is Ms. Ozturk's habeas corpus petition and the government's request for the petition to be dismissed. As a threshold matter, Ms. Ozturk argues that the District of Vermont has jurisdiction and is the proper court after the District of Massachusetts' transfer pursuant to 28 U.S.C. § 1631. The government argues that § 1631 cannot supply this Court with jurisdiction and that the petition should be dismissed because the proper forum is the Western District of Louisiana, where Ms. Ozturk is currently confined. The parties

also dispute whether certain provisions of the INA bar review of Ms. Ozturk's habeas claims.

Ms. Ozturk's substantive constitutional claims center on alleged violations of her First and Fifth Amendment rights. In support of her First Amendment claim, she has submitted evidence to show that the actions against her were retaliatory, as the only identifiable conduct supporting her detention is her co-authoring of a Tufts University op-ed. The government has submitted no evidence to counter her First Amendment claim. Ms. Ozturk's Fifth Amendment claim asserts due process violations. Finally, Ms. Ozturk requests immediate release on bail pending the outcome of the habeas review, while the government argues that bail or bond can only be sought from an immigration judge. In the alternative, Ms. Ozturk requests she be returned to custody in Vermont where she can work with counsel to prepare her legal claims. The Court will first address the jurisdictional questions.

**I.    Habeas Corpus Jurisdiction**

   **A. Legal Standards**

Ms. Ozturk filed her habeas petition pursuant to 28 U.S.C. § 2241. Generally, "[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." *Rumsfeld v. Padilla*,

542 U.S. 426, 447 (2004). This rule is "derived from the terms of the habeas statute," *id.*, which only permits district courts to grant habeas relief "within their respective jurisdictions," 28 U.S.C. § 2241(a).

The federal habeas statute further states that a petition must allege "the name of the person who has custody over him." 28 U.S.C. § 2242; *see* 28 U.S.C. § 2243 ("The writ, or order to show cause shall be directed to the person having custody of the person detained."). The Supreme Court has interpreted this statutory language as requiring the petitioner to name as the respondent her "immediate custodian[,]" who, "[b]y definition . . . reside[s] in the same district" as the petitioner. *Padilla*, 542 U.S. at 444. "[T]he default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Id.* at 435. These jurisdictional rules for habeas petitions do not implicate the Court's subject-matter jurisdiction and are treated functionally as matters of personal jurisdiction or venue. *See id.* at 434 n.7 (explaining that the Court uses the word "'jurisdiction . . . in the sense that it is used in the habeas statute, 28 U.S.C. § 2241(a), and not in the sense of subject-matter jurisdiction of the District Court"); *id.* at 451 (Kennedy, J., concurring) ("In my view, the question of the proper location for a habeas

14

petition is best understood as a question of personal jurisdiction or venue.").

Because Ms. Ozturk was in Vermont when her counsel filed the pending habeas petition in the District of Massachusetts, the petition was not filed in her district of confinement. Nor did it name her immediate custodian (who presumptively would have been in the District of Vermont). The government argues that the § 1631 transfer by the District of Massachusetts is insufficient to cure these jurisdictional defects, and that the only forum where Ms. Ozturk's petition may properly be brought is the Western District of Louisiana. The Court therefore addresses, in turn, (1) whether the District of Massachusetts § 1631 transfer was proper, (2) whether the § 1631 transfer cures the original petition's failure to comply with the district of confinement rule, and (3) whether this Court has jurisdiction despite the petition's alleged failure to identify any immediate custodian.

## B. The Section 1631 Transfer

Under 28 U.S.C. § 1631:

> [w]henever a civil action is filed in a court as defined in section 610 of this title or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court (or, for cases within the jurisdiction of the United States Tax Court, to that court) in which the action

15

or appeal could have been brought at the time it was
filed or noticed, and the action or appeal shall
proceed as if it had been filed in or noticed for the
court to which it is transferred on the date upon
which it was actually filed in or noticed for the
court from which it is transferred.

It is well-established in the Second Circuit that habeas
petitions may be transferred under § 1631. *See, e.g., Liriano v.
United States*, 95 F.3d 119, 123 (2d Cir. 1996) (holding that
when a second or successive petition for habeas corpus is filed
in district court without the requisite authorization of the
Second Circuit, "the district court should transfer the petition
or motion to this Court in the interest of justice pursuant to §
1631"); *Zhen Yi Guo v. Napolitano*, 2009 WL 2840400, at *6
(S.D.N.Y. Sept. 2, 2009) ("Courts have consistently found it in
the interest of justice to transfer habeas petitions when
jurisdiction is lacking." (quoting *Shehnaz v. Ashcroft*, 2004 WL
2378371, at *4 (S.D.N.Y. Oct. 25, 2004))). "When considering
whether a transfer would serve the interest of justice, [the
Court] must weigh 'the equities of dismissing a claim when it
could be transferred.'" *Ruiz v. Mukasey*, 552 F.3d 269, 276 (2d
Cir. 2009) (quoting *Liriano,* 95 F.3d at 122). Relevant equities
include whether the petitioner acted in good faith and whether a
transfer would "expedite [] review, thereby furthering the
interest of justice." *Id.*

In this case, the government does not dispute that this
petition "could have been brought" in the District of Vermont

16

"at the time it was filed[.]" 28 U.S.C. § 1631; *see* ECF No. 19
at 27 ("It is true that at the time Petitioner's original
petition was filed, it could have been properly filed in Vermont
as that is where she was then in custody."). Ms. Ozturk acted in
good faith when she originally filed the petition in
Massachusetts, and transfer expedited review because Ms. Ozturk
would otherwise have needed to spend time refiling the petition.
Because Ms. Ozturk's petition could have been brought in this
Court at the time it was filed and the record supports that the
equities weighed in favor of transfer, the Massachusetts
district court's decision to transfer the petition to this Court
complied with the requirements for transfer under § 1631. *Cf.
U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 152 (2d
Cir. 2019) (noting the Supreme Court's "sagacious warning" that
"'[t]ransferee courts that feel entirely free to revisit
transfer decisions of a coordinate court threaten to send
litigants into a vicious circle of litigation,' culminating in a
'perpetual game of jurisdictional ping-pong.'" (quoting
*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816,
818 (1988))).

   **C. The District of Confinement Rule**

   Ms. Ozturk argues that because a case transferred under §
1631 "shall proceed as if it had been filed in or noticed for
the court to which it is transferred on the date upon which it

17

was actually filed in[,]" the Court should treat her petition as if it had been filed in the District of Vermont at approximately 10:02 p.m. on March 25, 2025, in which case it would have been filed in her district of confinement. 28 U.S.C. § 1631. The government contends that Ms. Ozturk cannot "use § 1631 to vest this Court with authority that it otherwise would lack by way of statute" and that "[n]othing in § 1631 allows a district court to somehow blow past" § 2241's statutory requirements "based on the fiction that the suit was properly before it." ECF No. 83 at 14-15.

The government does not cite any authority holding that § 1631 cannot cure a habeas petitioner's failure to file a petition in the correct district. Other courts have found transfer under § 1631 to be proper where a habeas petition was not originally filed in the district of confinement. *See, e.g., Abraham v. Decker*, 2018 WL 3387695, at *3 (E.D.N.Y. July 12, 2018) (transferring habeas petition under § 1631 because petitioner's immediate custodian was in New Jersey, not New York); *Golding v. Sessions*, 2018 WL 6444400, at *3 (S.D.N.Y. Dec. 6, 2018) (same). Additionally, "[t]he legislative history of § 1631 indicates that 'Congress contemplated that the provision would aid litigants who were confused about the proper forum for review.'" *Liriano*, 95 F.3d at 122. Ms. Ozturk's filing of her habeas petition in the District of Massachusetts because

18

her counsel did not know her location — in other words, her confusion about the proper forum for review — is thus exactly the kind of jurisdictional defect § 1631 was designed to cure.

The government cites *De Ping Wang v. Department of Homeland Security*, 484 F.3d 615 (2d Cir. 2007) for the proposition that "[t]he Second Circuit has held that, while § 1631 allows a transferee court to proceed as if the case had been filed on a certain date, § 1631 does not allow courts to ignore other facts and substantive limits on jurisdiction." ECF No. 83 at 15. That case, however, is readily distinguishable. In *De Ping Wang,* the Second Circuit found that transfer under 28 U.S.C. § 1631 was improper because, even if the action in that case were correctly filed in the transferee court on the same date it was mistakenly filed in transferor, it would still have been untimely. 484 F.3d at 617-18. In contrast, filing Ms. Ozturk's petition in the District of Vermont on the same date it was filed in the District of Massachusetts would have satisfied the jurisdictional requirement that she file in her district of confinement.

A New Jersey federal court recently found transfer under § 1631 to support habeas jurisdiction under similar circumstances. *Khalil v. Joyce*, 2025 WL 972959, at *15 (D.N.J. Apr. 1, 2025). In *Khalil*, the habeas petitioner was arrested by federal officials in Manhattan but was being held in a New Jersey

19

facility when he filed his petition. *Id.* at *1. Finding that it lacked jurisdiction, the Manhattan district court transferred the petition to the District of New Jersey. In finding that it had habeas jurisdiction to proceed upon the case's transfer, the District of New Jersey court reasoned that according to the clear language of § 1631, it must treat the case as if it had been filed in New Jersey on the same date it was filed in New York. The court concluded that because "[a]t that moment, the Petitioner was in New Jersey . . . there is no missing piece of the jurisdictional puzzle[,]" and thus "the Petition counts as having been in New Jersey at the same moment the Petitioner was here." *Id.* at *15.

This Court comes to the same conclusion here. At approximately 10:02 p.m. on March 25, 2025, the moment Ms. Ozturk filed her habeas petition, she was detained in Vermont. Accordingly, for this action to "proceed as if it had been filed in or noticed for the court to which it [was] transferred on the date upon which it was actually filed[,]" the case must proceed as if it were filed in the District of Vermont while Ms. Ozturk was detained here, in which case the district of confinement rule would have been satisfied. 28 U.S.C. § 1631.

The government further argues that Ms. Ozturk's present detention in Louisiana prevents the District of Vermont from exercising habeas jurisdiction. Section § 2241(a) provides that

20

district courts may only grant a writ of habeas corpus "within
their respective jurisdictions[,]" and although Ms. Ozturk was
in this jurisdiction at the time her petition was filed, she is
no longer in the District of Vermont. Ms. Ozturk asserts that
the District of Vermont has jurisdiction notwithstanding her
transfer to Louisiana based on *Ex parte Endo*, 323 U.S. 283
(1944).

In *Ex parte Endo*, the Supreme Court recognized an exception
to the general rule that a district court only has power to
grant habeas relief when the petitioner is being held within its
jurisdiction. The *Endo* petitioner was a Japanese-American
citizen who was interned by the government during World War II.
323 U.S. at 284-85. The petitioner filed a habeas petition in a
California district court while detained in that district and,
while appealing the petition's denial, was transferred to a
detention center in Utah. *Id.* The Supreme Court held that the
petitioner's transfer to Utah after the California district
court "acquired jurisdiction in this case" did not "cause it to
lose jurisdiction where a person in whose custody [the
petitioner] is remains within the district." *Id.* at 306. In
*Padilla*, the Supreme Court recognized that,

> *Endo* stands for the important but limited proposition
> that when the Government moves a habeas petitioner
> after she properly files a petition naming her
> immediate custodian, the District Court retains
> jurisdiction and may direct the writ to any respondent

21

within its jurisdiction who has legal authority to
effectuate the prisoner's release.

542 U.S. at 441.

The government argues that *Ex parte Endo* does not apply
because, in this case, Ms. Ozturk "never properly filed her
habeas petition" in the District of Vermont and thus this Court
had not acquired jurisdiction prior to her transfer to a
different district. ECF No. 83 at 9 n.2. The plain language of
the transfer statute, however, states that the transferred
action "shall proceed *as if it had been filed*" in the transferee
court on the same date it was filed in the transferor court. 28
U.S.C. § 1631 (emphasis added); *see Jimenez v. Quarterman*, 555
U.S. 113, 118 (2009) ("[W]hen the statutory language is plain,
we must enforce it according to its terms.").

Had Ms. Ozturk filed her habeas petition in the District of
Vermont on March 25, 2025, the holding of *Ex parte Endo* would
squarely apply. The District of Vermont would have acquired
jurisdiction on that date, and Ms. Ozturk's transfer to
Louisiana would not have stripped the Court of its jurisdiction
because a respondent with the power to effectuate Ms. Ozturk's
release remains within the reach of the District of Vermont. *See*
*Henderson v. I.N.S.*, 157 F.3d 106, 125 (2d Cir. 1998) (noting
that there is "no question that the Attorney General has the
power to produce the petitioners" in case brought by legal
permanent residents who were ordered deported).

22

**D. The Immediate Custodian Rule**

Even if this Court allows Ms. Ozturk's petition to proceed as if it had been filed on March 25, 2025, in the District of Vermont, the question remains of whether the Court could not have properly acquired jurisdiction on that date because the petition may have failed to name Ms. Ozturk's immediate custodian as a respondent.

The government contends that "Petitioner named improper respondents in her original petition because she named supervisory officials, rather than her immediate custodian in Vermont when the petition was filed." ECF No. 83 at 10. Of the supervisory officials named in the Petition, the one closest to Vermont was Ms. Hyde, the acting ICE Field Office director for New England. When presented with the question of whether an ICE Field Office director was the correct respondent in a habeas petition, other district courts in the Second Circuit have held that the correct custodian was instead the warden of the local facility where the petitioner was being held. *See Sanchez v. Decker*, 2019 WL 6311955, at *4 (S.D.N.Y. Nov. 25, 2019) (finding that the warden of the county correctional facility where petitioner was held, rather than the director of ICE's New York City Field Office, was the immediate custodian); *see also Lemus-Pineda v. Whittaker*, 354 F. Supp. 3d 473, 475 (S.D.N.Y. 2018)

(holding that county jail warden, rather than ICE field office director, was proper respondent).

In this case, however, Ms. Ozturk was not at a prison or jail when the Petition was filed – she was in a vehicle being transported to an ICE Field Office. There is no "warden" that Ms. Ozturk could have named. It is also not apparent to the Court that Ms. Hyde was not functionally the immediate custodian in that moment. Presumably a call from Ms. Hyde to a subordinate may have actually freed Ms. Ozturk, just as a call from a warden to a correctional officer may actually free a prisoner. At oral argument, government's counsel could not identify who that immediate custodian would have been if not Ms. Hyde. ECF No. 98 at 30. Because the government has provided insufficient facts to determine that Ms. Hyde was not Ms. Ozturk's immediate custodian, the Court will not dismiss her petition on that basis.

Regardless of whether Ms. Hyde was the immediate custodian, Ms. Ozturk argues that this case falls within an exception to the immediate custodian rule because her custodian was unknown at the time of the Petition's filing. The unknown custodian exception arises from *Demjanjuk v. Meese*, 784 F.2d 1114 (D.C. Cir. 1986), in which a habeas petitioner was held by the United States in a confidential location at the time he filed his petition. The D.C. Circuit thus ruled that "in these very

24

limited and special circumstances," it would consider the
Attorney General of the United States the appropriate custodian.
784 F.2d at 1116. In *Padilla*, the Supreme Court recognized this
exception by noting that although "[w]hen, as in [*Demjanjuk*], a
prisoner is held in an undisclosed location by an unknown
custodian, it is impossible to apply the immediate custodian and
district of confinement rules[,]" that was not the case in
*Padilla*. 542 U.S. at 450 n.18.

In *Khalil*, the New Jersey district court found that this
exception applied where, at the time of filing the petition,
nothing in the record showed that the petitioner's counsel could
"have determined in real time that the Petitioner had been moved
to New Jersey[.]" 2025 WL 972959, at *27. Although Mr. Khalil's
counsel attempted to locate the petitioner, the ICE Online
Detainee Locator System incorrectly indicated that he was still
being held in New York, and Mr. Khalil was not allowed to call
his attorney. Accordingly, the District of New Jersey court
concluded the unknown custodian exception applied because "the
identity of the immediate custodian [was] virtually unknowable"
when Mr. Khalil filed his habeas petition. *Id.* at *30.

The District of New Jersey court acknowledged that Mr.
Khalil's custodian subsequently became known such that the case
could "simply be dismissed and refiled in Louisiana[,]" where he
was currently being held. *Id.* at 36. It nonetheless concluded

that equitable concerns weighed in favor of applying the unknown

custodian exception, explaining that:

> if the exception does not apply, and the case is
> dismissed on that basis, then the implication would be
> that there can be a period of time during which a
> person can be arrested in the United States and then
> moved by federal officials, during which period no
> habeas court would have the power to hear him out ---
> even though, as here, his lawyers and family cannot
> determine where he is only because they have been
> given inaccurate information about his whereabouts,
> and because he has not been allowed to correct that
> information by making a phone call.

*Id.*

For similar reasons, this Court agrees with Ms. Ozturk that

the unknown custodian exception applies in this case. As in

*Demjanjuk*, Ms. Ozturk was being held in "an undisclosed location

by an unknown custodian" on the date her habeas petition was

filed. 542 U.S. at 450 n.18. The government does not dispute

that her counsel could not have known her location; in fact, the

government states in its briefing that it does not permit

immigration detainees "to communicate about their location while

enroute between detention facilities" because doing so "would

raise serious security concerns." ECF No. 83 at 13. The

government thus admits that from the time ICE agents arrested

Ms. Ozturk to the time she arrived at the Louisiana detention

facility, it was keeping her location a secret. And the identity

of Ms. Ozturk's actual custodian at the time of filing, if it is

not one of the Respondents, appears to still be unknown to the

government.

Ms. Ozturk was arrested at 5:25 pm on March 25, 2025, and ICE did not provide her location to her counsel until the afternoon of March 26, 2025. This made it "impossible to apply the immediate custodian" rule for a period of nearly 24 hours after Ms. Ozturk's initial detention. *Padilla*, 542 U.S. at 450 n.18; *see United States v. Paracha*, 2006 WL 12768, at *6 (S.D.N.Y. Jan. 3, 2006) ("Ordinarily, a habeas writ must be served on a prisoner's immediate custodian. However, where, as here, the immediate custodian is unknown, a writ may properly be served on the prisoner's ultimate custodian.").

The government asserted at oral argument that under *Padilla*, it is irrelevant whether Ms. Ozturk's counsel made diligent efforts to ascertain her location — that does not excuse a petitioner from the immediate custodian requirement. The *Padilla* majority, however, had no occasion to apply the unknown custodian exception because the facts there indicated that the petitioner's counsel may have been "well aware" of Mr. Padilla's presence in South Carolina before filing a habeas petition in New York. 542 U.S. at 449 n.17. The majority rejected the dissent's characterization of the petitioner's location as secret, finding that "neither Padilla nor the District court" had "ever suggested that the Government concealed Padilla's whereabouts from counsel[.]" *Id.* In this case, Ms. Ozturk argues, and the government does not dispute,

27

that ICE officials were intentionally concealing Ms. Ozturk's whereabouts on the day her petition was filed.

Additionally, application of the unknown custodian exception in this case would not implicate the forum-shopping concerns that underlie the immediate custodian rule. As the Supreme Court explained in *Padilla*, this rule "serves the important purpose of preventing forum shopping by habeas petitioners" because "[w]ithout it, a prisoner could name a high-level supervisory official as respondent and then sue that person wherever he is amenable to long-arm jurisdiction." 542 U.S. at 447. Here, the Court finds that Ms. Ozturk could only have filed her petition in one location: the District of Vermont.

Even if the unknown custodian rule exception did not apply here, had Ms. Ozturk correctly filed the Petition in the District of Vermont but named the incorrect custodian, this Court could have simply allowed her to amend the Petition to include the proper respondent. *See* Fed. R. Civ. P. 15(a)(1)(A) ("A party may amend its pleading once as a matter of course no later than . . . 21 days after serving it); *see also Destyl v. Garland*, 2023 WL 3603666, at *4 (W.D.N.Y. May 23, 2023) (finding "purely as a procedural matter" that the proper respondent was the officer-in-charge of the Buffalo Federal Detention Facility

rather than the United States Attorney General and substituting in the correct respondent).

Accordingly, the Court finds it has habeas corpus jurisdiction to consider Ms. Ozturk's petition.

## II.  Habeas Review Limitations in the Immigration and Nationality Act

Having found that habeas corpus jurisdiction is proper, the Court turns to the government's argument that the INA nonetheless bars district court review of Ms. Ozturk's habeas claims related to her detention. The government cites five provisions of the INA which they argue constrain or prohibit the Court's review: 8 U.S.C. § 1201(i); 8 U.S.C. § 1226(e); 8 U.S.C. § 1252(g); 8 U.S.C. § 1252(a)(5); and 8 U.S.C. 1252 (b)(9). For reasons set forth below, the Court finds that none of these provisions limit the Court's review where Ms. Ozturk has raised constitutional and legal challenges to her detention that are separate from removal proceedings.

### A. The Court's Review is Not Barred by § 1226(e)

Ms. Ozturk has been detained under the discretionary detention provision of the INA, codified at 8 U.S.C. § 1226(a). Section 1226 created two mutually exclusive avenues for government detention of individuals who may be subject to removal. One avenue, under the subsection titled "Detention of Criminal Aliens," requires ("shall") the government to "take

29

into custody" individuals who fit certain heightened criteria. §1226(c). The other avenue – at issue in this case – entitled "Arrest, Detention, and Release," grants the government discretion to arrest and detain individuals: "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). The statute also includes a subsection on judicial review. This subsection reads in its entirety, "The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole." § 1226(e).[1]

The government argues that § 1226(e) precludes the Court's review of Ms. Ozturk's detention, notwithstanding the United States Constitution's Suspension Clause. The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Because of the history and importance of the habeas corpus writ, along with a desire to read statutes to comport with the Constitution, the

---

[1] Note that since the enactment of the INA, Congress created the Department of Homeland Security and charged the Secretary with enforcing the INA, 8 U.S.C. § 1103.

Supreme Court has held that "where a provision precluding review
is claimed to bar habeas review, the Court requires a
particularly clear statement that such is Congress' intent."
*Demore v. Kim*, 538 U.S. 510, 511 (2003); *id.* at 517 (finding
that the "clear text" of § 1226(e) does not bar a habeas
challenge to detention). This mandate for statutory construction
is so strict that it has been criticized for establishing a
"magic words" requirement for Congress to preclude habeas
review. *INS v. St. Cyr*, 533 U.S. 289, 327 (2001) (Scalia, J.,
dissenting). Here, the Court does not find such a clear
statement of Congressional intent, let alone any magic words,
that would support a categorical bar to habeas review of
detention under § 1226.

Binding precedent in this Circuit also counters the
government's argument. In *Velasco Lopez v. Decker*, the Second
Circuit squarely considered the availability of habeas review
for the petitioner who was detained under § 1226(a). 978 F.3d
842 (2d Cir. 2020). The Circuit court reviewed a grant of habeas
relief under 28 U.S.C. § 2241 and held that § 1226(e) does not
limit habeas jurisdiction over constitutional claims or
questions of law. *Id.* at 850. Further, habeas review in federal
court can consider claims that the discretionary process itself
was constitutionally flawed. *Id.* In sum, whether a habeas

31

petitioner received due process is not a matter of discretion and is subject to judicial review. *Id.*

As discussed below, Ms. Ozturk has raised questions that are fairly characterized as "constitutional claims or questions of law." *Id.* Ms. Ozturk has also argued that while the government does have discretion in § 1226(a) detention, that discretionary process may be unconstitutional if it allows for the deprivation of constitutional rights. For jurisdictional purposes, the Court need not analyze the merits of these claims at this point. It is enough to acknowledge that because Ms. Ozturk has appropriately raised constitutional claims for this Court to consider in habeas, the nature of those claims defeats any jurisdictional bar set forth in § 1226(e).[2]

The legislative history of the REAL ID Act of 2005 confirms that Congress understood § 1226(e) does not operate as a categorical bar to habeas review of detention. Regarding provisions of the REAL ID Act which purport to deprive the districts courts of habeas jurisdiction of removal proceedings, Congress noted that those provisions "will not preclude habeas review over challenges to detention that are independent of

---

[2] The Court acknowledges case law limiting, but not eliminating, habeas review for "Criminal Aliens" mandatorily detained under § 1226(c). *See e.g., Jennings v. Rodriguez*, 583 U.S. 281 (2018). However, Ms. Ozturk is held in discretionary detention under § 1226(a), not mandatory detention under § 1226(c).

challenges to removal orders." H.R. Cong. Rep. No. 109-72, at 2873 (May 3, 2005). Almost immediately after the Real ID Act was enacted, the First Circuit confronted the question of continued district court jurisdiction for habeas challenges to detention and determined that the REAL ID Act provided no bar in such cases. *Hernandez v. Gonzales*, 424 F.3d 42, 42 (1st Cir. 2005). And courts in this Circuit have continued to consider habeas challenges to detention under § 1226(a) since then. *See, e.g.*, *Velasco Lopez,* 978 F.3d 842. The Court adheres to that precedent in this case.

### B. Sections § 1201(i), § 1252(g), § 1252(a)(5), and § 1252(b)(9)

The government argues that, regardless of this Court's interpretation of 8 U.S.C. § 1226(e), four additional statutory provisions prevent it from considering Ms. Ozturk's claim for relief from present detention. Those four provisions – 8 U.S.C. § 1201(i), 8 U.S.C. § 1252(g), 8 U.S.C. § 1252(a)(5), and 8 U.S.C. § 1252(b)(9) – each directly relate to removal proceedings.

At the outset, the Court acknowledges that the Suspension Clause does not establish an absolute right to seek the writ of habeas corpus. The Supreme Court has held that Congress may modify or eliminate the right to seek the writ if Congress provides "a collateral remedy which is neither inadequate nor

ineffective to test the legality of a person's detention." *Swain v. Pressley*, 430 U.S. 372, 381 (1977). For example, as the Court found in *INS v. St. Cyr*, "Congress could, without raising any constitutional questions, provide an adequate substitute through the courts of appeals." 533 U.S. at 314 n.38. If such a substitute is crafted by Congress, courts must then determine "whether the statute stripping jurisdiction to issue the writ avoids the Suspension Clause mandate because Congress has provided adequate substitute procedures for habeas corpus." *Luna v. Holder*, 637 F.3d 85, 93 (2d Cir. 2011) (quoting *Boumediene v. Bush*, 553 U.S. 723, 771 (2008)).

Section 1201 governs the issuance of visas. The jurisdictional bar in § 1201(i) explicitly prohibits judicial review under "section 2241 of title 28 or any other habeas corpus provision, and sections 1361 and 1651 of such title . . . except in the context of a removal proceeding" for individuals challenging the revocation of visas or documents. The government urges the Court to follow the guidance of courts in other jurisdictions who have found "themselves without jurisdiction to consider the merits of a visa revocation upon operation of Section 1201(i)'s language." ECF No. 83 at 24. Here, however, the merits of a visa revocation are not before the Court. While Ms. Ozturk may plan to challenge the revocation of her visa in another forum, she does not do so in the instant Petition.

Section 1252 provides a collateral remedy in the context of removal proceedings. The government details its understanding of that procedure succinctly: "Petitioner must seek release before an immigration judge and must pursue relief from removal in Immigration Court, whose decision would be reviewable before the Board of Immigration Appeals ("BIA"), and (if necessary) a federal circuit court." ECF No. 83 at 4. Courts across the country, including the Second Circuit, have functionally endorsed this procedure as a substitute for the writ of habeas corpus in instances where would-be habeas petitioners seek judicial review of removal proceedings. *See, e.g., Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 114 (2d Cir. 2008). Thus, if Ms. Ozturk sought relief from removal proceedings, this Court would be obligated to follow Circuit precedent and conclude its review of that claim.

The government argues that whatever Ms. Ozturk's claims may be about the constitutionality of her detention, any "challenges inextricably intertwined with the final order of removal that precede issuance of any order of removal . . . and decisions to detain for the purposes of removal" should all be considered subject to the same jurisdictional bar. ECF No. 83 at 23. The Second Circuit has held, however, that "a suit brought against immigration authorities is not *per* se a challenge to a removal order; whether the district court has jurisdiction will turn on

35

the substance of the relief that a plaintiff is seeking."
*Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (citing
*Kellici v. Gonzales*, 472 F.3d 416, 420 (6th Cir. 2006) (finding
that a "district court, not court of appeals, had jurisdiction
where plaintiffs' habeas petitions challenged only the
constitutionality of the arrest and detention, not the
underlying administrative order of removal.")).

The claims for relief before this Court do not challenge
Ms. Ozturk's removal proceedings. Ms. Ozturk's attorneys
acknowledge that claims related to removal are not appropriate
in this action: "While the government's Policy also lay behind
the revocation of her visa and placement in removal proceedings,
she does not, in this Court, challenge those actions. Instead,
she seeks relief on her claims challenging her apprehension,
detention, and the termination of her SEVIS, release from
detention, reinstatement of her SEVIS, and corresponding
declaratory and injunctive relief that the Policy that resulted
in her apprehension, detention, and SEVIS termination are
illegal."[3] ECF. No. 81 at 21. None of these claims raise
challenges to the removal process.

The limitations on habeas review set forth in Section 1252
thus do not apply in this case. Subsection (a)(5) provides for

---

[3] The government notes that Ms. Ozturk's SEVIS record is not the basis
for her detention or removability. ECF No. 83 at 21.

the "Exclusive Means of Review" for habeas petitions challenging "an order of removal" through the established scheme. Subsection (b)(9) limits habeas review, except through the established scheme requiring a final order before appeal to the circuit court, for "all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter." And subsection (g) limits jurisdiction of courts outside the established scheme to "hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

Subsection (a)(5) can be dispensed of quickly, as no "removal order" has been issued here and Ms. Ozturk does not challenge one. Similarly, she has not raised in this Court any constitutional or legal concerns "arising from" "any action" or "proceeding" brought to remove her, per subsection (b)(9). Moreover, the plain text of subsection (g) does not support a reading that Ms. Ozturk's detention and resulting constitutional claims arise from the government's "decision or action" to "commence proceedings, adjudicate cases, or execute removal orders." Whether removal proceedings have proceeded according to

law and in comport with the Constitution is not a question
before this Court.

The government's argument that Ms. Ozturk's detention
"arises from" her removal proceedings stretches the bounds of
the text and the facts of this case. While Ms. Ozturk's
detention may be related to her immigration status following the
revocation of her visa, it does not "arise from" her removal
proceedings. Indeed, there is no causal relationship between the
removal proceedings and her detention. As the government has
confirmed, ICE's decision to arrest and detain her was
*discretionary* under § 1226(e). Her detention did not flow
naturally as a consequence of her removal proceedings. Indeed,
Ms. Ozturk was detained before the commencement of her removal
proceedings. *See* 8 C.F.R. § 1003.14. Whether her detention
comports with the law and the Constitution is the subject of
this Court's habeas review.

The government cites *Jennings v. Rodriguez*, 138 S. Ct. 830,
841 (2018) for the proposition that the habeas corpus bar in §
1252(b)(9) includes challenges to a decision to detain or to
seek removal. *Jennings* does not provide guidance on the question
of reviewability of detention decisions under § 1252(b)(9),
however, in part because that issue was not briefed or argued
before the court. 138 S. Ct. at 841 ("The parties in this case
have not addressed the scope of § 1252(b)(9), and it is not

38

necessary for us to attempt to provide a comprehensive interpretation. For present purposes, it is enough to note that respondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar."). In fact, *Jennings* explicitly rejected the formulation, proposed in a concurrence, that the government seeks here. "The concurrence contends that 'detention *is* an "action taken ... to remove" an alien' and that therefore 'even the narrowest reading of "arising from" must cover' the claims raised by respondents. *Post* at 855. (*Thomas, J.,* concurring in part and concurring in judgment). We do not follow this logic." *Id.* at 841 n.3. Accordingly, this Court also does not read "arising from" to encompass any activity that has occurred since the revocation of Ms. Ozturk's visa.[4]

---

[4] In Court proceedings on April 14, 2025, the government reasserted the argument that the confluence of the opinions of five Justices in *Jennings* should be read to bar review of Ms. Ozturk's claims in this Court and instead channel them eventually to a court of appeals, no matter the nature of the challenged action. But Justice Alito's opinion for the Court, while not controlling on the matter of §1252(b)(9), rejects the "staggering results" that would follow Respondents' interpretation. "Suppose, for example, that a detained alien wishes to assert a claim under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), based on allegedly inhumane conditions of confinement. . . . [C]ramming judicial review of those questions into the review of final removal orders would be absurd." *Jennings* 138 S.Ct. at 293.

Similarly, the government's reliance on *Delgado v. Quarantillo* is misplaced. 643 F.3d 52 (2d Cir. 2011). The *Delgado* case did not concern detention. The plaintiff in that case brought a mandamus action to raise an adjustment-of-status challenge, which the Second Circuit determined was "inextricably linked" to a reinstatement of removal order and thus barred by § 1252(a)(5) because "the adjustment of status to that of a lawful permanent resident would render the reinstatement order invalid." 643 F.3d at 55 (cleaned up). Implicit in the *Delgado* court's reasoning is a causal relationship between the relief sought and the removal process. As noted above, the *Delgado* court made clear that district courts must determine jurisdiction by considering the substance of the asked-for relief because suits brought against immigration authorities are not *per se* challenges to removal orders. *Id.* In this case, there is no causal relationship between discretionary detention and removal proceedings. Relief from alleged improper detention would not render any removal proceedings invalid.

Finally, *Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019) does not address an analogous situation for the purpose of § 1252(g) interpretation. The government contends that *Ragbir* counsels that "1252(g) strips the district court of jurisdiction to hear a retaliatory First Amendment challenge in a removal case." ECF No. 83 at 26. But, again, the Court is not considering a removal

40

case. The Court is considering a habeas challenge to discretionary detention.

In summary, the government urges the court to interpret challenges to § 1226(a) detention as *per se* challenges to removal proceedings and barred by several provisions in § 1252. The Court declines to adopt that approach, as it has no precedent in this Circuit or at the Supreme Court. Indeed, cases like *Velasco Lopez* suggest that district courts in this Circuit should continue to consider habeas challenges to detention post-REAL ID Act, where otherwise appropriate. Article III courts have an important role to play in evaluating constitutional and legal claims related to detention brought in habeas, and this Court has jurisdiction over this case.

The Court offers one final observation about the government's argument that constitutional challenges to detention must be brought first to an Immigration Judge, then to the Board of Immigration Appeals, and finally via a petition for review to the court of appeals. There are serious questions about whether that process would be an adequate substitute for the writ of habeas corpus in district court, given the limited scope of administrative review.[5] In a similar case proceeding in

---

[5] Respondents' reliance on *Reno v. American-Arab Anti-Discrimination Committee ("AADC")*, 525 U.S. 471 (1999), to "settle" these questions elides the fact that *AADC* was exclusively about removal, not detention.

41

the District of New Jersey, the government has acknowledged
that, "[i]f the alleged claim is a fundamental constitutional
claim the BIA (or the immigration judge) is powerless to
address, the court of appeals can address that issue in the
first instance." *Khalil*, 2:25-cv-01963-MEF-MAH, ECF No. 185 at 2
(cleaned up). Attorneys for the detainee in that case put it
more bluntly, "both the IJ and the Board of Immigration Appeals
('BIA') lack jurisdiction over constitutional challenges." *Id.*
at ECF No. 189 at 1; *see also Severino v. Mukasey*, 549 F.3d 79,
83 (2d Cir. 2008).

While timelines may vary on the speed with which detainees
may have their constitutional arguments heard by a court of
appeals in the first instance after the IJ and the BIA
processes, it is evident that it will necessarily be slower than
a petition to a district court, likely by a factor of months,
leading to a gap in their habeas rights. The District Court of
New Jersey held in *Khalil* that to deny jurisdiction would be to
say that for a single day in March, the detainee in that case
"would not have been able to call on any habeas court." 2025 WL
972959, at *37. The Court found that to be "too far" because
"[o]ur tradition is that there is no gap in the fabric of habeas
--- no place, no moment, where a person held in custody in the
United States cannot call on a court to hear his case and decide
it." *Id.*

42

Consider that the government's argument on this issue boils down to a bold statement that no matter how egregious the type or quantity of First Amendment or due process violations committed by the government in detaining an individual, an Article III court *cannot* consider any alleged constitutional violations until after Article II employees, with no power to consider or address those violations, have moved the case through their lengthy process. Put another way, the government argues that § 1226(a) grants practically limitless, unreviewable power to detain individuals for weeks or months, even if the detention is patently unconstitutional. Fortunately, this Court need not rule on the merits of that argument today, given the Court's rejection of the jurisdictional bar on other grounds. Thus, having found that 8 U.S.C. § 1201(i), § 1226(e), § 1252(g), § 1252(a)(5), and § 1252(b)(9) do not bar the Court's consideration of Ms. Ozturk's constitutional and legal claims, the Court turns to those claims now.

## III. Petitioner's Request for Immediate Release

Ms. Ozturk seeks habeas corpus relief based on alleged violations of her constitutional rights. Her ultimate goal in these proceedings is release from detention, but the Court presently considers her request for immediate release pending the resolution of her habeas petition.

43

Both parties analyze Ms. Ozturk's claim for immediate release pending the adjudication of her petition in reference to *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001). Such release is authorized by *Mapp* provided the Court finds the habeas petition raises "substantial claims" and that "extraordinary circumstances" exist "that make the grant of bail necessary to make the habeas remedy effective." *Id.* at 230 (cleaned up).

In this section, the Court first considers its power to conduct a habeas review and the proper nature of that review at this point in the case. The Court turns next to a short summary of evidence related to Ms. Ozturk's constitutional claims. The Court then considers Ms. Ozturk's First Amendment and Due Process claims. The Court finds that while Ms. Ozturk has raised serious claims and provided evidence that merit further review, the Court does not yet have enough evidence to make a determination on pre-disposition release under *Mapp*, particularly given the government's limited representations on that question.

**A. Habeas Corpus Review**

District Courts have "inherent power" to consider habeas petitions and grant relief. *Mapp*, 241 F.3d at 226 (citing *Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978)). The power is also statutory, as Section 2241 states that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice

thereof, the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241. "Congress has authorized federal district courts to grant a writ of habeas corpus whenever a petitioner is in custody in violation of the Constitution or laws or treaties of the United States." *Black v. Decker*, 2020 WL 4260994, at *5 (S.D.N.Y. July 23, 2020), *aff'd*, 103 F.4th 133 (2d Cir. 2024) (cleaned up).

Historically, "common-law habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed upon the circumstances." *Boumediene*, 553 U.S. at 779. The "equitable and flexible nature of habeas relief" continues in our system today. *Velasco Lopez*, 978 F.3d at 855. Where appropriate, courts must use their authority to consider not only the present circumstances of confinement, but the actions that led to it. "The intended duration of the detention and the reasons for it bear upon the precise scope of the inquiry. . . . The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain." *Boumediene*, 553 U.S. at 783. As the *Velasco Lopez* court stated, "[t]he purpose of habeas corpus is to impose limitations on the Government's ability to do these things." 978 F.3d at 855.

The nature of the detention, and any other proceedings that have occurred, will impact the rigor of review. "Where a person

is detained by executive order, rather than, say, after being tried and convicted in a court, the need for collateral review is most pressing. . . . In this context the need for habeas corpus is more urgent." *Boumediene*, 553 U.S. at 783. Accordingly, this Court must conduct an "urgent" investigation of Ms. Ozturk's detention and consider "both the cause for detention and the Executive's power to detain." *Id.*

The current questions before this Court are how to evaluate Ms. Ozturk's claims at this stage of the proceedings and what, if any, relief is appropriate. Ms. Ozturk argues that her detention pursuant to the government's authority under 8 U.S.C. § 1226(a) is unconstitutional because it is motivated by an impermissible purpose. She acknowledges that § 1226(a) grants the government discretion generally as it relates to decisions to detain individuals who may be subject to removal, but, as her counsel argued in court, "there's no discretion to violate the Constitution." ECF No. 98 at 51; *see also id.* at 77 (citing *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975) and *Bates v. Town of Cavendish, Vermont*, 735 F. Supp. 3d 479, 506 (D. Vt. 2024) for the proposition that government officials cannot violate the Constitution despite grants of discretion). If her detention is unconstitutional, the likely remedy is release.

In addition to habeas corpus relief, Ms. Ozturk has asked the Court to grant her immediate release pending the adjudication of her Petition. Such release is governed by the *Mapp* factors which, as noted above, require the Court to find that the habeas petition raises "substantial claims" and that "extraordinary circumstances" exist "that make the grant of bail necessary to make the habeas remedy effective." *Id.* at 230 (cleaned up).

The Court must also consider the government's request for dismissal. In *Ashcroft v. Iqbal.* 556 U.S. 662 (2009), the Supreme Court considered claims of unconstitutional conduct relating to immigration detention. *Iqbal* requires the complaint to state "a plausible claim for relief" and "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. However, if "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the Court cannot sustain a claim. *Id.* In short, "while legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*

For the reasons set forth below, the Court finds that Ms. Ozturk has presented significant evidence supporting her constitutional claims, and that those claims easily meet the *Iqbal* standard. Ms. Ozturk argues that her detention is in retaliation for her political speech, thus violating her rights

47

under the First and Fifth Amendments. Her evidence supports her
argument that the government's motivation or purpose for her
detention is to punish her for co-authoring an op-ed in a campus
newspaper which criticized the Tufts University administration,
and to chill the political speech of others. The government has
so far offered no evidence to support an alternative, lawful
motivation or purpose for Ms. Ozturk's detention.

**B. Summary of Facts Supporting Constitutional Claims**

Over a year ago, on March 26, 2024, Ms. Ozturk was one of
four co-authors of an op-ed published in a student newspaper.
*The Tufts Daily* "is the entirely student-run newspaper of record
at Tufts University" which regularly publishes "op-eds submitted
by readers and members of the Tufts community." *About Us*, The
Tufts Daily, https://www.tuftsdaily.com/page/about. The op-ed
was titled "Try again, President Kumar: Renewing calls for Tufts
to adopt March 4 TCU Senate resolutions." Ms. Ozturk describes
the op-ed as "criticiz[ing] the University's dismissal of
several resolutions that had been adopted by the undergraduate
student Senate as 'a sincere effort to hold Israel accountable
for clear violations of international law.' The op-ed urged
Tufts to "trust in the Senate's rigorous and democratic process'
and 'meaningfully engage with and actualize the resolutions
passed by the Senate.'" ECF No. 12 at 2.

Tufts University "declares that this opinion piece was not in violation of any Tufts policies" and "[t]he University maintains that the op-ed was consistent with speech permitted by the Declaration on Freedom of Expression adopted by [University] trustees on November 7, 2009." ECF No. 26 at 67. This declaration from Tufts University was signed by President Kumar, the addressee of Ms. Ozturk's co-authored op-ed. *Id.* at 69.

Ms. Ozturk supports her claim that her adverse treatment from the government is improperly motivated by pointing to several statements made by high-level government officials.[6] On May 14, 2024, then-candidate Donald Trump reportedly said, "any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[7] On March 28, 2025, Secretary of State Marco Rubio delivered remarks to the press regarding Ms. Ozturk's detention. U.S. Department of State, *Secretary of State*

---

[6] Though Ms. Ozturk offers these statements to support her argument that her detention is related to her speech, these statements do not always neatly differentiate between the issues of visa revocation, legal status in the country, detention, and removal. *See, e.g.*, Secretary Rubio's statement on March 27, 2025, "We'll revoke your visa, and once your visa is revoked, you're illegally in the country and you have to leave." *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

[7] Josh Dawsey, et al., *Trump told donors he will crush pro-Palestinian protests, deport demonstrators*, Washington Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

*Marco Rubio Remarks to the Press* (Mar. 28, 2025),
https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-
the-press-3/. Secretary Rubio stated in response to a question
about Ms. Ozturk, "The activities presented to me meet the
standard of what I've just described to you: people that are
supportive of movements that run counter to the foreign policy
of the United States." Secretary Rubio further indicated that
Ms. Ozturk's detention was the government "basically asking them
to leave the country." He explicitly noted that "that's why
they've been detained."

Secretary Rubio, however, alluded that the government had
more evidence than the op-ed to support Ms. Ozturk's detention,
stating: "I would caution you against solely going off of what
the media has been able to identify, and those presentations, if
necessary, will be made in court." A March 21, 2025 memo from a
Senior Bureau Official in the Bureau of Consular Affairs with
the Department of State states that, "in response to a request
from DHS/ICE and the assessment from DHS/ICE that Rumeysa OZTURK
had been involved in associations that 'may undermine U.S.
foreign policy by creating a hostile environment for Jewish
students and indicating support for a designated terrorist
organization' *including* co-authoring an op-ed that found common
cause with an organization that was later temporarily banned

from campus, the Bureau of Consular Affairs" revoked Ms. Ozturk's visa. ECF No. 91 at 6 (emphasis added).

Ms. Ozturk has also provided declarations to this Court supporting her claim that the manner of her arrest and detention are irregular. Declarations from five immigration attorneys in New England provide evidence that her movements through at least five states and several different government facilities within 24 hours of arrest may be atypical for an individual in her situation. ECF No. 82 at 17-18. In particular, Ms. Ozturk has offered evidence to dispute the government's claims that she has been detained in Louisiana because there were no appropriate beds available in New England at the time of her detention. *Id.* at 20.

The government has presented little evidence to rebut Ms. Ozturk's constitutional violation claims. As noted above, the government has offered a declaration from the Acting Deputy Field Office Director for ICE in Burlington, Massachusetts regarding ICE detention procedures and available bedspace. ECF No. 19-1. The government has not offered any evidence specifically regarding its motivation or rationale for Ms. Ozturk's detention.

### C. First Amendment Claim

The First Amendment's protection of the right to free speech is often considered the cornerstone of our vibrant

American democracy. As Benjamin Franklin famously wrote in 1737,
"Freedom of speech is a principal pillar of a free government;
when this support is taken away, the constitution of a free
society is dissolved." The Supreme Court has confronted
restrictions on the right to free speech countless times since
our founding, and it recently summarized the history, scope, and
importance of the right to freedom of speech:

> The framers designed the Free Speech Clause of the
> First Amendment to protect the freedom to think as you
> will and to speak as you think. They did so because
> they saw the freedom of speech both as an end and as a
> means. An end because the freedom to think and speak
> is among our inalienable human rights. A means because
> the freedom of thought and speech is indispensable to
> the discovery and spread of political truth. By
> allowing all views to flourish, the framers
> understood, we may test and improve our own thinking
> both as individuals and as a Nation. For all these
> reasons, if there is any fixed star in our
> constitutional constellation, it is the principle that
> the government may not interfere with an uninhibited
> marketplace of ideas. . . . [t]he First Amendment
> protects an individual's right to speak his mind
> regardless of whether the government considers his
> speech sensible and well intentioned or deeply
> misguided and likely to cause anguish and incalculable
> grief. Equally, the First Amendment protects acts of
> expressive association.

*303 Creative LLC v. Elenis*, 600 U.S. 570, 584-86 (2023)
(internal citations and quotations omitted).

It is against this backdrop that Ms. Ozturk alleges that
her detention is retaliation for political speech which is core
First Amendment protected conduct. The only specific act cited
by the government so far as justification for any of their

52

adverse actions towards Ms. Ozturk is her co-authored op-ed. ECF
No. 91-1. The Supreme Court has repeatedly "reaffirmed that
speech on public issues occupies the highest rung of the
hierarchy of First Amendment values, and is entitled to special
protection," *Connick v. Myers*, 461 U.S. 138, 145 (1983)
(internal quotation omitted), because "political speech [is] at
the core of what the First Amendment is designed to protect,"
*Virginia v. Black*, 538 U.S. 343, 365 (2003). As a general rule,
"the First Amendment means that government has no power to
restrict expression because of its message, its ideas, its
subject matter, or its content." *Ashcroft v. Am. Civil Liberties
Union*, 535 U.S. 564, 573 (2002). Furthermore, First Amendment
protections have long extended to noncitizens residing within
the country. *Bridges v. Wixon*, 326 U.S. 135 (1945).

The Court hesitates to characterize the content of Ms.
Ozturk's speech, which is obviously about public issues, but it
is necessary to clarify that Ms. Ozturk's op-ed does not readily
fall into one of the established exemptions to the First
Amendment's protection from government speech regulation. The
op-ed focuses largely on the authors' belief that the Tufts
University administration erred by not affording sufficient
deference to resolutions adopted by the Tufts undergraduate
student senate. The op-ed quotes school documents to argue that
the school administrators are not upholding their stated values

53

of supporting critical thinking and debate in the community. The authors express their belief regarding violations of international law that have motivated the student senate's resolutions. And as the Armstrong Memorandum cites, the authors note alignment in rejecting the university administration's response to the student senate recommendations with another organization later temporarily barred from the Tufts campus for actions the organization took well after the publication of this op-ed. The op-ed culminates with the co-authors "urg[ing] President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions by the Senate." Taken together, the op-ed is self-evidently speech regarding public issues, albeit largely focused on the parochial politics of university governance.

The Supreme Court has recognized only "a few limited areas" where the First Amendment permits restrictions based on the content of speech. *See United States v. Stevens*, 559 U.S. 460, 468 (2010) (citation omitted). The Supreme Court summarized these areas in the recent *Counterman v. Colorado* case: "incitement—statements directed at producing imminent lawless action, and likely to do so," "defamation—false statements of fact harming another's reputation," "obscenity—valueless material appealing to the prurient interest," and "true threats of violence." 600 U.S. 66, 73-74 (2023) (cleaned up). This Court

54

does not believe that a reasonable reader of the op-ed would find a true threat or incitement of lawless action, let alone obscenity or defamation. Tufts University has confirmed that the op-ed did not violate any Tufts policy, that no complaints were filed about the op-ed, that the speech in the op-ed was consistent with University guidelines, and indeed that it was just one of many op-eds discussing the issue published in the school newspaper. ECF No. 26-1 at 67.

The First Amendment protects individuals from government action that is based on improper motives, namely silencing disfavored speech. The Second Circuit has long recognized retaliation in violation of the First Amendment as a defense from government enforcement. In recently affirming this Court, the Circuit identified the appropriate standard: "A plaintiff must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Demarest v. Town of Underhill*, 2025 WL 88417, at *2 (2d Cir. Jan. 14, 2025) (summary order) (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015)) (cleaned up). In the criminal context, the Supreme Court has expanded on the standard for the third element: "With respect to the third requirement, '[i]t is not enough to show that an official acted with a retaliatory motive

and that the plaintiff was injured – the motive must cause the injury.'" *Id.* (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)). "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (quoting *Nieves* 587 U.S. at 399). However, given the different nature of criminal detention and immigration detention, as discussed above, it is not altogether clear that this interpretation controls the habeas inquiry. *See Gonzalez v. Trevino* 602 U.S. 653, 658 (2024) (rejecting an "overly cramped" reading of the *Nieves* standard). Regardless of whether it binds the Court here, *Nieves* serves to highlight the importance of identifying the motive for detention.

The Second Circuit has specifically recognized potential retaliation for protected political speech as a cognizable ground for habeas relief in the immigration context, noting that "to allow this retaliatory conduct to proceed would broadly chill protected speech, among not only activists subject to final orders of deportation but also those citizens and other residents who would fear retaliation against others." *Ragbir*, 923 F.3d at 71.

Ms. Ozturk has presented evidence to support her argument that she may qualify for a retaliation claim. Administration officials have identified her speech as the reason her visa was

revoked. If this Court were evaluating the question of
motivation for Ms. Ozturk's visa revocation, this inquiry could
likely conclude now. It may well be that the Ms. Ozturk's
detention shares common motivation with her visa revocation. But
as this Court has found that visa revocation and detention
proceedings are not inextricably linked, the Court seeks
additional evidence of the connection between Ms. Ozturk's
speech and her detention.

The court in *Ragbir*, decided before *Nieves*, found that a
retaliation claim was satisfied by "plausible — indeed, strong —
evidence that officials responsible for the decision to deport
him did so based on their disfavor of Ragbir's speech." 923 F.3d
at 73. Regardless of whether the standard for establishing a
connection is "plausible," "strong," or "causation," the Court's
inquiry would benefit from the ability to consider additional
evidence. For present purposes it is sufficient to find that Ms.
Ozturk's First Amendment claims are serious and worthy of
further exploration in this Court.

Secretary Rubio has argued publicly that there are
additional justifications for the government's actions adverse
to Ms. Ozturk and that these justifications may be filed in
court if necessary. The Court invites an immediate submission
any such evidence in this case. In the absence of additional
information from the government, the Court's habeas review is

likely to conclude that Ms. Ozturk has presented a substantial claim.

### D. Due Process Claim

The Due Process Clause of the Fifth Amendment protects the right of "any person" from "be[ing] deprived of life, liberty, or property, without due process of law." "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

Ms. Ozturk alleges that her detention violates the Due Process Clause because it serves no legitimate purpose, or in the alternative because it is motivated by improper purposes. Her due process claims are grounded in a "line of cases which interprets the Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301-02 (1993). Substantive due process claims are available in the context of immigration detention. *Zadvydas*, 533 U.S. at 694 (citing *Wong Wing v. U.S.*, 163 U.S. 228 (1896)). And "the Due Process Clause covers noncitizens, whether their presence here is lawful,

unlawful, temporary, or permanent." *Velasco Lopez*, 978 F.3d at
850 (citing *Zadvydas*, 533 U.S. at 693).

In the civil immigration context, potential requirements of
the Due Process Clause frequently conflict with the prerogatives
of Congress and the Executive to manage immigration and foreign
affairs. As discussed above, Congress has granted the Executive
the authority to detain individuals such as Ms. Ozturk pending a
removal decision under 8 U.S.C. § 1226(a). Though detentions
under § 1226(a) do not follow any judicial process, let alone a
criminal conviction, the Supreme Court has found that such
deprivation of liberty is not *per se* unconstitutional. The
Supreme Court "has recognized detention during deportation
proceedings as a constitutionally valid aspect of the
deportation process," *Demore*, 538 U.S. at 523, and determined
that "the Due Process Clause does not require [the government]
to employ the least burdensome means to accomplish its goal,"
*id.* at 528.

Civil detention may be permissible with lower procedural
requirements than criminal detention, but it is not permissible
for the same purposes. Specifically, the Supreme Court has long
recognized that the key rationale for allowing less process in
immigration cases than in criminal cases is that the immigration
system, including detention, is not punitive. *See, e.g., Fong
Yue Ting v. United States*, 149 U.S. 698, 730 (1893); *AADC*, 525

U.S. at 491. ICE acknowledges this principle with respect to immigration detention, *Detention Management*, U.S. Immigrations and Custom Enforcement, https://www.ice.gov/detain/detention-management (updated Apr. 16, 2025)("Detention is non-punitive."), and for good reason. The Supreme Court has reiterated that immigration detention is "civil, not criminal, and we assume that they are nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690. Justice Kennedy confirmed the majority's understanding in that case that "both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious. Where detention is incident to removal, the detention cannot be justified as punishment nor can the confinement or its conditions be designed in order to punish." *Id.* at 721 (Kennedy, J., dissenting). Rather than punishment, immigration detention must be motivated by the two valid regulatory goals that the government has previously argued motivate the statute: "ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community." *Id.* at 690 (cleaned up). So long as detention is motivated by those goals, and not a desire for punishment, the Court is generally required to defer to the political branches on the administration of the immigration system.

Ms. Ozturk argues that her detention is punitive, in addition to the First Amendment retaliation claims discussed

above. The Secretary of State's recent comments imply that her detention is motivated by a desire to compel her to voluntarily depart the country. U.S. Department of State, *Secretary of State Marco Rubio Remarks to the Press* (Mar. 28, 2025),https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3/. The Secretary also suggests that her detention advances a message to others in similar situations that they should choose to leave the country rather than face detention. "They can do so tomorrow. Buy an airplane ticket and leave." However, courts have not sanctioned the use of the immigration detention system to strike fear in or punish individuals who may seek to contest their removal through lawful administrative and judicial channels designed for that purpose. This is an important distinction between civil detention and criminal incarceration, which allows for punishment and deterrence. Courts' less exacting due process scrutiny has thus far been premised on the assumption that the system is operating for permitted purposes.

Ordinarily, the government may not need to justify its discretionary decision to detain an individual pursuant to 8 U.S.C. § 1226(e), and it has presented no evidence here as to its motivations for Ms. Ozturk's detention. Ms. Ozturk's counsel has informed the Court that DHS contended in immigration court that "Ms. Ozturk poses a flight risk," though Ms. Ozturk's

attorneys have characterized that claim as "unsupported." ECF No. 99 at 1. An immigration judge found "Danger and Flight Risk," but the Court has not seen the evidence that supported that determination, and Ms. Ozturk has submitted evidence to support the opposite conclusion. ECF 101-1 at 4. Where a detainee presents evidence that her detention, though discretionary, is motivated by unconstitutional purposes in violation of the Due Process Clause, the Court may reasonably conclude the same in the absence of countervailing evidence. As the Court continues consideration of Ms. Ozturk's habeas petition, it will allow the government to present evidence to rebut claims that her detention is improperly motivated.

### E. Ms. Ozturk Has Plausibly Alleged Constitutional Violations, But the Record Is Not Sufficiently Developed to Support Immediate Release

The record before the Court demonstrates that Ms. Ozturk has plausibly pled constitutional violations related to her detention. Ms. Ozturk's Free Speech and Due Process claims are serious, and the Court intends to continue to develop the facts on these issues. However, the Court does not find at this time that such pleadings are sufficient to satisfy the standard for immediate release, given the overarching deference towards the executive branch's authority in the area of immigration enforcement.

Both Ms. Ozturk and the government suggest that it is appropriate for the Court to consider Ms. Ozturk's claim for release pending the resolution of her habeas petition under the Second Circuit's standard in *Mapp*. As noted previously, the *Mapp* standard requires a court contemplating bail to "inquire into whether the habeas petition raises substantial claims and whether extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." 241 F.3d at 230 (cleaned up).

The Court does not find that it has sufficient information to support release under *Mapp*, nor does it determine that Ms. Ozturk is unlikely to be able to meet that standard with additional evidence. The Court notes at the outset that this case has been proceeding rapidly, and new evidence has been emerging regularly. For example, on Friday, April 11, 2025, Ms. Ozturk's counsel transmitted to the Court the Armstrong Memorandum, which contains probative evidence regarding the government's motivations but was received by Ms. Ozturk's counsel after the April 10 filing deadline on these issues. *See* ECF No. 91. Similarly, on Sunday, April 13, less than twenty-four hours before this Court held a hearing on these issues, Ms. Ozturk's counsel submitted as an exhibit an April 13, 2025 Washington Post article reporting on the existence of an additional State Department memorandum, though that memorandum

has not yet been provided to this Court. See ECF No. 95. These memoranda, along with any other evidence held by either party but not yet disclosed to the Court, are important to the resolution of both a request for release on bail and a final determination. The Court plans to move expeditiously towards the resolution of these factual questions.

### F. Scope of Federal Judicial Power

Rather than contest the merits of Ms. Ozturk's detention, the government has primarily argued that decisions regarding immigration detention fall squarely under the control of the political branches and should not be second guessed by the courts. This Court follows clear instruction of the Supreme Court on this matter and has "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs." *Noem v. Abrego Garcia*, 2025 WL 1077101, at *1 (U.S. Apr. 10, 2025). This Court has not considered questions of foreign policy or immigration policy in the course of these proceedings. The Court concerns itself only with review of Ms. Ozturk's discretionary domestic detention, within the contours of established precedent.

To be clear, precedent in this Circuit has confirmed that Congress may restrict some judicial review of immigration cases. The *Mapp* decision found that "[t]here can be no doubt that, with respect to immigration and deportation, federal judicial power

is singularly constrained," 241 F.3d at 227, and that Congress may have "plenary power over immigration matters [that] renders this [habeas] authority readily subject to congressional limitation," *id.* at 231. However, the *Mapp* Court also held that, "[a]bsent a clear direction from Congress, federal judicial power is unaltered, and the authority of the federal courts to admit to bail parties properly within their jurisdiction remains unqualified." *Id.* at 227. As discussed above, no such clear direction applies here.[8]

Nonetheless, this backdrop will inform the scope and depth of the Court's review into the merits of Ms. Ozturk's habeas claims to ensure that the Court does not improperly intrude upon the prerogatives of the other co-equal branches. *See AADC*, 525 U.S. at 491 (holding that in general courts should not assess the legitimacy of the Executive's foreign policy objectives or law enforcement priorities when considering deportation cases though there may be "a rare case in which the alleged basis of discrimination is so outrageous" as to warrant judicial review). Where the executive branch has exercised powers assigned to it by the legislative branch in compliance with the laws and

---

[8] Further it is not evident that the power of the political branches to "constrain" or "limit" habeas review is the same as the power to eliminate it in the district courts, particularly in the context of detention. Consider the *Jennings* Court's hypothetical regarding judicial review of inhumane conditions of confinement, which the Supreme Court found "absurd" to channel to the circuit courts via a petition for review. *Supra* note 4.

Constitution, this Court will not second guess the government's
choices.

## IV. Petitioner's Request for Return to Vermont

Ms. Ozturk has proposed that, if her request for immediate
release is not granted, the Court order her returned to the
District of Vermont. The Court finds that Ms. Ozturk's physical
return to ICE custody within the District of Vermont is in the
interest of justice because transfer would assist the Court's
exploration of the important constitutional questions in this
case, would allow the Court to conduct appropriate fact-finding
including to support a potential bail hearing, and would
otherwise have no impact on removal proceedings. Her physical
return to Vermont would also give closely proximate effect to
the order issued by the District of Massachusetts court at 10:55
p.m. on Tuesday, March 25, 2025, which was not heeded by the
government.

### A. Ms. Ozturk's Presence in Vermont Will Facilitate the Fair and Expeditious Resolution of this Matter

The Court finds that Ms. Ozturk's presence in Vermont will
facilitate her ability to work with her attorneys, coordinate
the appearance of witnesses, and generally present her habeas
claims, many of which are based on events that occurred in New
England. A transfer to Vermont will also facilitate Ms. Ozturk's
ability to receive a neutral medical evaluation, as her medical

condition will be a factor for the Court to consider when addressing the question of release. More generally, her presence in the courtroom will assist the Court in determining potential bail conditions and whether release is appropriate.

Ms. Ozturk has informed the Court that her treatment in the Louisiana facility is inadequate. She is suffering from severe asthma attacks and is not provided appropriate medication. Her place of detention is reportedly overcrowded and unsanitary. Her religious needs are not being addressed. The Court takes these issues into consideration when determining the necessity and equities of a transfer.

As discussed previously, the Second Circuit has recognized the "equitable and flexible nature of habeas relief." *Velasco Lopez*, 978 F.3d at 855. The Supreme Court has held that the "exercise of a court's equity powers . . . must be made on a case-by-case basis." *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964). The "flexibility" inherent in "equitable procedure" enables courts "to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944). The Court also has the inherent authority and responsibility to protect the integrity of its proceedings which were undoubtedly impacted when Ms. Ozturk was transferred to Louisiana. *See Degen v. United States*,

517 U.S. 820, 823 (1996) ("Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities.").

Here, the Court finds that the equities strongly favor Ms. Ozturk's transfer to Vermont. Such transfer will expedite resolution of this matter, provide Ms. Ozturk ready access to legal and medical services, and address concerns about the conditions of her confinement. The Court further finds that a transfer to Vermont will not prejudice the government's removal proceedings, as she may participate in those remotely. The Court plans to proceed to resolution of the habeas petition quickly, and it is essential that Ms. Ozturk be a full participant in the process. Should her petition be denied, the government will have discretion over her place of confinement. Accordingly, pursuant to its inherent equitable power, as well its power under the All Writs Act, the Court orders Ms. Ozturk's transfer as set forth below. *See* 28 U.S.C. § 1651(a) (empowering courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law").

**B. Ms. Ozturk's Return to Vermont Will Give Effect to the District of Massachusetts Court's Order Preserving the Status Quo**

The United States District Court for the District of Massachusetts issued a valid order in this case at approximately 10:55 p.m. on March 25, 2025. The order was transmitted to the government immediately, both formally by the court and by Ms. Ozturk's attorney. ECF No. 26-2 at 3. The order had been issued by the court within an hour of Ms. Ozturk's attorney filing the initial habeas petition.

The purpose of the District of Massachusetts' order was to "order respondent to preserve the status quo." ECF No. 3 at 2. The order had immediate effect and required that "petitioner shall not be moved outside the District of Massachusetts without first providing advance notice of the intended move." Moreover, the court clearly understood that Ms. Ozturk's physical location was critical to the court's jurisdiction. The court noted that the order was intended to preserve its ability "to consider whether it has subject-matter jurisdiction," and would be "valid unless and until it is overturned." *Id.* The court further clarified that the motivation for the order was the court's recognition that "the action the court enjoins," i.e., Ms. Ozturk's movement out of the state by the government, "would otherwise destroy its jurisdiction or moot the case." *Id.*

The government apparently did not take any immediate steps to comply with the order or to communicate with the court to ascertain the court's intent. At oral argument, the government

69

was not able to say who learned about the order or when. The government's only argument to date has been that the order may have been impossible to comply with if construed literally, because by 10:55 p.m., the government had already moved Ms. Ozturk to Vermont. There is no evidence that officials in the U.S. Attorney's Office in Massachusetts who were in contact with Ms. Ozturk's attorney at the time and received the order, or indeed any other government representatives, made contact with the court to convey this perceived predicament.

Ms. Ozturk cites Second Circuit precedent stating that it is the obligation of parties receiving orders from Article III courts "to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded." *John B. Stetson Co. v. Stephen L. Stetson Co.,* 128 F.2d 981, 983 (2d Cir. 1942). *Stetson* remains good law in this Circuit, standing for the proposition that "'it is the spirit of the order, not the letter, that must be obeyed.'" *Aquavit Pharms., Inc. v. U-Bio Med, Inc.*, 2020 WL 1900502, at *6 (S.D.N.Y. Apr. 17, 2020) (quoting *Titra California, Inc. v. Titra Film*, 2001 WL 1382587, at *5 (S.D.N.Y. Nov. 6, 2001)); *see also Salazar v. Buono*, 559 U.S. 700, 762 (2010) (Breyer, J. dissenting) (citing *Stetson* for proposition that courts have long looked to the intent of granted injunctive relief when

70

assessing compliance). The Court agrees that it is appropriate to consider whether parties have complied with the spirit of an injunction, where that spirit is readily discernible from an order.

There is no question here that the District of Massachusetts intended to preserve the status quo of Ms. Ozturk's whereabouts while it assessed its jurisdiction to consider the case. The government of course had already moved Ms. Ozturk out of state, so that jurisdictional analysis may have still resulted in the case being heard before this Court. Nevertheless, the Court holds that after receipt of the order, the government had an obligation to consider the intent of the order, even if literal compliance with the order was impossible. Ms. Ozturk has offered alternative potential actions that the government could have taken upon receipt of the order, in lieu of ignoring it entirely. ECF No. 82-1 at 22-23. At minimum, the government should have informed the issuing court in a timely fashion that compliance with the order was not literally possible and sought out clarification. Informing the District of Massachusetts would have allowed for that court to make any necessary modifications to either its order or its determination of its jurisdiction. Ignoring an order, particularly one issued on an emergency basis in response to events that are currently

unfolding, is not the approach the Court expects from the government.

The remedy for the government ignoring the March 25, 2025, order is simple. Ms. Ozturk should be returned to the status quo at the time of issuance when she was in custody in the District of Vermont. This equitable relief, ordered under this Court's inherent habeas power, will give proximate effect to the District of Massachusetts's order without disadvantaging the government. Giving effect to the spirit of the District of Massachusetts' order is also necessary to ensure continued respect for orders issued by Article III courts. "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911). The Court declines to abet a slide into mockery in this case.

## Conclusion

For the foregoing reasons, the Court concludes that this case will continue in this Court with Ms. Ozturk physically present for the remainder of the proceedings.

The Court has determined that it retains jurisdiction over Ms. Ozturk's habeas petition which shall proceed in the District

of Vermont. The petition, filed in federal district court in Massachusetts, was properly transferred to this Court. There are no technical deficiencies that prevent this Court's consideration of this petition as if it were originally filed here. Furthermore, there is nothing in the INA that categorically prevents a federal district court from reviewing a habeas petition challenging discretionary detention. Therefore, there are no jurisdictional limitations on this Court's consideration of Ms. Ozturk's habeas claims related to her detention.

Upon review of the First Amendment and Due Process claims and the evidence presented by both parties, the Court concludes that Ms. Ozturk has presented viable and serious habeas claims which warrant urgent review on the merits. The Court plans to move expeditiously to a bail hearing and final disposition of the habeas petition, as Ms. Ozturk's claims require no less.

To support the Court's resolution of these issues, the Court orders that Ms. Ozturk be physically transferred to ICE custody within the District of Vermont no later than May 1, 2025. The Court orders that a bail hearing be scheduled in this Court for May 9, 2025, with Ms. Ozturk appearing in person. Parties are ordered to brief the Court and present all evidence related to the issue of bail by May 2, 2025. A hearing on the merits of the habeas petition will be held on May 22, 2025. The

Court stays the effect of this order for four days to allow either party to appeal this order.

DATED at Burlington, in the District of Vermont, this 18th day of April 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge