UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RUMEYSA OZTURK,                    )
                                  )
          Petitioner,             )
                                  )
     v.                           )    Case No. 2:25-cv-374
                                  )
DONALD J. TRUMP, in his           )
official capacity as              )
President of the United           )
States; PATRICIA HYDE, in her     )
official capacity as the New      )
England Field Director for        )
U.S. Immigration and Customs      )
Enforcement; MICHAEL KROL, in     )
his official capacity as HSI      )
New England Special Agent in      )
Charge, U.S. Immigration and      )
Customs Enforcement; TODD         )
LYONS, in his official            )
capacity as Acting Director,      )
U.S. Immigration and Customs      )
Enforcement; KRISTI NOEM, in      )
her official capacity as          )
Secretary of the United           )
States Department of              )
Homeland Security; and MARCO      )
RUBIO, in his official            )
capacity as Secretary of          )
State,                            )
                                  )
          Respondents.            )

## OPINION AND ORDER

On April 10, 2025, Petitioner Rumeysa Ozturk filed a Motion
for Release pending the adjudication of her habeas corpus
petition, as governed by *Mapp v. Reno,* 241 F.3d 221 (2d Cir.
2001). ECF No. 82. Respondents opposed the motion, raising
arguments about this Court's jurisdiction to consider the

underlying habeas petition and about Ms. Ozturk's ability to meet the *Mapp* standard for release on bail. ECF Nos. 83, 84, and 103. On April 18, 2025, the Court issued an Opinion and Order holding, *inter alia*, that this Court had jurisdiction to consider Ms. Ozturk's habeas petition and planned to move expeditiously to consideration of both Ms. Ozturk's motion for release and the petition itself. ECF No. 104.

On May 9, 2025, following a full bail hearing on Petitioner's motion for release under *Mapp*, the Court ruled from the bench, granting Ms. Ozturk's motion and ordering that she be released immediately from U.S. Immigration and Customs Enforcement ("ICE") custody. ECF No. 130. That Order was reiterated in part later the same day in a text Order. ECF No. 131. This Opinion supplements the May 9 Order from the bench and subsequent text Order.

## Procedural Background

On April 18, 2025, this Court issued an Opinion and Order in this case. ECF No. 104. The Court "determined that it retains jurisdiction over Ms. Ozturk's habeas petition" and found that "there are no jurisdictional limitations on this Court's habeas claims related to her detention." *Id.* at 72-73. The Court further concluded that "Ms. Ozturk has presented viable and serious habeas claims which warrant urgent review on the merits." *Id.* at 73. On April 22, 2025, the government appealed

2

the Court's Order to the United States Court of Appeals for the Second Circuit. ECF No. 105. That appeal on the merits remains pending.

The Court's April 18 Order also required the government to transfer Ms. Ozturk to ICE custody within the District of Vermont no later than May 1, 2025. On April 22, the government filed a motion to stay Ms. Ozturk's transfer to ICE custody in Vermont. ECF No. 106. On April 24, the Court denied that motion, rejecting the government's jurisdictional arguments again and finding that "the four factors from *Nken v. Holder* that the government has identified for evaluating a motion to stay . . . weigh against the government." ECF No. 109 at 2.

Later that day, the government filed an Emergency Motion with the circuit court, seeking a stay of this Court's order to return Ms. Ozturk to Vermont. Emergency Motion Pursuant to Circuit Rule 27.1(d) for Stay Pending Appeal with Relief Request by April 29, 2025, Docket No. 25-1019, ECF. No. 19. The government's argument predominately focused on the question of this Court's jurisdiction to consider Ms. Ozturk's habeas petition. Given the procedural posture of the case, the circuit court evaluated the government's jurisdictional arguments to determine whether the government was likely to succeed on the merits. On May 7, 2025, the circuit court issued an Order denying the government's motion for a stay "because the

government has not met its burden on any of the factors." *Ozturk v. Hyde*, 2025 WL 1318154, at *3 (2d Cir. May 7, 2025). Significantly, the circuit court found that the government was not likely to prevail on its arguments that this Court lacks jurisdiction over Ms. Ozturk's habeas petition. *Id.* at *4-13.

The Court has reviewed the circuit court's ruling and notes that nothing therein can be construed as denying this Court's continued jurisdiction over Ms. Ozturk's habeas petition, including the instant motion for immediate release. Indeed the circuit court acknowledged this Court's ongoing hearing schedule which included a planned bail hearing and instructed that the Court may amend its hearing schedule if necessary. *Id.* at *14. Therefore, the Court will not again consider the government's jurisdictional objections which have already been rejected by this Court and the circuit court.

On May 8, the Court held a status conference with counsel. Petitioner's counsel requested that the Court proceed with the scheduled May 9 bail hearing, with Ms. Ozturk appearing remotely if she has not yet been returned to Vermont. Government's counsel indicated that the only prejudice they may experience as a result of such hearing was "tension" between the Court's April 18 Order requiring Ms. Ozturk's return to Vermont and the circuit court's May 7 Order requiring the same by a later date. The circuit court, after requiring Ms. Ozturk's physical

4

transfer to Vermont "no later than May 14, 2025" stated that "the district court may amend its hearing schedule as it deems necessary in light of this order." *Ozturk,* 2025 WL 1318154, at *14.

In granting Ms. Ozturk's motion for return to Vermont, the Court's April 18 Order stated that "[Ms. Ozturk's] presence in the courtroom will assist the Court in determining potential bail conditions and whether release is appropriate." ECF No. 104 at 67. The circuit court similarly noted on May 7 that this Court's order was intended in part to allow Ms. Ozturk "to prepare for and attend her bail and habeas petition." *Ozturk,* 2025 WL 1318154, at *13. However, on May 8, Ms. Ozturk waived her request for in-person appearance at her bail hearing to avoid further delay, particularly in light of her ongoing and worsening medical conditions, discussed below. The government meanwhile did not argue any other prejudice from a remote appearance by Ms. Ozturk. The circuit court required the government to return Ms. Ozturk "by" May 14, but the government was of course free to transport Ms. Ozturk back to Vermont sooner. In light of Ms. Ozturk's waiver of her in-person appearance at her bail hearing, and no concrete prejudice to the government from Ms. Ozturk's remote appearance, the Court determined it was appropriate to proceed with a bail hearing on May 9, 2025.

Before this Court was consideration of the merits of Ms. Ozturk's petition for release under *Mapp*.

### Factual Background

The facts of this case were largely set forth in the Court's prior Opinion and Order issued April 18, 2025 and again by the circuit court in its ruling issued May 7, 2025. This Court assumes familiarity with those facts.

Briefly stated, the case arises from the arrest and detention of Ms. Ozturk, a Turkish student who entered the United States lawfully pursuant to a valid F-1 student visa and has been engaged in doctoral studies in Child Study and Human Development at Tufts University. At approximately 5:25 p.m. on March 25, 2025, while walking near her residence in Somerville, Massachusetts, Ms. Ozturk was arrested without warning by a group of armed, plainclothes law enforcement officers, some of whom were masked. The officers immediately handcuffed her and led to her to an unmarked vehicle. Ms. Ozturk had not been notified of her visa revocation or imminent arrest.

Over the course of the next few hours, she was transported to an office in Methuen, Massachusetts, then to Lebanon, New Hampshire, and ultimately to an ICE Field Office in St. Albans, Vermont. Early the following morning, ICE transported Ms. Ozturk from Vermont to a detention facility in Basile, Louisiana, where she remained in ICE custody for over six weeks.

6

To date, the only basis offered by the government to justify Ms. Ozturk's arrest is an assessment by the Department of Homeland Security ("DHS") and ICE that she "had been involved in associations that 'may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization' including co-authoring an op-ed that found common cause with an organization that was later temporarily banned from campus." ECF No. 91 at 6. The "op-ed" in question, co-authored by Ms. Ozturk and three other Tufts students, criticized the University's response to three resolutions passed by the Tufts Community Union Senate and asked the University to "acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments and divest from companies with direct or indirect ties to Israel." ECF No. 123 at 6. In an April 1, 2025, declaration, Tufts University President Kumar attested that Ms. Ozturk's co-authored op-ed "was not in violation of any Tufts policies" and that "no complaints were filed with the University or, to our knowledge, outside of the University about this op-ed." ECF No. 26-1 at 67. President Kumar further noted that the same newspaper also published other "op-eds on multiple sides of the issue with opinions that were shared just as strongly as the op-ed Ms. Ozturk co-authored." *Id.*

Ms. Ozturk was not informed, prior to her arrest, that DHS and ICE were pursuing visa revocation or that the revocation had occurred. In fact, a memo from the Bureau of Consular Affairs required that the revocation "be silent; the Department of State will not notify the subject of the revocation." ECF No. 91-1 at 6. With respect to Ms. Ozturk's movements immediately post-arrest, her counsel has submitted affidavits from experienced immigration attorneys stating that such successive transfers, particularly to those locations, were highly unusual. *See, e.g.,* ECF No. 82-3 at 4 ("In my 16 years of practice, I have not seen or even heard of an ICE detainee arrested in Massachusetts being booked and repeatedly moved in the manner described in that declaration."). And as to her detention generally, other immigration practitioners have opined that detention in a case such as this – involving revocation of an F-1 visa and termination of a SEVIS record – is equally unusual. *See, e.g.,* ECF Nos. 122-4 at 5; 122-5 at 4.

Ms. Ozturk reported poor treatment and unsanitary conditions during her detention in Louisiana. Several of her concerns pertained to her health. Ms. Ozturk suffers from asthma, which requires daily medication. ECF No. 82-10 at 4. Prior to her arrest, she had suffered approximately 13 asthma attacks in her life, commonly lasting between 5 and 15 minutes. *Id.* She informed the Court on May 2 that since her arrest, she

had suffered at least 8 additional attacks lasting anywhere from 5-45 minutes. ECF No. 122-9 at 3. She is concerned about the severity of the attacks and her ability to manage them. *Id.* When not incarcerated, Ms. Ozturk is more able to control her environment and avoid exposure to triggers. *Id.* at 4.

Ms. Ozturk also reported poor medical care at the facility. For example, she was allegedly told that an asthma attack was "all in her head," and her questions to a doctor were belittled. *Id.* at 7. She witnessed other women experience significant delays in receiving care. A physician who reviewed Ms. Ozturk's medical history and spoke to her recently believes, in her professional opinion, that if not released Ms. Ozturk would be at risk for progressive symptoms, worsening disease control, and perhaps even "potentially fatal asthma exacerbation." ECF No. 122-10 at 8.

Stress is one of Ms. Ozturk's asthma triggers, and she attested that her time in detention has been stressful. Officers at the facility were allegedly not responsive to detainee concerns and were verbally abusive. *Id.* at 10. Ms. Ozturk had difficulty sleeping due to loud noises and constant lighting throughout the night. *Id.* at 10-11. Poor food quality was also an issue. *Id.* at 11. From the outset, Ms. Ozturk reported that cells were overcrowded, hygiene supplies were inadequate, and

that she was not provided certain religious materials. ECF No. 82-10 at 6-7.

Ms. Ozturk's counsel has provided the Court with numerous letters of support which attest to Ms. Ozturk's qualities as a person. Representative examples describe her as "compassionate," "service-minded," "conscientious," "gentle" and "caring." *See* ECF No. 90 at 6, 9, 14, 52. Nothing in the record suggests otherwise.

Going forward, the Dean of the Graduate School of Arts and Sciences at Tufts informs the Court that Ms. Ozturk will have several sources of income this coming summer as a result of her teaching and research and that the University will be able to provide her with housing. ECF No. 122-7 at 3. The Court also received a Declaration from personnel at the Burlington Community Justice Center, which was ready and willing to provide pre-trial services to Ms. Ozturk upon her release. ECF No. 122-8 at 3. Ms. Ozturk reported that within the Tufts community she has a core group of close friends, as well as a larger group of friends and colleagues to which she will be returning.

On May 9, 2025, the Court heard testimony from Ms. Ozturk. The testimony from Ms. Ozturk confirmed the nature of her academic work, her ties to her community in Massachusetts, her desire to return to her academic studies, and the continued decline of her health. Ms. Ozturk reported that since the

10

submission of her last court filing on May 2, she had
experienced 4 additional asthma attacks. And as a witness
testified at the bail hearing, Ms. Ozturk appeared to suffer
another asthma attack and was temporarily excused from the
hearing to obtain her inhaler.

The Court also heard testimony from three witnesses who had
previously submitted sworn affidavits. Testimony from the
physician who had consulted with Ms. Ozturk remotely and
reviewed her medical records expanded on the serious risk of Ms.
Ozturk's worsening asthma without proper management and
treatment. Testimony from Ms. Ozturk's primary academic advisor
reiterated Ms. Ozturk's strong ties to her community and her
generous and compassionate character, as well as the potential
negative academic and professional consequences of continued
detention. Finally, testimony from an official with the
Burlington Community Justice Center reiterated that
organization's ability to provide supervision and support
services for Ms. Ozturk if she were released.

## **Discussion**

Ms. Ozturk requested release from custody pending
resolution of her habeas petition. Ms. Ozturk argued that the
Court has the inherent authority to order such a release,
subject to the analysis in *Mapp v. Reno*. 241 F.3d 221 (2d Cir.
2001). The government countered that the Court lacks authority

11

to consider release because of various jurisdictional bars, ECF
No. 84 at 1-6, but the government otherwise acknowledged that if
the Court did have such authority, *Mapp* is likely the
controlling standard. *Id.* at 1-2. As previously discussed,
following the circuit court's May 7 Opinion the Court will not
reconsider its April 18 jurisdictional determinations at this
time. The Court has the authority to grant release pending the
adjudication of Ms. Ozturk's habeas petition. Therefore, the
only question before the Court was whether Ms. Ozturk's release
is appropriate under a *Mapp* analysis.

   *Mapp v. Reno* established the controlling bail standard: "a
court considering a habeas petitioner's fitness for bail must
inquire into whether the habeas petition raises substantial
claims and whether extraordinary circumstances exist that make
the grant of bail necessary to make the habeas remedy
effective." 241 F.3d at 230 (cleaned up). Sibling courts have
typically interpreted this standard to require three findings.
*See, e.g.,* *Mahdawi v. Trump*, 2025 WL 1243135, at *8-14 (D. Vt.
Apr. 30, 2025). The Court must find (1) substantial claims, (2)
extraordinary circumstances, and (3) grant of bail is necessary
to make the habeas remedy effective. *Id.* (applying *Mapp).* The
*Mapp* court noted that this standard is "difficult," and the
burden falls on the petitioner to make the necessary
demonstrations. 241 F.3d at 226.

Though not explicitly a part of the *Mapp* standard, it is also appropriate for the Court to consider whether the petitioner is a risk of flight or a danger to the community. *Id* at 244 (noting that the district court had ordered release after finding that petitioner was not a serious flight risk or threat to the community.); *see also Black v. Decker*, 103 F.4th 133, 157 (2d Cir. 2024) ("Both sections 1226(a) and (c) aim to prevent flight and danger to the community."); *Velasco Lopez v. Decker*, 978 F.3d 842, 857 (2d Cir. 2020) ("The Government . . . has no interest in the continued incarceration of an individual who it cannot show to be either a flight risk or a danger to his community.")

In the April 18 Opinion, the Court instructed the parties to submit briefing and evidence related to bail by May 2, 2025. On May 2, Ms. Ozturk filed a supplemental memorandum and evidence with the Court. ECF No. 122. The government did not file additional briefing or evidence. At the May 9 bail hearing, the government maintained that its objections to Ms. Ozturk's release were primarily related to the Court's jurisdiction, and the government wished to preserve those arguments for any potential appeal. The government did raise arguments related to conditions of release, on which the Court subsequently ordered further briefing. *See* ECF Nos. 130, 131. But the government did not make substantive arguments in relation to the *Mapp* factors.

The Court therefore considered the government's substantive opposition to Ms. Ozturk's bail from its April 10, 2025, briefing. ECF No. 84.

For the reasons below, the Court found that Ms. Ozturk has made the necessary demonstrations under *Mapp*, and the Court further found that she does not pose a risk of flight or danger to the community. Therefore, release was appropriate.

## I.   Substantial Claims

Ms. Ozturk has raised two primary constitutional claims related to her arrest and detention.[1] Ms. Ozturk argued that the government's actions have violated her First Amendment right to free speech and association. She further argued that her arrest and detention were intended to be, and actually are, punitive in violation of her Fifth Amendment due process rights. A detailed summary of these claims and the Court's analytic framework was outlined in the April 18 Opinion. On May 9, the Court found that Ms. Ozturk's habeas petition raised substantial claims of both violations.

### a. First Amendment

As a threshold matter, the Court's April 18 Opinion stated that "in the absence of additional information from the

---

[1] Ms. Ozturk also raised claims based on the Administrative Procedure Act and the *Accardi* doctrine. ECF No. 82-1 at 14. Thus far it has not been necessary for the Court to evaluate those claims as litigation has proceeded on other grounds.

government, the Court's habeas review is likely to conclude that Ms. Ozturk has presented a substantial claim." ECF No. 104 at 57-58. Specifically, the Court took note of Secretary Rubio's public statements seemingly offering to make presentations in court to justify Ms. Ozturk's detention, *id.* at 50, and the Court invited an immediate submission of any relevant evidence. *Id.* at 57. No such submission has been received by this Court. In its absence, the Court concluded that Ms. Ozturk has presented a substantial First Amendment claim.

To briefly summarize, Ms. Ozturk has argued that her arrest and detention are retaliation for her co-authorship of an op-ed in a student newspaper. The government has identified her op-ed, and potentially related associations, as the precipitating factor for her visa revocation. *Id.* at 9 (quoting a State Department memorandum revoking her visa). As the Court cited in its April 18, 2025, Opinion and Order, then-candidate Trump reportedly threatened to deport foreign students involved in campus protests. *Id.* at 49. And Secretary of State Marco Rubio, in response to press inquiries about Ms. Ozturk's arrest, opined that Ms. Ozturk's activities "meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States" and that detention was "basically asking them to leave the country." *Id.*

Arrest and detention, let alone termination of status, are not a natural consequence of visa revocation. Ms. Ozturk has presented credible evidence to show that similarly situated individuals historically have not been detained following visa revocation or termination of status. ECF No. 122 at 8 (summarizing submitted declarations from attorneys with considerable experience with student visas).

To date, the government has neither rebutted the argument that retaliation for Ms. Ozturk's op-ed was the motivation for her detention nor identified another specific reason for Ms. Ozturk's detention, arguing instead that such decisions are committed to the discretion of the executive branch. ECF No. 84 at 5. While it is uncontested that the government has discretion in this area, that discretion is not accompanied by the authority to violate the Constitution.

The Court need not decide at this stage whether Ms. Ozturk's detention actually constitutes a First Amendment violation. As the April 18 opinion established, Ms. Ozturk's op-ed carries all the hallmarks of protected speech on public issues, and it does not fall into any recognized exception. ECF No. 104 at 52-55. A First Amendment retaliation claim requires showing a causal connection between protected speech by Ms. Ozturk and adverse action by the government. *Id*. at 55 (quoting *Demarest v. Town of Underhill*, 2025 WL 88417, at *2 (2d Cir.

16

2025). The record before this Court shows that the only speech
at issue is Ms. Ozturk's op-ed, and her arrest and detention
clearly constitute adverse action. On April 18, the Court
offered the government the opportunity to rebut Ms. Ozturk's
evidence showing that her op-ed is the but-for cause of her
detention. ECF No. 104 at 56-58. The government has not done so.
Meanwhile, Ms. Ozturk has introduced significant evidence
demonstrating the irregular nature of the government's actions.
ECF No. 122 at 8. The Court therefore concluded that Ms. Ozturk
has presented, at the very least, a substantial claim of a First
Amendment violation.[2]

---

[2] The Court previously posited that the test for First Amendment
retaliation claims may be open to debate after *Nieves v.
Bartlett*, 587 U.S. 391 (2019). ECF No. 104 at 55-56. Petitioner
subsequently argued that *Nieves* was inapposite in the habeas
context and *Mt. Healthy Sch. Dist. Bd. Of Educ. v. Doyle*, 429
U.S. 274 (1977) should govern the Court's inquiry, while
Respondents provided no argument. The Court finds that Ms.
Ozturk has presented a substantial claim at this stage no matter
the applicable test. The Court invites further briefing on the
appropriate standard for First Amendment retaliation claims in
civil immigration habeas proceedings prior to final disposition.
In addition, the Court notes that a court in the District of
Massachusetts recently found that plaintiffs in that case
"plausibly alleged the existence of both an ideological-
deportation policy targeting protected political speech and a
more informal campaign of censorship through threats." *Am. Ass'n
of Univ. Professors v. Rubio*, 2025 WL 1235084, at *20 (D. Mass.
Apr. 29, 2025). The Court invites briefing on whether the
potential existence of such a policy would instead implicate the
First Amendment retaliation test in *Lozman v. Riviera Beach*, 585
U.S. 87 (2018). Finally, the Court notes that, in similar
litigation proceeding in other courts, the government has argued
that non-citizens may not share the First Amendment protections
of citizens, *Bridges v. Wixon* notwithstanding. *See, e.g.,*

**b. Due Process**

In its April 18 Opinion, the Court stated, "Where a detainee presents evidence that her detention, though discretionary, is motivated by unconstitutional purposes in violation of the Due Process Clause, the Court may reasonably conclude the same in the absence of countervailing evidence." ECF No. 104 at 62. The Court invited the government to rebut Ms. Ozturk's claims of an improper, punitive motivation for her detention, but the Court has received no such evidence. Therefore, on May 9 the Court concluded that Ms. Ozturk has presented a substantial claim of a due process violation by the government.

Civil detention by the government of individuals like Ms. Ozturk who are undergoing removal proceedings is authorized by Congress in 8 U.S.C. § 1226(a). The government has argued that such detention is completely at the discretion of the government. ECF No. 84 at 3. However, that discretion may not be deployed for any purpose of the government's choosing. Detention is primarily permitted for two purposes: preventing danger to the community and ensuring an individual in proceedings does not abscond. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). In

---

Opposition to Motion for Release Under *Mapp v. Reno*, *Mahdawi v. Trump*, Docket No. 2:25-cv-00389, ECF No. 42 at 5. The Court invites briefing on the nature and extent of this distinction, if any, in this case's context.

contrast with criminal incarceration, civil immigration detention is not permissible for a punitive purpose. *Id.*

The government could have demonstrated that Ms. Ozturk's detention was motivated by a desire to prevent a danger to the community or a flight risk.[3] However, Ms. Ozturk has instead shown that her detention is likely motivated by improper purposes.

Ms. Ozturk argued that her detention is punishment for her op-ed, and that her punishment is intended to serve as a warning to other non-citizens who are contemplating public speech on issues of the day. The Court found that Ms. Ozturk has presented credible evidence to support her argument, including her own testimony describing her terror during her irregular arrest, statements by the Secretary of State describing the purpose of the government's actions, sworn declarations from immigration attorneys attesting to the unusual nature of Ms. Ozturk's case, and a sworn declaration from the Tufts University president describing the resulting climate of fear among the international members of the school community. The Court need not conclude at this stage that Ms. Ozturk's arrest and detention are actually punitive in violation of her due process rights. However, for

---

[3] An immigration judge's finding at a bond hearing are discussed below. For this analysis, the Court notes only that the immigration judge's determination did not precede detention.

the purpose of *Mapp,* the Court found that Ms. Ozturk has demonstrated a substantial claim of a violation of due process.

## II. Extraordinary Circumstances

*Mapp* requires that the court find "extraordinary circumstances" before granting bail. Extraordinary circumstances are evident across multiple dimensions of this case.

First, the Court considered the unusual sequence of events that led to Ms. Ozturk's present detention in Louisiana. Not only was Ms. Ozturk arrested and transported out of Massachusetts in a striking manner, but she was further flown to Louisiana despite a court order issued on an emergency basis by a federal court in Massachusetts which was intended to preserve the status quo. ECF No. 104 at 68-72. This Court previously criticized the government's response to the order issued on the evening of Ms. Ozturk's arrest, *id.*, and ordered Ms. Ozturk's return to Vermont "in part to effectuate the district court in Massachusetts's order, returning Ozturk to the status quo at the time of issuance and in part to ensure continued respect for orders issued by Article III courts." *Ozturk v. Hyde*, 2025 WL 1318154, at *14 (2d Cir. May 7, 2025) (cleaned up). The reviewing circuit court determined that "equity favors such a determination." *Id.* Needless to say, it is an extraordinary circumstance when an individual is transported across the country despite a court order.

20

Second, the facts underlying Ms. Ozturk's substantial claims present an extraordinary circumstance. The government has not claimed that Ms. Ozturk violated any civil or criminal laws requiring her removal from the country. Instead, a year after Ms. Ozturk co-authored an op-ed in a campus newspaper, the government seemingly discovered the op-ed and exercised its discretion to revoke Ms. Ozturk's student visa, and then took further steps to terminate her status, arrest, and detain her. ECF No. 83 at 21, n. 5. In defense of these actions, the government has not provided anything beyond Ms. Ozturk's political speech. As Judge Crawford recently explained in a similar case, these are not unprecedented actions by the government, but they are nonetheless extraordinary. *Mahdawi*, 2025 WL 1243135, at *12-13.

Finally, Ms. Ozturk's declining health in custody provides another basis for finding extraordinary circumstances. The Court received testimony and affidavits expressing concern about Ms. Ozturk's conditions of confinement which appeared to be exacerbating her underlying medical conditions. The Court takes seriously the testifying physician's warning that Ms. Ozturk's asthma could be life-threatening if not properly managed. Therefore, Ms. Ozturk's health now constitutes an additional extraordinary circumstance which warranted immediate release.

### III. Necessary to Make the Habeas Remedy Effective

Ms. Ozturk has spent over six weeks in detention, and she has established substantial claims that her detention is unconstitutional. Her release is now necessary as the Court continues to consider the merits of her habeas petition.

The evidence before the Court showed that Ms. Ozturk's health has declined precipitously over the last six weeks, and she is at risk for needing emergency medical care, which may be difficult to obtain in detention. Her detention also had a negative impact on her academic, professional, and personal life, as has been established by voluminous affidavits and testimony. "When the Government incarcerates individuals it cannot show to be a poor bail risk . . . it separates families and removes from the community breadwinners, caregivers, parents, siblings and employees. The Government articulates no public interest that any of this serves and we see none." *Velasco Lopez,* 978 F.3d at 855.

Ms. Ozturk's detention necessarily constitutes an infringement of her First Amendment rights and her right to liberty. While such an infringement may be justified if the government presented a legitimate purpose for it, *see Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125 (1977), the government has not done so in this case. If the Court later finds that Ms. Ozturk's substantial claims are in

fact proven claims, her detention will have been an
unconstitutional deprivation with no public purpose or benefit.
Meanwhile, Ms. Ozturk's continued detention restricts her
ability to speak freely and potentially chills the speech of
other non-citizens. For all these reasons, the Court found that
bail was necessary to make the habeas remedy effective.

## IV. Risk of Flight and Danger to the Community

The Court found that Ms. Ozturk has presented substantial
claims and that extraordinary circumstances make the grant of
bail necessary for the habeas remedy to be effective. As is
customary in bail considerations, the Court continued on to
consider whether the detainee presents a risk of flight or
danger to the community which may make release inappropriate.
The Court considered the totality of evidence presented and
found that Ms. Ozturk does not pose a risk of flight or a danger
to the community.

The Court is aware that on April 16, 2025, an immigration
judge in Louisiana denied Ms. Ozturk's request for a change in
custody status and provided "Danger and Flight Risk" as the
rationale. ECF No. 101-1 at 4. The Court does not here, as the
government has argued, conduct "improper judicial review of a
bail determination" of the immigration judge. ECF No. 84 at 3.
The Court instead considers the immigration judge's finding as
potential evidence in the government's favor. In the April 18

Opinion, the Court took notice of that finding, which was supplied to the Court by Ms. Ozturk, as well as DHS's reported contention at immigration judge's bond hearing that Ms. Ozturk posed a flight risk. ECF 104 at 61-62. The Court further invited the government to submit evidence supporting that determination to the record in this case. *Id.* The government did not present any such evidence.

This is an Article III court. It is obligated to conduct an independent and rigorous review of the evidence that is a part of the record in this case. Immigration judges, by contrast, are executive branch employees subject to executive branch orders. The Court does not seek to disturb or set aside the immigration judge's finding—indeed if Ms. Ozturk's habeas petition is unsuccessful, she may presumably be again subject to potential discretionary detention—but neither is this Court bound by an executive branch employee's finding apparently unsupported by evidence. Such deference would obviate the purpose of habeas corpus as enshrined in the Constitution:

> In our own system the Suspension Clause is designed to protect against these cyclical abuses. The Clause protects the rights of the detained by a means consistent with the essential design of the Constitution. It ensures that, except during periods of formal suspension, the Judiciary will have a time-tested device, the writ, to maintain the delicate balance of governance that is itself the surest safeguard of liberty. The Clause protects the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account.

*Boumediene v. Bush*, 553 U.S. 723, 745 (2008) (cleaned up).

The Court is not bound by the immigration judge's analysis for an additional reason. This Court has inherent authority to grant bail in immigration habeas cases after making the necessary findings. *Mapp,* 241 F.3d at 222. In this case, those findings include substantial claims of constitutional violations, as discussed above. As the circuit court has recognized, "neither the IJ nor the BIA has jurisdiction to decide constitutional issues." *Ozturk*, 2025 WL 1318154, at *12 (2d Cir. May 7, 2025) (internal quotation omitted). In part for that reason, the circuit court was "not persuaded that an IJ or the BIA would have developed a sufficient factual record, or any record at all, with respect to the challenged *detention*[.]" *Id.* (emphasis in original). As discussed above, constitutional issues permeate this case and necessitate the grant of bail.

Both preceding and following the April 18 Opinion, the Court received significant credible evidence attesting to Ms. Ozturk's peaceful and compassionate character as well as to her ties to her university and her community. This evidence includes numerous sworn affidavits as well as testimony from Ms. Ozturk's academic advisor and Ms. Ozturk herself. This demonstration contrasts with the complete lack of evidence from the government suggesting Ms. Ozturk is a danger or at risk of flight. There is

no evidence that Ms. Ozturk has engaged in violence or advocated violence, and she has no criminal record. Nor does any of her conduct suggest a risk of flight. Instead the evidence before the court showed that Ms. Ozturk is committed to her academic career and her community. Therefore, the Court found that Ms. Ozturk does not pose a danger to the community, nor does she present a risk of flight.

Ms. Ozturk's motion for immediate release was granted at the May 9 hearing, subject to the following conditions.[4]

## V.    Conditions of Release

Ms. Ozturk was ordered to be immediately released on her own recognizance, without Body-Worn GPS. Ms. Ozturk is free to travel as she sees fit, as the Court has not found any risk of flight and Ms. Ozturk's academic career necessitates travel. Ms. Ozturk was ordered to have at least monthly contact with the Burlington Community Justice Center to monitor and support her reintegration into her community following these traumatic events. The Burlington Community Justice Center was ordered to submit a monthly report to the Court detailing Ms. Ozturk's status, activities over the previous month, and future plans.

---

[4] The government did not move for a stay of release pending appeal; however, petitioner's counsel raised the possibility in her argument. The Court found that a stay would not be appropriate under *Nken v. Holder*, 556 U.S. 418 (2009), because all four factors weigh in favor of Ms. Ozturk.

Government's counsel requested additional conditions of release that are common for immigration detainees who have been granted bail. The Court instructed both parties to confer and attempt to find consensus on modest additional conditions and submit a proposal to the Court.

## Conclusion

For the reasons above, Ms. Ozturk was ordered immediately released at her bail hearing on May 9, 2025, pending the resolution of her habeas petition.

The Court found that Ms. Ozturk demonstrated substantial claims of First Amendment and Due Process Clause violations related to her detention. At this stage in the proceedings, there is no evidence to support Ms. Ozturk's continued detention absent consideration of her op-ed. Her substantial claims, which have been largely unrebutted by the government, are that her detention is retaliation for her op-ed in a school newspaper and that her detention is punitive, in part to serve as a message to others contemplating similar speech.

The Court found that extraordinary conditions exist in this case. In particular, the government's actions in ignoring a court order while arresting and transporting her to Louisiana constitute extraordinary circumstances. Further, extraordinary circumstances exist given the nature and strength of Ms.

Ozturk's constitutional claims and her demonstration that her detention exacerbated an underlying medical condition.

The Court found that immediate release was necessary to make the habeas remedy effective. As demonstrated by testimony and affidavits, continued detention may have potentially severe consequences for Ms. Ozturk's health. Immediate release was also necessary to ameliorate the chilling effect that Ms. Ozturk's arguably unconstitutional detention may have on non-citizens present in the country.

Finally, the Court found that Ms. Ozturk does not present a danger to the community or a risk of flight. This Article III Court was obligated to conduct an independent, rigorous review of all evidence presented, and the Court concluded that Ms. Ozturk is a cherished member of her community who exhibits a caring and compassionate character. On those bases, Ms. Ozturk's immediate release was warranted, and Ms. Ozturk's motion for release, ECF No. 82, was granted.

DATED at Burlington, in the District of Vermont, this 16th day of May 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge